## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *ex rel.* BRIAN D. HOLBROOK, | Civil Action No. *11- 4732 (wjm)* |
| Plaintiff, | |
| v. | |
| THE BRINK'S COMPANY, BRINK'S, INCORPORATED, JACKSON METALS LLC, and WALTER LUHRMAN, | **COMPLAINT FILED UNDER SEAL UNDER 31 U.S.C. § 3730(b)(2)** |
| Defendants. | |

On behalf of the United States of America, Plaintiff and Relator Brian D. Holbrook ("Mr. Holbrook" or "Relator") files this *qui tam* complaint against Defendants The Brink's Company, Brink's, Incorporated (collectively "Brink's"), Jackson Metals LLC ("Jackson Metals"), and Walter Luhrman ("Luhrman") (collectively "Defendants") and alleges as follows:

### I.       INTRODUCTION

1.       This is a *qui tam* action by Relator, for himself and on behalf of the United States of America, to recover treble damages and civil penalties arising from the Defendants' actions in violating the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, (the "FCA" or the "Act"). As set forth below, Defendants have committed unlawful practices that include conspiring to defraud the United States Government, including the Federal Reserve Banks, the United States Mint, and the United States Treasury.

2.       The United States Government entrusts billions of dollars to Brink's, the primary company providing security-related services for the Government's currency and coins, including through Coin Terminal Agreements with Federal Reserve Banks (the "Federal Reserve").

Brink's publicly holds itself out as "the world's premier provider of secure transportation and cash management services." Brink's represents to the Federal Reserve (for which it has provided services since 1932) that it is a trusted partner that protects and secures the funds placed in its vaults and armored vehicles. Indeed, Brink's proudly advertises that "[i]t is a fact that since 1859 no one has ever lost a single penny by entrusting their valuables to any Brink's affiliated company."

3.     Contrary to its agreements with and representations to the Government, Brink's engaged in a secret agreement with Jackson Metals and Luhrman to extract value from Federal Reserve-owned coins that were entrusted to Brink's care. As part of this scheme, Defendants sorted through the Federal Reserve's pennies to convert for their own use the more valuable pennies minted in 1992 and earlier, which contain 95% copper and 5% zinc ("brass"), and replace them with newer pennies, which contain 97.5% zinc and only 2.5% copper ("copper-plated zinc"), without disclosing to the Government any of this conduct. In doing so, Defendants clearly violated the Act by knowingly delivering or causing to be delivered less than all of the Government's property, and knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to transmit property to the Government.

4.     Based on the terms of the Coin Terminal Agreement with the Federal Reserve Bank of Cleveland, entered into in or around September 2000, Brink's was contractually required to securely store Federal Reserve-owned coin transported to Brink's facility from (i) a Federal Reserve Bank, (ii) the United States Mint, or (iii) as directed by the Federal Reserve, from a depository financial institution ("DFI"), which may also be a Brink's customer.

2

5.     Instead of securely storing the coin, Brink's exchanged truckloads of pennies with Luhrman and Jackson Metals in exchange for money and free transportation so that Jackson Metals could benefit by culling the pennies for those with high copper content.

6.     By virtue of these actions, Brink's converted the value of the pennies for their benefit and the benefit of Luhrman and Jackson Metals, Brink's breached the explicit terms of the Coin Terminal Agreement by failing to secure the Federal Reserve's property, and Brink's knowingly concealed or misrepresented these facts that were material to Brink's obligation to transmit property to the Government.

7.     The Brink's Defendants have failed to comply with statutes, regulations, and contractual requirements material to their ability to maintain their contracts with the Federal Reserve Banks.

8.     Under the Act, Relator seeks to recover, on behalf of the United States of America, damages and civil penalties arising from Defendants' actions in violating the False Claims Act, 31 U.S.C. §§ 3729, *et seq*.

## II.     JURISDICTION AND VENUE

9.     The Court has subject-matter jurisdiction to entertain this action under 28 U.S.C. §§ 1331 and 1345. The Court may exercise personal jurisdiction over the Defendants under 31 U.S.C. § 3732(a).

10.     Venue is proper in the District of New Jersey under 31 U.S.C. §§ 3732 and 28 U.S.C. §§ 1391(b) and (c) because the Defendants transact business in this District.

11.     In accordance with 31 U.S.C. § 3730(b)(2), this Complaint has been filed *in camera* and will remain under seal for a period of at least 60 days and shall not be served on the Defendants until the Court so orders.

3

12.     Under 31 U.S.C. § 3730(b)(2), Relator must provide the Government with a copy of the Complaint and/or a written disclosure of substantially all material evidence and material information in his possession contemporaneous with the filing of the Complaint. Relator has complied with this provision by serving copies of this Complaint upon the Honorable Paul J. Fishman, United States Attorney for the District of New Jersey, and upon the Honorable Eric H. Holder, Jr., Attorney General of the United States.

13.     Relator is not aware that the allegations in this Complaint have been publicly disclosed. Further, to the extent Relator is aware of any public disclosures, this Complaint is not based on such public disclosures. In any event, this Court has jurisdiction under 31 U.S.C. § 3730(e)(4) because the Relator is an "original source" because he has provided his information voluntarily to the Government before filing this Complaint, and has knowledge that is both direct and independent of any public disclosures to the extent they may exist.

### III.     THE PARTIES

14.     Relator Brian D. Holbrook is a former Brink's employee and a resident of Parma Heights, Ohio.

15.     From August 27, 1996 through December 4, 2007, Mr. Holbrook worked for Brink's, Incorporated in Cleveland, Ohio. Mr. Holbrook was employed in various positions at Brink's from 1996 until 2003.

16.     Between 2000 and 2003, Mr. Holbrook worked as an internal auditor and was responsible for counting currency and coin inventory that he then reconciled with the inventory of the Federal Reserve and commercial banks.

17.     Mr. Holbrook served as the Branch Manager of the Cleveland Coin Branch from April 1, 2003 until his termination on December 4, 2007. As Branch Manager, Mr. Holbrook

administered a $2.9 million annual budget in a 117,000-square-foot coin-processing facility of 23 employees. He controlled depository accounts and supervised administrative functions for the Federal Reserve Bank and all major Ohio financial institutions. Mr. Holbrook also reconciled the vault inventory with off-site locations, performed daily vault audits, tabulated shipments and receipts, and reported consolidated balances to customers. In addition, Mr. Holbrook prepared and sent monthly financial reports for management that documented variances as compared to the budget.

18.     Defendant The Brink's Company is a Delaware corporation, with its principal place of business in Richmond, Virginia, and operates Brink's, Incorporated. The Brink's Company is a leading world-wide provider of security-related services to financial institutions, retailers, government agencies, mints, and other commercial operations, which generated 2009 revenues of over $3.1 billion.

19.     Defendant Brink's, Incorporated is a Delaware corporation, with its headquarters located in Coppell, Texas. Brink's, Incorporated is a wholly owned subsidiary of The Brink's Company with branch offices throughout the country, including in Newark, New Jersey and Cleveland, Ohio.

20.     Defendant Brink's U.S. is a division of Brink's, Incorporated. Brink's U.S. is the largest provider of coin-processing services and has developed proprietary technology such as its "Supersorters" coin-sorting-and-counting machine.

21.     At Brink's Coin Branch facilities, it is engaged in the business of sorting, counting, wrapping, and storing coin for a variety of customers, including the Federal Reserve Banks.

22.     Defendant Walter Luhrman is a resident of Jackson, Ohio.  Luhrman is a metallurgist and the owner and President of Jackson Metals.

23.     Defendant Jackson Metals LLC is an Ohio Limited Liability Company, with its principal place of business in Jackson, Ohio. Jackson Metals is a wholesale metal buyer that possesses specialized machinery that can rapidly cull brass pennies, with the high copper content, from more recent copper-plated zinc pennies, with the purpose of melting them for their copper and returning the copper-plated zinc pennies into circulation. This same machinery is also used to cull other coins for their metals, such as Canadian five-cent coins.

## IV.     GOVERNING LAWS, REGULATIONS, AND CODES OF CONDUCT

### A.     The False Claims Act.

24.     Originally enacted in 1863, the Act was substantially amended in 1986 by the False Claims Amendments Act. The 1986 amendments enhanced the Government's ability to recover losses sustained as a result of fraud against the United States. Further clarifying amendments were adopted in May 2009.

25.     The Act imposes liability upon any person who "has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property"; or "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government"; or "conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)." 31 U.S.C. §§ 3729(a)(1)(C), (D), (G). Any person found to have violated these provisions is liable for a civil penalty of up to $11,000 for each such act, plus three times the amount of the damages sustained by the Government.

6

26.     Significantly, the Act imposes liability where the conduct is merely "in reckless disregard of the truth or falsity of the information" and further clarifies that "no proof of specific intent to defraud" is required. 31 U.S.C. § 3729(b)(1).

27.     The Act empowers private persons to bring an action on behalf of the Government and to share in any recovery. The complaint must be filed under seal without service on any Defendant. The complaint remains under seal while the Government conducts an investigation of the allegations in the complaint and determines whether to intervene in the action. 31 U.S.C. § 3730(b).

28.     In this action, the Defendants failed to comply with and conspired to violate statutes, regulations, and contractual terms material to Brink's ongoing relationship with the Federal Reserve causing substantial damage to the Federal Reserve, the U.S. Mint, and the U.S. Treasury.

**B.      Regulations Prohibiting the Melting of Pennies.**

29.     On December 14, 2006, the United States Mint announced the enactment of new regulations prohibiting the melting and limiting the exportation of pennies and nickels with the goal of preventing a shortage of small change in circulation. *See* 31 C.F.R. §§ 82, *et seq.*

30.     Unless extended by further rulemaking, the interim rule was scheduled to expire on April 14, 2007. "Because of an administrative oversight, the final rule was published on April 16, 2007, two days after the interim rule had expired." 72 F.R. 61055 (Oct. 29, 2007). Since the interim rule had expired, the regulations were incorrectly adopted when there were none to adopt. *Id.* Accordingly, on October 29, 2007, this was corrected and the regulations prohibiting the melting of one-cent and five-cent coins went into effect. *Id.*

31. "The purpose of this regulation is to protect 5-cent and one-cent coins in circulation from being the subject of recycling and speculation in order to ensure that sufficient quantities of the coins remain in circulation to meet the needs of the United States." 72 F.R. 18880 (April 16, 2007).

32. Upon information and belief, prior to July 2007, with the assistance of then-Congressman Zack Space (D-OH), Jackson Metals made an application to the U.S. Mint to resume its "coin recycling program" in which it had engaged prior to the implementation of the new regulations. In rejecting this application, the U.S. Mint cited the lack of evidence that the program benefitted the U.S. Government.

33. The Honorable Edmund C. Moy, Director of the U.S. Mint, stated in a December 14, 2006 Press Release regarding the enactment of the new regulations: "We are taking this action because the Nation needs its coinage for commerce. . . . We don't want to see our pennies and nickels melted down so a few individuals can take advantage of the American taxpayer. Replacing these coins would be an enormous cost to taxpayers." www.usmint.gov/ pressroom/index.cfm?flash=yes&action=press_release&id=724

34. Also, in an April 17, 2007 Press Release, the U.S. Mint stated: "Widespread withdrawal of pennies and nickels from circulation could cause coin shortages, and it would be extremely costly to replenish them, given prevailing metal prices and production costs." www.usmint.gov/pressroom/index.cfm?action=press_release&ID=771

**C.    The Production of U.S. Coin.**

35. The U.S. Mint, established in 1792, is an agency of the Federal Government and a bureau in the U.S. Department of the Treasury ("U.S. Treasury"). 31 U.S.C. § 304. The U.S. Treasury is the executive agency charged with promoting economic prosperity and protecting the

financial security of the United States. 5 U.S.C. §§ 101, 105. As a Treasury Bureau, the U.S. Mint is an operating unit of the organization.

36.     The U.S. Mint mints and issues circulating coins from its Philadelphia and Denver production facilities for trade and commerce.

37.     Coins are shipped to the Federal Reserve Banks and their offsite locations as requested to replenish their inventory and fulfill commercial demand.

38.     The Federal Reserve Banks distribute the new and circulated coins to depository institutions to meet the public's demand. If the depository institutions have more coins than the public demands, they can return coins to the Federal Reserve Banks.

39.     The U.S. Mint determines how many coins to mint, but the Federal Reserve Banks influence that process by placing monthly coin orders and providing a 12-month coin-order forecast.

40.     While some of the coin is stored in the Federal Reserve Banks' vaults, they also presently contract with 174 coin terminals to hold inventories of coin, to distribute coins to depository institutions and retailers, and to receive deposits from depository institutions on behalf of the Federal Reserve Banks. These coin terminals "store about 37 percent of the Federal Reserve's coin inventory volume, but account for about 88 percent of Reserve Bank daily distributional activity." *See* Testimony, Louise L. Roseman, Director, Division of Reserve Bank Operations and Payment Systems, *The State of U.S. Coins and Currency*, Before the Subcommittee on Domestic Monetary Policy and Technology, Committee on Financial Services, U.S. House of Representatives, Washington, D.C., July 20, 2010.

41.     The coin terminals are secure facilities that are usually operated by armored-carrier companies, which receive fees from depository institutions and retailers for other coin

9

services, such as transporting and wrapping coin. They do not, however, charge the Federal Reserve Banks a fee these services. *See id.* at n.3. "In the 1990s, the Federal Reserve and the armored carrier companies reached a mutually beneficial agreement that the armored carriers would provide coin services on behalf of the Federal Reserve at no cost in exchange for access at the armored carrier terminals to Reserve Bank coin inventories, which significantly reduced the transportation expenses incurred by the armored carriers in obtaining the coin from the Reserve Bank locations." *Id.*

42. The Federal Reserve Banks pay face value to the U.S. Mint for the coins at the time of shipment. The U.S. Mint's net return is called seigniorage, which is the face value of the circulating coins less the total cost (metal, manufacturing, and transportation) of production.

43. All mutilated (coins that are chipped, fused and are not machine countable) and uncurrent (coins that are worn but still recognizable and machine countable) coins returned to the U.S. Mint are melted, and the metal is sold to a fabricator to be recycled into the manufacture of coinage strips.

44. Over the past 200 years, the metal composition of the penny has changed six times. From 1793 to 1837 the penny was pure copper. From 1857 to 1864 the penny was composed of 88 percent copper and 12 percent nickel. At various times the penny also contained tin, making it bronze (95 percent copper, and five percent tin and zinc). For one year in 1943, due to the war efforts need for copper, the penny was made of zinc-coated steel. Between 1962 and 1982 the composition of the penny was changed from bronze to 95 percent copper and the balance zinc ("brass"). The composition changed in late 1982 to 97.5 percent zinc and the balance copper ("copper-plated zinc").

45.     In 1996, Congress converted the U.S. Mint to a nonappropriated fund instrumentality ("NAFI") and the U.S. Mint began operating under the U.S. Mint Public Enterprise Fund, 31 U.S.C. § 5136, which eliminates the U.S. Mint's receipt of appropriations from the government. As a result, the U.S. Mint supports its costs and obligations through proceeds from the sale of numismatic products and bullion coins to customers worldwide and from the sale of circulating coins to the Federal Reserve Banks and the public. On an annual basis, the U.S. Mint is required to transfer its excess proceeds, after determining its costs and obligations, to the U.S. Treasury General Fund. The excess proceeds from the sale of circulating coin, seigniorage, is used by the Treasury General Fund as a means to finance the national debt, while excess proceeds from the sale of numismatic products and bullion coins are used by the Treasury General Fund as a means to pay for current Federal Government operations and programs.

46.     In fiscal year[1] 2006, the U.S. Mint transferred $750 million to the U.S. Treasury General Fund. The unit cost of producing and distributing a penny was $0.0121.  The U.S. Mint produced approximately 8,243,000,000 pennies.

47.     In fiscal year 2007, the U.S. Mint transferred $825 million to the U.S. Treasury General Fund. The unit cost of producing and distributing a penny went up to $0.0167 due to significant increases in the prices of copper and zinc.

48.     In fiscal year 2008, the U.S. Mint transferred only $750 million to the U.S. Treasury General Fund due primarily to a drop in the demand for circulating coin. The Federal Reserve Banks thought they had too many coins on hand, due to the slowing economy, and, therefore, ordered 34 percent fewer low-denomination coins. The unit cost of producing and distributing a penny was $0.0142.

---

[1] The U.S. Mint's fiscal year ends on September 30.

49. The transfer to the U.S. Treasury General Fund dropped 37 percent in 2009 to only $475 million in part because total circulating coins shipped to the Federal Reserve Banks dropped 47.8 percent from the previous year, with penny shipments falling 39 percent. At the beginning of 2009, market prices of copper and zinc fell to five-year lows. Although market prices for these metals dropped, production costs went up because of the decreased demand. The unit cost of producing and distributing a penny was $0.0162.

50. As of May 31, 2010, the value of U.S. coins in circulation was about $40.4 billion, with about 1.5 billion pennies being held by the Federal Reserve Banks. The Federal Reserve Banks have improved their inventory management over the past five years and have succeeded in decreasing their orders for low-denomination coins by almost one-third compared to the previous five years.

51. In fiscal year 2010, the U.S. Mint transferred $388 million to the U.S. Treasury General Fund. The unit cost of producing and distributing a penny rose again to $0.0179.

52. In 2010, the unit cost of a penny remained above face value for the fifth consecutive year. Minting and issuing coins at a loss reduces the amount of seigniorage that the U.S. Mint is able to transfer to the U.S. Treasury General Fund.

### V. SPECIFIC ALLEGATIONS

53. From in or about 2006 through 2007, and, upon information and belief, through the present, Brink's has conspired with Jackson Metals and Luhrman to defraud the United States government by abusing Brink's coin-terminal agreements with various Federal Reserve banks. The significant rise in copper prices over the past five years has made the penny worth more than one cent, which also means that the per-unit cost for the U.S. Mint to produce a penny

has been above face value for the past five consecutive years including 2010 when the cost was as high as 1.7 cents to produce a single penny.

54.     To take advantage of the increased value of the penny, Brink's and Jackson Metals have entered into agreements to extract the value from the brass pennies and replace the Federal Reserve's coffers with less valuable pennies.

55.     As part of their scheme, Brink's provides Jackson Metals and Luhrman with circulated pennies belonging to the Federal Reserve. Jackson Metals culls all of the brass pennies, which are 95 percent copper and 5 percent zinc, for their copper content. Jackson Metals then ships all of the newer copper-plated zinc pennies, which are 97.5 percent zinc and 2.5 percent copper, back to Brink's.

56.     Since Jackson Metals does not manufacture pennies, Jackson Metals is required to melt these pennies to extract their copper content. As a metal recycler, Jackson Metals profits, at a copper market price of $3.07 per pound, approximately $44,892.33 per tractor-trailer load.

57.     In exchange, Brink's obtains $2.45 per bag of pennies received from Huntington Bank of Cleveland or Bank of America, which are banks used by Jackson Metals and Luhrman in Cleveland, OH and Jessup, MD, respectively, for a total of approximately $3,424.00 per tractor-trailer load. These $3,424.00 swaps are recorded on Brink's books as revenue.

58.     As a result, Defendants are necessarily eliminating these pennies from circulation forever and, as a result, the U.S. Mint will inevitably replace these coins at a cost well exceeding their value.

59.     Relator first learned of this fraud in August 2007 from Paul Zinser, Brink's former Great Lakes Region Coin Product Manager, when Zinser sent him to the Jessup, Maryland coin terminal to assist in managing the branch. At the Jessup facility, Relator was

instructed to allow Brink's penny shipments to be picked up by a non-armored Jackson Metals truck, rather than transported by a Brink's Armored vehicle to a local Federal Reserve Bank. He thought this was unusual because he did not believe he could send coin anywhere but banks.

60.     Twice a week, in or about August 2007, Jackson Metals sent an empty semi-trailer to the Jessup facility for them to fill with about $76,000 in circulated pennies. Zinser told Relator that this was the standard procedure at Jessup.

61.     Bill Reisinger, the former Assistant Branch Manager of Brink's Jessup, MD, told Relator that Jessup had been allowing Jackson Metals to pick up semi-trailer shipments of pennies for about two-and-a-half years, at a rate of about two $76,000 penny shipments per week. Reisinger informed Mr. Holbrook that Brink's relationship with Jackson Metals and Luhrman began in early 2004.

62.     In August 2007, Relator began having daily phone conversations with Luhrman, the owner and President of Jackson Metals. Luhrman claimed that he was a coin dealer with the technology to cull copper pennies, though he had no access to pennies.

63.     In conversations with Mr. Holbrook, Luhrman admitted that this scheme began in 2006 when he was referred to James Mulroney, Brink's Director of Coin Services, because Luhrman was considering setting up self-service kiosks in retail stores that would, for a fee, exchange coins for currency similar to those used by Coinstar, which would allow Jackson Metals to gather large quantities of pennies. Mulroney told Luhrman that Brink's could help because it had excessive inventories of pennies and regularly needed to move them from place to place. For example, especially in Jessup, MD, Brink's excessive inventories of pennies are a result of Brink's receiving a surplus of pennies from its Coinstar account and the local Federal Reserve's refusal to allow Brink's to deposit 100% of this surplus with the Federal Reserve.

14

64.     Jackson Metals and Luhrman agreed to pay Brink's a premium rate of $2.45 (the Cleveland verification rate) per standard bag (the normal standard bag rate is only $0.00 to $0.50) to accept these shipments of pennies, in return for giving Jackson Metals improper and unprecedented access to Federal Reserve pennies. Defendants conspired to conceal, and never disclosed, the improper transactions and reciprocal payments by receiving standard bags of pennies, but charging a premium verification rate. Jackson Metals and Luhrman also provided Brink's with free transportation from Maryland to any destination or Federal Reserve Bank.

65.     This arrangement saved Brink's substantial transportation costs that could range from about $1,200.00 to $3,000.00 per shipment. At the Jessup, MD facility, there were about 126 shipments to Jackson Metals per year.

66.     The Brink's Defendants have access to more pennies than any other accessible source as a subcontractor to the Federal Reserve Bank and also the largest processor of Coinstar deposits in the United States.

67.     Luhrman asked Relator if the Cleveland coin terminal could use pennies, because there were actually no known penny shortages across the nation and Jackson Metals needed to rid itself of excessive copper-plated zinc pennies so that it could accept more circulated-penny shipments. Relator explained that while they did not need pennies in Cleveland, to increase revenue for the branch Brink's would do these exchanges. As a result, Relator directed and reported to Brink's management eight swaps of about $66,000 worth of pennies between September and October of 2007, at a time when the U.S. Mint had specifically rejected Jackson Metals' request to recycle such coins.

68.     Jackson Metals and Luhrman often delivered the newer copper-plated zinc pennies to Brink's Chicago coin terminal when the various local Federal Reserve Banks did not

have the capacity to receive them, which also contributed to a surplus of pennies in the region of the Chicago Federal Reserve Bank. Terry Hughes, the former Brink's Chicago Coin Branch Manager, coordinated and received these penny shipments and his branch received a premium for each bag of pennies that it accepted.

69.     In one Brink's-Cleveland-tractor-trailer penny swap, there were about 1,320 bags of $50.00 of pennies, with $2.45 charged per bag to Huntington Bank of Cleveland, plus a $190.00 preparation fee, resulting in a gain of about $3,424.00 for Brink's. A $50.00 bag of pennies weighs about 32 lbs., and about 37 percent of those pennies are brass pennies. At the estimated market price of copper at about $3.07 per pound, Jackson Metals and Luhrman earned profits of 44,892.33 per tractor-trailer penny swap.

70.     In both of Relator's September and October 2007 end-of-month reports, he specifically reported the revenue from these eight swaps to explain the discrepancies between his planned revenue and actual revenue.

71.     At the time these swaps occurred, Jackson Metals provided Brink's with a zero-balance invoice that described "an even swap for $66,000.00 in pennies." *See* Jackson Metals, LLC invoice dated October 10, 2007, attached as Exhibit A.

72.     Until this time, Jackson Metals and Luhrman handled culling the pennies. In the Fall of 2007, Keith Kovach, the former Great Lakes Regional Coin Mechanic for Brink's, installed and tested proprietary digital-signal processing ("DSP") software that was installed on the Cleveland Branch's Supersorter machines so that Brink's could internally cull copper. Kovach successfully tested its ability to cull brass pennies from newer pennies.

73.     Relator reported to both Mulroney (via email and telephone) and Luhrman (by telephone), that this new copper-mining software was 100% effective. Relator advised Mulroney

16

that the agreement between Brink's and Jackson Metals should be altered to increase Brink's own financial benefit, because Brink's would be able to cull the copper internally, thereby drastically decreasing Brink's reliance on Jackson Metals for processing and transportation. Brink's DSP software would increase Jackson Metals' profit from about $44,892.43 to about $126,252.80 per swap.

74.     Relator heard from Bill Putske, Brink's Coin Services Mechanic, that Mulroney "hit the roof" when he received Relator's voicemail and email and Mulroney quickly advised Relator to "keep quiet." Luhrman subsequently advised that Relator "be careful who [he] talk[s] to about this software." Shortly thereafter, Relator's employment with Brink's was terminated.

75.     In a telephone conversation with Relator in June 2010, Kovach stated that the DSP software was used in many Brink's branches and since Relator's termination was being used to cull copper pennies that were being sent to Jackson Metals.

76.     Moreover, in a telephone conversation on January 28, 2010, Luhrman reported to Relator that he had $5,000,000 in copper pennies in his vault that were acquired through Jackson Metals and Brink's culling the copper from circulated pennies.

77.     Relator was part of a team at Brink's that was dealing with excessive coin inventories at certain branches, and was in contact with top management nearly every day.

78.     Excessive inventory was one of the main reasons that Brink's got involved in shipping pennies to Jackson Metals. Purportedly, Jackson Metals and Luhrman provided the transportation of these pennies from one part of the country to wherever there was a supposed shortage of pennies.

17

79.     In reality, Jackson Metals and Luhrman simply provided certain Brink's branches with inventory relief if they had excessive pennies and transported these pennies to whatever Brink's Branch or Federal Reserve terminal agreed to receive them.

80.     In addition, it now appears that there were no penny shortages and that the entire transaction was a scheme to profit from melting copper coins and hoarding copper coins for future profits.

81.     By virtue of the coin-terminal agreements with the Federal Reserve Banks, Defendants are to securely store Federal Reserve-owned coin transported to a Brink's facility from (i) a Federal Reserve Bank, (ii) the United States Mint, or (iii) as the Federal Reserve directs, from a depository financial institution ("DFI") that may also be a Brink's customer.

82.     Brink's is contractually obligated to handle the Federal Reserve-owned coin in accordance with the purposes and requirements set forth in the coin-terminal agreements. In fact, "Brink's acknowledges that title to Bank-owned coin shall at all times remain with the Bank and Brink's shall have no right, title or interest therein. Brink's shall keep Bank-owned coin free and clear of any and all claims, liens, encumbrances and legal processes of any kind." (*See* Coin Terminal Agreement dated in 2000, attached as Exhibit B).

83.     While it appears that prior to December 2006, Brink's provided Jackson Metals and Luhrman with Federal Reserve coin and may have violated Brink's contract with the Federal Reserve, those acts occurred prior to the enactment of the U.S. Mint's interim rule specifically banning the melting of one-cent and five-cent coins.

## VI.     DAMAGES CAUSED BY DEFENDANTS' UNLAWFUL SCHEME

84.     In 2006, the U.S. Mint estimated that it annually augments and replenishes approximately eight percent of the penny supply. As a result, in proposing the interim rule

prohibiting the melting of pennies, the U.S. Mint stated that "the extraction of even relatively small amounts of these coins from circulation could have a significant impact on the United States Mint's ability to produce sufficient volumes of these coins to meet the needs of commerce." 71 F.R. 76148 (Dec. 20, 2006). The U.S. Mint went on to state as follows:

> Another reason for limiting the melting, exportation, and treatment of 5-cent and one-cent coins is that the United States Mint, and ultimately the United States Treasury and the taxpayer, would have to bear the additional cost of replenishing these coins. At prevailing prices, and based on existing commercial coin counting and recirculation capacities, the cost to the United States Treasury in replenishing 5-cent and one-cent coins taken out of circulation and diverted as scrap metal for recycling could be well in excess of $1 million per day, and volumes required for replenishment could be in excess of the United States Mint's capacity.

71 F.R. 76149 (Dec. 20, 2006).

85.      While the U.S. Mint's estimated damages in excess of $1 million per day included pennies and nickels, as a result of Defendants' conversion of these copper pennies for their own private benefit, the Mint has to mint more pennies at a cost of 1.7 cents per penny, which results in millions of dollars per month in damages to the U.S. Treasury and taxpayers by virtue of the damages to the Federal Reserve and the U.S. Mint.

86.      Brink's has had possession, custody, or control of Federal Reserve coin that was used or to be used at the direction of the Federal Reserve and knowingly and unlawfully delivered, or caused Jackson Metals and Luhrman to deliver, less than the metallurgical value of the Federal Reserve's coin.

87.      Without knowing of Defendants' improper conduct perpetrated upon the Federal Reserve and the U.S. Mint, and ultimately the U.S. Treasury and the American public, the Federal Reserve has maintained its Coin Terminal Agreements with Brink's when it would not have otherwise done so if Brink's had disclosed the truth regarding its activities with Jackson Metals and Luhrman.

88.     Had Brink's been forthcoming with the Federal Reserve, the Federal Reserve would have terminated the Coin Terminal Agreements, thereby limiting the damages suffered by the Government. Instead, Brink's knowingly misreported and withheld material information relating to the security and location of the Federal Reserve's coin, which was an obligation that the Coin Terminal Agreements Brink's had entered into with the Federal Reserve imposed upon Brink's.

89.     Brink's knowingly deceived the Federal Reserve about its activities with Jackson Metals because it knew the Federal Reserve would have terminated the Coin Terminal Agreements, which would have resulted in the loss of Brink's lucrative business relationships with many banks that use Brink's services because they are a coin terminal. In essence, as a coin terminal, Brink's increased its market share of the coin business from banks while using the Federal Reserve coin entrusted to it to further profit off the value of the copper content in the pennies.

90.     It was foreseeable that Defendants' conspiratorial conduct would inevitably result in the U.S. Mint having to bear the expense of replenishing the pennies converted by Defendants.

91.     The value of the metal in the pennies belongs to the U.S. Mint and at some time in the future would ultimately be melted by the U.S. Mint and the metal would be sold to a fabricator to be recycled into coinage strips. A higher-value metal content would be sold at a higher price to a fabricator, which would benefit the Government.

92.     As a result, the Government has been substantially damaged as a result of Defendants' improper conduct.

## VII.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

(False Claims Act: Presentation of False Claims)
(31 U.S.C. § 3729(a)(1)(D))

93.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 92 of this Complaint as if fully set forth here.

94.    As more particularly set forth in the foregoing paragraphs, by virtue of the above alleged acts, the Brink's Defendants have had possession, custody, or control of property used, or to be used, by the Government and knowingly delivered, or caused to be delivered, less than all of that property in violation of 31 U.S.C. § 3729(a)(1)(D).

### SECOND CAUSE OF ACTION

(False Claims Act: Making or Using False Record or Statement)
(31 U.S.C. § 3729(a)(1)(G))

95.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 94 of this Complaint as if fully set forth here.

96.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged above, the Brink's Defendants knowingly made, used or caused to be made or used false records or false statements—*i.e.*, Brink's misrepresentations and withholding of material information relating to the security and location of the Federal Reserve's coin—material to an obligation to transmit property to the Government.

### THIRD CAUSE OF ACTION

(False Claims Act: Conspiracy)
(31 U.S.C. § 3729(a)(1)(C))

97.    Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 96 of this Complaint as if full set forth here.

98. As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged above, the Defendants conspired to make or present false or fraudulent claims and performed one or more acts to effect payment of false or fraudulent claims.

## VIII. DEMANDS FOR RELIEF

**WHEREFORE**, Relator, on behalf of the United States Government, demands judgment against the Defendants, ordering that:

a. Under 31 U.S.C. § 3729(a), Defendants pay an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 or such other penalty as the law may permit and/or require for each violation of 31 U.S.C. §§ 3729, *et seq.*;

b. Relator be awarded the maximum amount allowed under 31 U.S.C. § 3730(d) of the False Claims Act and/or any other applicable provision of law;

c. Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by 31 U.S.C. § 3730(d) and any other applicable provision of the law; and

d. Relator be awarded such other and further relief as the Court may deem to be just and proper.

## TRIAL BY JURY

Relator demands a trial by jury as to all issues.

Dated: August 16, 2011

STONE & MAGNANINI LLP

By: _____

David S. Stone, Esq.
Eric H. Jaso, Esq.
Amy Walker Wagner, Esq.
150 John F. Kennedy Parkway, 4th Floor
Short Hills, New Jersey 07078
973-218-1111
973-218-1106 fax
DStone@stonemagnalaw.com
EJaso@stonemagnalaw.com
AWagner@stonemagnalaw.com


THE CHANDRA LAW FIRM, LLC

Subodh Chandra, Esq. (*pro hac vice to be filed*)
Donald P. Screen, Esq. (*pro hac vice to be filed*)
Ashlie E. Case, Esq. (*pro hac vice to be filed*)
1265 West Sixth Street, Suite 400
Cleveland, Ohio 44113-1326
216-578-1700
216-578-1800 fax
Subodh.Chandra@gmail.com
Donald.Screen@gmail.com
Ashlie.Case@gmail.com

Attorneys for Relator Brian D. Holbrook