**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION AT COLUMBUS**

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. BRIAN D. HOLBROOK, | JUDGE ALGENON L. MARBLEY |
| Relator, | MAGISTRATE JUDGE ELIZABETH PRESTON DEAVERS |
| v. | Civil Action No. 2:13-cv-873 |
| THE BRINK'S COMPANY, et al., | |
| Defendants. | |

**DEFENDANT BRINK'S, INCORPORATED'S MEMORANDUM OF LAW**
**IN SUPPORT OF SUMMARY JUDGMENT**

## TABLE OF CONTENTS

FACTUAL BACKGROUND .................................................................................................2

    I.    All Coin In The Brink's Coin Terminals Was Commingled And Treated
        As Legal Tender,  Consistent With The Coin Terminal Agreements As
        Understood And Interpreted By The RFRBs ...........................................................3

    II.    Jackson Metals' Activities Were Not Secret: The Government Knew
        About Jackson Metals' Penny Endeavors ...............................................................8

    III.    The RFRBs And Their Coin Were Not Part Or The Property Of "The
        Government" ...........................................................................................................9

LEGAL STANDARD ........................................................................................................9

SUMMARY OF ARGUMENT .........................................................................................11

ARGUMENT ...................................................................................................................14

    I.    Brink's Provided The RFRBs The Full Face Value Of All Pennies Held
        For The RFRBs ......................................................................................................14

        A.    All Parties To The CTAs Agree That, Per The CTAs, The Coins
            Were Properly and Knowingly Commingled and Were Treated
            As Legal Tender--The RFRBs' Sole Concern Was That They
            Received Full Face Value For Their Coin (And It Is Undisputed
            That They Did) ......................................................................................15

            i.    All Coins Were Commingled And Treated As Fungible
                Legal Tender .............................................................................15

            ii.    The RFRBs Received Full Face Value For All Coin Held
                By Brink's ................................................................................17

        B.    Even If Relator Had Not  Conceded That The RFRBs Always
            Received Full Face Value For Their Coin, The Claim Also Fails
            Because Of Other Multiple Evidentiary Voids ......................................18

            i.    Relator Has No Evidence Of Any "Receipt" For Purposes
                Of Subpart (a)(4) Of The FCA .................................................18

            ii.    There Is No Evidence Of Any "Delivery" To The RFRBs ..........21

            iii.    There Is No Evidence That Any RFRB-Owned Coin Was
                Involved In The Alleged Coin "Swaps" ....................................22

II.     Brink's Did Not Submit Any False Reports Or Statements To The RFRBs...................................................................................25

     A.     Brink's Accurately Reported To The RFRBs All Information Required By The CTAs ..................................................26

     B.     The Government's Knowledge of Jackson Metals' Penny Culling and Stockpiling Vitiates The Falsity Required For An FCA Claim.............................................................................27

III.    The RFRBs Are Not "The Government" For Purposes Of The FCA And Any RFRB Coins At Issue Were Not Property Of The Federal Government...............................................................................32

     A.     Establishment of the Federal Reserve System ...........................................33

     B.     Operating Structure of the RFRBs............................................................34

     C.     Judicial Recognition of the Independent Nature of the RFRBs.................36

     D.     The RFRBs are not the United States Government for Purposes of the FCA...............................................................................39

     E.     Even Assuming Arguendo That Certain Discrete Functions Or Activities Of The RFRBs Could Implicate Federal Instrumentality Status, The Activities At Issue In This Case Are Not Governmental And Thus The FCA Should Not Apply .....................44

IV.    Relator's FCA Conspiracy Claim Fails Because Relator Has Failed To Produce Evidence Of Any Post-FERA Conduct And For Lack Of An Underlying FCA Violation ...................................................................45

CONCLUSION...................................................................................46

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Advanced Software Design Corp. v. Fed. Reserve Bank of St. Louis*, 583 F.3d 1371 (Fed. Cir. 2009)............................................................................36

*Arkansas v. Farm Credit Servs. of Cent. Ark.*, 520 U.S. 821 (1997)............................................39

*Ball v. Bd. of Governors of Fed. Reserve Sys.*, 87 F.Supp. 3d 33 (D.D.C. 2015).........................45

*Brink's v. Board of Governors of Fed. Reserve Sys.*, 466 F.Supp. 116 (D.C. 1979)..............37, 38

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................10

*Fasano v. Fed. Reserve Bank of New York*, 457 F.3d 274 (3d Cir. 2006)....................................39

*Fed. Reserve Bank of Minneapolis v. Register of Deeds for Delta Cnty.*, 284 N.W. 667 (Mich. 1939) ................................................................................................37

*Fed. Reserve Bank of St. Louis v. Metrocentre Imp. Dist. No. 1*, 657 F.2d 183 (8th Cir. 1981) ...............................................................................................37

*In re Hoag Ranches*, 846 F.2d 1225 (9th Cir. 1988) ...................................................................41

*James v. Fed. Reserve Bank of N.Y.*, 471 F.Supp.2d 226 (E.D.N.Y. 2007) .................................37

*Jet Courier Servs., Inc. v. Fed. Reserve Bank of Atlanta*, 713 F.2d 1221 (6th Cir. 1983) ................................................................................................................37

*Katsiavelos v. Fed. Reserve Bank of Chicago*, 859 F.Supp. 1183 (N.D. Ill. 1994).....................36

*Lewis v. U.S.*, 680 F.2d 1239 (9th Cir. 1982) ...............................................................36, 38, 41, 42

*Marcella v. Brandywine Hosp.*, 47 F.3d 618 (3d Cir. 1995) .......................................................38

*Nevada ex rel. Hager v. Countrywide Home Loans Servicing, LP*, 812 F.Supp.2d 1211 (D. Nev. 2011) .........................................................................................39

*Obradovic v. Fed. Reserve Bank of N.Y.*, 569 F.Supp. 785 (S.D.N.Y. 1983)...............................35

*Pencheng Si v. Laogai Research Found.*, 71 F.Supp.3d 73 (D.D.C. 2014)..................................46

*Rainwater v. United States*, 356 U.S. 590 (1958)........................................................32, 40, 41, 42

*Sanders v. Freeman*, 221 F.3d 846 (6th Cir. 2000) .....................................................................17

*Scott v. Fed. Reserve Bank of Kansas City*, 406 F.3d 532 (8th Cir. 2005) ...............................36, 42

*U.S. ex rel Aakhus v. Dyncorp, Inc.*, 136 F.3d 676 (10th Cir. 1998).......................................19, 20

*U.S. ex rel. Adams v. Aurora Loan Servs., Inc.*, 813 F.3d 1259 (9th Cir. 2016) .........................39

*U.S. ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284 (4th Cir. 2002) ...........................................................................................................................31

*U.S. ex rel. Burlbaw v. Orenduff*, 548 F.3d 931 (10th Cir. 2008).................................................31

*U.S. ex rel. Farmer v. City of Houston*, 523 F.3d 333 (5th Cir. 2008) .........................................46

*U.S. ex rel Fellhoelter v. Valley Milk Prods., L.L.C.*, 617 F.Supp.2d 723 (E.D. Tenn. 2008)..................................................................................................................32

*U.S. ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013 (7th Cir. 1999)...................................30

*U.S. ex rel Lamers v. City of Green Bay*, 998 F.Supp. 971 (E.D. Wis. 1998), *aff'd* 168 F.3d 1013 (7th Cir. 1999) ..............................................................................27

*U.S. ex rel Pasto v. Megabyte Business Sys., Inc.*, No. 3:98CV693 (E.D. Va. Apr. 18, 2000) (Unpublished Memorandum Opinion) .................................................43

*U.S. ex rel Shupe v. Cisco Systems, Inc.*, 759 F.3d 379 (2014) .................................................39

*U.S. ex rel Totten v. Bombardier Corp.*, 380 F.3d 488 (D.C. Cir. 2004).....................................39

*United States ex. rel Durcholz v. FKW Inc.*, 189 F.3d 542 (7th Cir. 1999)............................28, 30

*United States ex rel. Head v. The Kane Co.*, 798 F. Supp. 2d 186 (D.D.C. 2011) .......................12

*United States ex rel. Purcell v. MWI Corp.*, 209 F.R.D. 21 (D.D.C. 2002) .................................12

*United States Shipping Bd. Emergency Fleet Corp. v. W. Union Tel. Co.*, 275 U.S. 415 (1928)..................................................................................................................38

**Statutes and Constitutional Provisions**

12 U.S.C. § 221, *et. seq.* (Federal Reserve Act) ..........................................................................33

12 U.S.C. § 222 ...........................................................................................................................35

12 U.S.C. § 241.............................................................................................................................33

12 U.S.C. § 244.............................................................................................................................34

12 U.S.C. § 282.............................................................................................................................34

12 U.S.C. § 283 ...................................................................................................34

12 U.S.C. § 289 ...................................................................................................34

12 U.S.C. § 301 ...................................................................................................35

12 U.S.C. § 302 ...................................................................................................35

12 U.S.C. § 321 ...................................................................................................34

12 U.S.C. § 341 ..................................................................................33, 34, 35, 42

12 U.S.C. § 502 ...................................................................................................34

12 U.S.C. § 531 .............................................................................................37, 42

12 U.S.C. § 1723 .................................................................................................42

12 U.S.C. § 1820 .................................................................................................42

29 U.S.C. § 152 ...................................................................................................42

31 U.S.C. §§ 3729 *et seq*. (False Claims Act) ............................................ *passim*

50 U.S.C. § 4531 .................................................................................................42

**Rules**

Fed. R. App. P. 4 .................................................................................................36

Fed. R. Civ. P. 56 .................................................................................................9

**Other Authorities**

31 CFR § 210.2(c).................................................................................................42

Relator Brian D. Holbrook filed this *qui tam* action on August 16, 2011, claiming

violations of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq*., by Jackson Metals, LLC

("Jackson Metals"), Walter Luhrman ("Luhrman"), and Brink's, Incorporated ("Brink's").

Relator, a former Brink's employee, later dismissed both Jackson Metals and its president,

Luhrman, from the lawsuit.[1]  The Complaint alleges that starting in 2006, Brink's engaged in a

secret penny-swapping scheme with Jackson Metals whereby Brink's allegedly permitted

Jackson Metals to sort through pennies purportedly owned by the regional Federal Reserve

Banks ("RFRBs") and stored at Brink's coin terminals.  Relator alleges that the purpose of the

alleged "scheme" was to cull out older copper pennies (minted prior to 1982) for their copper

value and to replace those pennies with newer zinc pennies.  The gravamen of the Complaint

appears to be an allegation that this purported "scheme" violated the terms of the Coin Terminal

Agreement ("CTA") executed by Brink's and the Federal Reserve Bank of Cleveland ("FRB of

Cleveland"), by preventing the various RFRBs from potentially capitalizing on the metallurgical

value of certain older pennies.

The Complaint's assertions, while creative, are simply not borne out by the facts.  When

Relator's naked assertions and innuendo are separated from fact, it becomes clear that Brink's

did nothing nefarious and that Relator's claims are groundless.  The FRB of Cleveland

unequivocally stated that it only cares about the face value of its coins.  This regional Federal

Reserve Bank further emphasized that coins held by Brink's are to be used and treated as legal

---

[1] More specifically, Jackson Metals and Luhrman filed motions for summary judgment, explaining among other things, that Relator had no factual basis to support the allegations in the Complaint.  Rather than respond, Relator dismissed Jackson Metals and Luhrman from the lawsuit.  This Court dismissed The Brink's Company on January 15, 2015.  Doc. 74 (Opinion & Order) at 42-43.  The sole remaining defendant is therefore Brink's, Incorporated, and it too should be dismissed for the reasons stated herein.

tender – a penny is a penny regardless of its age, intrinsic value, or metallurgical composition. Although Relator himself orchestrated a number of the very transactions that his counsel now try to cast as FCA violations, Relator concedes that the RFRBs always received full face value for all of their coins. Relator further concedes that none of the statements he made to the RFRBs in connection with the transactions at issue were inaccurate or false. Moreover, Relator's FCA claims fail at the outset because the RFRBs are not part of the federal government and coin owned by the RFRBs is not government property. These facts vitiate any claimed violation of the FCA, which requires an attempt to defraud "the Government" through use of a false statement or delivery of less than all of "the Government['s]" property. This Court should grant summary judgment for Brink's.

## FACTUAL BACKGROUND

Coins play a vital role in facilitating cash transactions and ensuring the free flow of commerce. Unfortunately, due to their abundance and weight, coins also present significant logistical challenges for banks, businesses and other entities that need to make change on a daily basis. Brink's helps address those challenges by providing secure storage, transportation, sorting, wrapping and other coin-related services to its customers, which include national and regional banks, corporate clients such as Coinstar, and the regional Federal Reserve Banks ("RFRBs"). Brink's Statement of Uncontroverted Material Fact ("S.O.F."), Exhibit A hereto at ¶ 1. As a result of its customers' daily shipments and deliveries of coin in all denominations, including pennies, the inventory of coin held at Brink's various "coin terminals" is constantly changing. Ex. A (S.O.F.) at ¶¶ 15-16. Brink's electronically credits and debits, by denomination, its customers' accounts to reflect the value of their coin inventories. *Id.* at ¶ 17. In this respect, Brink's functions similarly to a bank.

**I.      All Coin In The Brink's Coin Terminals Was Commingled And Treated As Legal Tender,  Consistent With The Coin Terminal Agreements As Understood And Interpreted By The RFRBs**

Brink's, and other armored carriers, have agreed to store up to a specified quantity of the RFRBs' coin without charge.  Ex. A (S.O.F.) at ¶ 22.  This arrangement saves on transportation costs and enables the RFRBs to more efficiently manage their coin inventories and serve the needs of their member banks.  Brink's and the RFRBs entered into various Coin Terminal Agreements ("CTAs") to govern their relationships.  *Id*. at ¶ 20.  These CTAs serve as the master contracts between Brink's and the RFRBs with respect to coin.  Pursuant to the CTAs, and the concept of coin as legal tender, the RFRBs valued and audited coins at the Brink's facilities based on face value.  *Id*. at ¶¶ 23-24.

Between 2006 and 2009, records of the individual coin accounts for Brink's customers were documented and maintained electronically; however, the physical coins held by Brink's were not segregated by customer.  *Id*. at ¶¶ 17, 19.  Rather, coins were commingled, regarded as general stock and treated as fungible legal tender within their respective denominations.  *Id*. at ¶ 18.  Brink's facilities that served as coin terminals for the RFRBs were no exception—all coins in general inventory, including pennies, were commingled by denomination and treated as fungible.  *Id*.  As a practical matter, this meant that when any customer requested a physical delivery of pennies from its account, Brink's could package for delivery to the customer any of the pennies in the coin room without regard to the original source of the coin.  The RFRBs were aware of and consented to the commingling of coin by Brink's.  *Id*. at ¶ 21.

In 2006, Jackson Metals, through its President, Walter Luhrman, approached Brink's and inquired whether it could purchase pennies from Brink's.  Ex. A (S.O.F.) at ¶ 6.  Luhrman indicated that he wanted to acquire large quantities of pennies for the purpose of culling out older (pre-1982) pennies that were primarily made of copper.  *Id*.  Brink's advised Jackson Metals that

- 3 -

its customer Coinstar was a potential source of large amounts of coin. *Id*. Brink's introduced Jackson Metals to its contact at Coinstar.

Coinstar's business model, by allowing individuals to easily monetize collected coin, introduced large amounts of older coin back into circulation. The high volume of Coinstar's business (and high intake of pennies) created storage problems for Brink's coin terminals, due in part to the massive quantities of pennies generated from Coinstar's operations. Ex. A (S.O.F.) at ¶ 5. Coinstar's pennies, however, were perfect for Jackson Metals' endeavor because Coinstar accumulated large quantities of older pennies and because a higher percentage (albeit still a small percentage) of the Coinstar pennies were older (pre-1982) copper pennies as opposed to the newer zinc pennies.

Jackson Metals and Coinstar ultimately entered into a contractual relationship through which Jackson Metals acquired large quantities of pennies from Coinstar's accounts at various Brink's locations. Ex. A (S.O.F.) at ¶ 7. The relationship between Jackson Metals and Coinstar would generally work as follows: (1) Jackson Metals would identify a Brink's coin terminal with large amounts of Coinstar pennies in inventory; (2) Jackson Metals would contact Coinstar to arrange a purchase of the coins; (3) Jackson Metals would wire payment to Coinstar for a shipment of pennies (usually a tractor-trailer load or $66,000 worth of pennies); (4) Brink's personnel typically would set aside pennies from Coinstar shipments without depositing them into Coinstar's bank account; (5) Jackson Metals would pick up these pennies from the Brink's terminal identified by Coinstar and take them back to the Jackson Metals facility; (6) Jackson Metals would run the pennies through its sorting machines to cull out the older copper pennies from the newer pennies made primarily of zinc; and finally, (7) Jackson Metals would deliver the

zinc pennies it had amassed (but did not want or need) to a Brink's coin terminal for deposit into Jackson Metals' bank account at Huntington Bank. *Id*. at ¶ 12.

Occasionally, Jackson Metals acquired pennies by purchasing them from a bank. Ex. A (S.O.F.) at ¶¶ 8, 11. If pennies were purchased from a bank, the bank would first need to ensure that it had a sufficient inventory of pennies and if not, the bank could purchase additional pennies from its RFRB. *Id*. In either of these scenarios, pennies were only released to Jackson Metals upon authorization by either Coinstar or Jackson Metals' bank. *Id*. at ¶ 9.

Brink's handled these transactions just as a bank teller would handle an individual's coins for deposit or withdrawal, except that these transactions were conducted on a much larger scale. Instead of rolls of pennies being handed to the customer at the bank teller window, the transactions involved pallets and truckloads of pennies that, due to their weight and mass, could not physically be handled at a bank teller window. Also mirroring a bank's practice, Brink's documented the deliveries of pennies to Jackson Metals (generally as a debit to Coinstar's account) and the receipt of pennies from Jackson Metals (as a credit to Huntington Bank or other account as Jackson Metals would direct). Ex. A (S.O.F.) at ¶¶ 8, 12, 17. Brink's charged Jackson Metals a fee for the labor involved in handling the pallets and forklift loads of coin being loaded and unloaded from the truck and for verifying the amount of coins tendered and received. *Id*. at ¶ 13.

A small subset of the Jackson Metals penny acquisitions do not appear to have followed the steps described above. These transactions, referenced by Jackson Metals as "swaps,"[2]

---

[2] The term "swap" is ambiguous. To add to the confusion, the term "swap" is not a recognized term of art in the industry and it is not one used by Brink's. Deposition of J. Mulroney ("Mulroney Depo"), attached as Exhibit C, at 77:14-78:10. Although Coinstar, Jackson Metals and others have referred to various transactions as "swaps," the term appears to have several

involved even exchanges of zinc pennies for circulated pennies.[3]  Although the paperwork

documenting some of these transactions is less precise, there is no indication that any of these

penny transactions involved or impacted any RFRB accounts.  Ex. A (S.O.F.) at ¶¶ 8, 10, 12.

Rather, it appears that as part of this subset of "swaps," Jackson Metals delivered a truckload

($66,000 worth) of zinc pennies to Brink's.  Brink's would unload and add those pennies to the

general penny inventory.  Deposition of Relator B. Holbrook ("Relator Depo."), attached as

Exhibit B, at 68:15-71:16.  Brink's would then load the empty truck with pennies ($66,000

worth) from the general penny inventory.  *Id*.  Jackson Metals' records indicate that a small

number of these transactions occurred in 2007.  Brink's Supp. Discovery Responses, attached as

Exhibit D, at Supp. Ex. A-09 to A-13.

The FRB of Cleveland – the regional FRB that Relator interacted with during Relator's

time as the coin terminal branch manager for Brink's in Cleveland, Ohio – confirmed that the

RFRBs are only concerned with the face value of coins and confirmed that the RFRBs do not

know and are not interested in the potential metallurgical, intrinsic, or numismatic value of

RFRB-owned coin.  Ex. A (S.O.F.) at ¶ 28.  Rather, the FRB of Cleveland confirmed that under

the CTAs, pennies are treated as fungible, legal tender—a penny is a penny regardless of its

---

meanings.  Supplemental Exhibit A to Brink's Supplemental Discovery Responses (Exhibit D
hereto), sets forth Jackson Metals' accounting of all of its penny acquisitions (purchases).
Supplemental Exhibit A lists a number of acquisitions Jackson Metals refers to as "swaps";
however, Jackson Metals' documentation indicates that many of those transactions were between
Coinstar and Jackson Metals.  *See, e.g.*, Ex. D at Supp. Ex. A-02 to A-06.  Those "swaps" clearly
involve Coinstar coin.  Other acquisitions identified by Jackson Metals as "swaps" do not
expressly reference Coinstar.  Regardless of how Jackson Metals may have characterized these
transactions in its books, none of these transactions give rise to an FCA violation.

[3] The term, "circulated pennies," as used by the parties, refers to pennies that had not been culled
for their copper content but were a mix of both zinc and copper pennies.  *See* Ex. B (Relator
Depo.) at 145:1-15.

composition or intrinsic value. *Id.* at ¶¶ 29-30, 32-33. The FRB of Cleveland further stated that, pursuant to the terms of the CTA, it expected that Brink's would hold coin in a commingled environment and would report, on a daily basis, the face value of the coin held by Brink's for the bank. *Id.* at ¶¶ 21, 35-37. So long as Brink's accurately reported the face value of the RFRB-owned coin, Brink's daily inventory reports were accurate. *Id.* at ¶ 39. The CTAs did not require that Brink's determine or report on the metallurgical value of pennies received for the RFRBs. *Id.* at ¶¶ 36-38. The FRB of Cleveland explained these concepts clearly and unequivocally as follows:

> 15. ….For any coin, the FRBCL's concern is a coin's face value. The FRBCL depository banks deposit and purchase coin based on face value. The FRBCL accounts for its coin based on face value. The FRBCL purchases coin, when needed, from the U.S. Mint at face value.

> 16. When the FRBCL audits a vendor's coin terminals, it seeks to determine whether the face value of actual coin present at the coin terminal matches FRBCL's records of what the face value of the coins at the coin terminal are reported to be. The FRBCL only values coins at face value. The numismatic value of coins does not matter to the FRBCL. The FRBCL does not know, nor is it interested in, the potential metallurgical value of coins. The coins are fungible, within their respective denominations.
> ….

> 18. ….When Brink's provided the Customer Inventory Balance Reports pursuant to paragraph 13 of this CTA (Exhibit 2), the FRBCL expected Brink's to state the face value of the coin. No other form of coin valuation was required or acceptable. Under paragraph 13 of Exhibit 2, FRBCL had no interest in the metallurgical value of the coins. For example, it would not have cared or wanted to know if the FRBCL pennies were primarily comprised of copper or zinc…. the FRBCL views a penny as a penny, without regard to metallurgical composition….

> 19. So long as Brink's accurately reports the face amount of FRBCL coins in its inventory in any daily report to the FRBCL that sets forth the amount of inventory on hand, then the vendor's daily inventory report is accurate. This is true even if the metallic value of any coin in inventory exceeds the coin's face amount.
> ….

> 23.     The FRBCL did not interpret or intend that the CTA (Exhibit 2) in
> effect between 2006-2009 be interpreted as requiring the FRBCL's coin to be
> held, stored or returned (1) based upon any intrinsic value that some coins may
> have had or (2) based upon any concern with metallurgical value.  It would be
> factually incorrect to interpret the CTA as suggesting that coins are not to be
> treated as legal tender and/or not to be exchanged at face value; rather, coins
> under the CTA are to be treated in a fungible manner as legal tender.  Any view to
> the contrary as to Exhibit 2 would be incorrect.

Affidavit of K. Green, Vice President of the FRB of Cleveland ("FRB Aff."), attached as

Exhibit H at ¶¶ 15-16, 18-19, 23.

Relator conceded that the RFRBs' only concern was the face value of coin and that

Brink's accurately reported the face value of the coin to the RFRBs.  Ex. A (S.O.F.) at ¶ 48.  He

admits that he did not submit or make any false statements to the RFRBs even when he

participated in a "swap."  *Id*. at ¶¶ 45-49.  Despite regular audits, the RFRBs never complained

about the commingling or treatment of coin as fungible by Brink's.  *Id*. at ¶¶ 18, 50.

## II.     Jackson Metals' Activities Were Not Secret: The Government Knew About Jackson Metals' Penny Endeavors

Relator explained that he filed the present lawsuit because he believed that Jackson

Metals' penny operation and penny transactions were kept secret.  Ex. B (Relator Depo.) at

113:20-114:24.

Unbeknownst to Relator, however, U.S. Congressmen, Congressional banking

committees, and the general counsel for the U.S. Mint all knew about Jackson Metals' efforts to

cull pennies.  Ex. A (S.O.F.) at ¶¶ 42-44.  In 2007, Luhrman, as president of Jackson Metals,

submitted written testimony and testified before Congressional committees with respect to

Jackson Metals' business model and efforts to obtain, cull and redistribute pennies.  Declaration

of W. Luhrman ("Luhrman Decl."), attached as Exhibit G, at ¶ 20.  Brink's and Coinstar also

offered testimony with respect to similar issues.  *Id*.  Jackson Metals' activities were not

secretive; they were well known to the U.S. Government.  Both the government and the RFRBs

knew that Jackson Metals was culling and stockpiling copper pennies and that Jackson Metals purchased pennies from Coinstar through various Brink's coin terminals.  Ex. A (S.O.F.) at ¶¶ 42-44.

## III.  The RFRBs And Their Coin Were Not Part Or The Property Of "The Government"

RFRB coin held by Brink's was not, in fact, government property.  The FRB of Cleveland acknowledged and agreed that coin held by Brink's for the RFRBs under the CTAs was owned by the individual RFRBs, not the federal government.  Ex. A (S.O.F.) at ¶¶ 27, 34. Moreover, the FRB of Cleveland further noted that the RFRBs are not themselves part of the federal government.  Ex. H (FRB Aff.) at ¶ 3; *see also* Ex. A (S.O.F.) at ¶ 66.  Rather, the RFRBs are private corporations that can sue and be sued in their own names, are not represented by the Department of Justice and fund all of their own operations.  Ex. A (S.O.F.) at ¶¶ 56-65. They receive no federal appropriations and the federal government lacks any proprietary interest in the RFRBs.  *Id*. at ¶¶ 57, 65.

Further support for the RFRBs' private status is offered by Peter Conti-Brown, a Wharton professor, author and leading historian on the structure of the Federal Reserve System.  Professor Conti-Brown explains how the RFRBs, in contrast to the Federal Reserve Board of Governors, were purposefully created as private entities separate from and independent of the federal government.  Declaration of P. Conti-Brown ("Conti-Brown Decl."), attached as Exhibit J. Likewise, the property owned by the individual RFRBs, specifically including the RFRBs' coin, are assets of the RFRBs, not the federal government.  Ex. A (S.O.F.) at ¶¶ 27, 34.

## LEGAL STANDARD

Pursuant to Rule 56, the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. Pro. 56(a).  Summary judgment is mandatory where a party fails to

make a showing sufficient to establish the existence of every element essential to the party's case on which the party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Where a movant is the defending party, the movant can also establish a right to summary judgment by showing facts that negate any one of the elements of the Relator's cause of action. *Id*. at 331.

To survive a motion for summary judgment, a Relator seeking damages for a violation of the False Claims Act under 31 U.S.C. § 3729(a)(4)[4] must present evidence that the defendant "has possession, custody, or control of property or money used, or to be used, by *the Government* and, intending to defraud *the Government*…delivers, or causes to be delivered, less property than the amount for which the person receives a certificate or receipt." 31 U.S.C. § 3729(a)(4) (emphasis added). Similarly, to survive entry of summary judgment on a claim under 31 U.S.C. § 3729(a)(7), a Relator must demonstrate that the defendant knowingly made or used "a *false* record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to *the Government*." 31 U.S.C. § 3729(a)(7) (emphasis added). With respect to FCA conspiracy, Relator must show that the defendant "conspire[d] to defraud the Government by getting a false or fraudulent claim allowed or paid." 31 U.S.C. § 3729(a)(3). This Court

---

[4] Relator has failed to present evidence of any wrongful conduct or alleged FCA violation after May 20, 2009, the date on which the Fraud Enforcement and Recovery Act Amendments ("FERA") took effect. In fact, the evidence shows that the alleged penny-related transactions ceased well before May 20, 2009. Deposition of Jackson Metals ("Jackson Metals Depo."), attached as Exhibit E, at 67:10-24, 76:9-10; Jackson Metals' Resp. to Relator's First Set of Interrogs., attached as Exhibit F, at 8, 10-12 (noting that last business transaction with Brink's "was its check payment to Brink's on or about March 16, 2009"); Ex. D (Brink's Supp. Discovery Resp.) at Supp. Ex. A-17 and B-12 (last penny transaction recorded on 2/2/2009). As a result, the pre-FERA version of the False Claims Act applies to all of Relator's claims. *See* Doc. 74 (Opinion & Order) at 15 (pre-FERA version of FCA applies to alleged conduct that occurred prior to May 20, 2009).

previously dismissed Relator's FCA conspiracy claims for alleged conduct prior to May 20, 2009. *See* Doc. 74 (Opinion & Order) at 41.

## SUMMARY OF ARGUMENT

The undisputed evidence negates *multiple* essential elements of Relator's FCA claims against Brink's. Relator claims that Brink's alleged conduct violated the following sections of the FCA; however, none of these allegations are supported by the evidence:

(1) 31 U.S.C. § 3729(a)(4)[5] – Relator alleges that Brink's delivered less than all Government property to the RFRBs because, allegedly, the metallurgical value of the pennies returned to the RFRBs was different from the metallurgical value of the pennies the RFRBs originally delivered to Brink's (even though the RFRBs did not measure or care about the metallurgic value of coin--the RFRBs only cared about face value of coins and, as such, considered the pennies fungible, legal tender);

(2) 31 U.S.C. § 3729(a)(7) – Relator alleges that Brink's knowingly made false statements or records material to an obligation to transmit property to the Government (even though Relator himself concedes that neither he nor Brink's made any false statements to the FRB of Cleveland, that the face value of the pennies was accurately reported to the RFRBs, and that he accurately provided to the RFRBs precisely what the RFRBs requested); and

(3) 31 U.S.C. § 3729(a)(3) – Relator alleges that Brink's engaged in a conspiracy to violate the FCA (even though there is no evidence of any FCA violations or post-FERA conduct and all of Relator's pre-FERA conspiracy claims (the only claims at issue here) were previously dismissed by the Court).

---

[5] The Complaint references the post-FERA version of the FCA; however, because all of the alleged penny transactions occurred prior to May 20, 2009, the pre-FERA version of the FCA applies here. *See also* n.4, *supra*.

Understandably, the Government declined to intervene or prosecute the suit on its own behalf.[6]  While the Complaint's allegations make for an interesting read, Relator's allegations lack any evidentiary support.  Rather, the undisputed facts reveal that Relator's Complaint fails for numerous reasons.

First, the alleged penny transactions did not result in any loss of property by either the RFRBs or the federal government, nor is there any evidence that any of the RFRBs' coin was involved in or impacted by any of the alleged penny transactions.  In fact, Relator, who orchestrated five of the alleged "swaps" at issue, confirmed that the RFRBs received full face value for all their pennies.

Second, Brink's did not make any false statements or misreport any information the CTAs required be provided to the RFRBs.  With respect to the very CTA appended to Relator's Complaint, *both* of the two contracting parties to that CTA, Brink's and the FRB of Cleveland, expressly confirm that the coins held by Brink's (1) were to be commingled with the coins of Brink's other customers, (2) were to be treated as fungible legal tender (just as a bank would treat coins), and (3) were to be accounted for *solely* based on the coins' face value. Therefore, metallurgic or numismatic (coin collector) value was of no concern to the RFRBs.  The fact that the FRB of Cleveland itself confirmed that the pennies at issue were fungible and to be treated as legal tender is fatal to the Complaint because Relator concedes that Brink's always reported to the RFRBs the correct face value (the sole criterion about which the RFRBs were concerned) of

---

[6] Courts have observed that "[a]lthough the Government's failure to intervene in a case is not dispositive, it deserves respect because the Government only makes such a decision 'if, after assessing the evidence presented by relator and conducting its own preliminary investigation, it believes the action lacks merit.'"  *United States ex rel. Head v. The Kane Co.*, 798 F. Supp. 2d 186, 197 n.14 (D.D.C. 2011); *United States ex rel. Purcell v. MWI Corp.*, 209 F.R.D. 21, 26 (D.D.C. 2002).

the coin in the RFRBs' coin accounts. In fact, and tellingly, Relator admits that even in engaging in the transactions complained of in the Complaint (*i.e.*, the alleged penny "swaps"), no false statements were made to the RFRBs. The RFRBs were not deprived of any property or information, nor did Brink's misreport any of the information it provided to the RFRBs. Relator's Complaint is baseless.

Third, the Complaint emphasizes, incorrectly, that Jackson Metals' plan to cull and melt pennies for their copper content was secretive. The facts do not support Relator's assertion. In 2007, Jackson Metals' president, Walter Luhrman, testified before Congressional banking committees about his penny endeavor as well as his relationship with Brink's and Coinstar. Governmental knowledge of the very facts upon which Relator's FCA claims are based undercuts and short-circuits Relator's claims as a matter of law.

Fourth, the RFRBs are not "the Government" for FCA purposes. Regardless of whether the RFRBs serve public purposes in some aspects of their operations, the specific activities at issue here (the storage of coin owned by the RFRBs and used to facilitate private banking transactions) are not governmental. As the FRB of Cleveland itself acknowledges, these coins are simply not the Government's property. For this reason alone, the Complaint fails as a matter of law.

These multiple, independent grounds for summary judgment – including but not limited to the *uncontroverted fact* that the FRB of Cleveland itself has conclusively stated that all coins held by Brink's were to be treated as legal tender – require but one result: this Court should grant summary judgment for Brink's.

# ARGUMENT

I. **Brink's Provided The RFRBs The Full Face Value Of All Pennies Held For The RFRBs**

Relator's claim under 31 U.S.C. § 3729(a)(4) fails because Relator has no evidence to show (and there is no such evidence) that Brink's ever provided the RFRBs less property than the RFRBs were to receive. In determining the value of coin, the RFRBs' *sole* metric is the coin's face value—the metallurgic value of coin is irrelevant and immaterial to the RFRBs. Thus, absent evidence that the RFRBs received less than the full face value of the pennies held by Brink's for the RFRBs (and there is none), Relator cannot establish that Brink's delivered to the RFRBs less than all of their property, a required element of 31 U.S.C. § 3729(a)(4). Relator lacks evidence of any such shortfall because the RFRBs in fact suffered no such loss.

Relator's claim under 31 U.S.C. § 3729(a)(4) suffers from both substantive and technical deficiencies. Substantively, there is no basis for a claim because it is *undisputed* that the RFRBs, consistent with a banking-type operation in which coins are intentionally and knowingly commingled and treated as legal tender, insisted upon valuing coin based on face value and the RFRBs in fact received the full face value of the coins held by Brink's. This fact substantively vitiates any basis for Relator's claim as a matter of law.

But even if Relator's own admission that the RFRBs *always* received the full face value of *all* their coins did not so clearly gut Relator's case (which it does), Relator's claim also fails because subsection (a)(4)requires, as an element of the claim, both a "delivery" and a "receipt." Relator has no evidence to satisfy either of these essential elements. Simply put, 31 U.S.C. § 3729(a)(4) does not even apply to the instant situation. Relator thus cannot sustain a claim under 31 U.S.C. § 3729(a)(4) and, as a result, Brink's is entitled to summary judgment.

**A.** **All Parties To The CTAs Agree That, Per The CTAs, The Coins Were Properly and Knowingly Commingled and Were Treated As Legal Tender-- The RFRBs' Sole Concern Was That They Received Full Face Value For Their Coin (And It Is Undisputed That They Did)**

**i.** **All Coins Were Commingled And Treated As Fungible Legal Tender**

The overriding purpose of the CTAs is "to provide coin services to [the RFRBs'] depository financial institutions ("DFIs") which order coin from and deposit coin with the Bank." Ex. H (FRB Aff.) at Ex. 2, 1. The CTAs were originally developed as part of a need to more effectively and efficiently manage the movement of coin between the RFRBs and its depository institutions. Ex. C (Mulroney Depo.) at 25:15-26:17.

To efficiently provide coin services to the depository institutions and the RFRBs, Brink's maintained detailed, individualized coin account records but physically commingled the coin within its facilities. The RFRBs were well aware that Brink's maintained commingled coin inventories during the 2006-2009 timeframe. Ex. B (Relator Depo.) at 60:10-61:3. The RFRBs also conducted audits of the Brink's facilities during the relevant timeframe and never raised the physical commingling of coin as a concern. *Id*.

Pursuant to Brink's written agreements with the RFRBs, the value of coin held by Brink's for the RFRBs was based solely on the face value of the coin. Ex. H (FRB Aff.) at ¶ 15 ("For any coin, the [FRB of Cleveland's] concern is a coin's face value."); Ex. B (Relator Depo.) at 58:6-59:8, 82:2-83:3, 83:21-84:24. The depository banks, which both the RFRBs and Brink's serve, deposit and purchase coin based on face value, the RFRBs account for coin based on face value and even purchase coin from the U.S. Mint at face value. Ex. H (FRB Aff.) at ¶ 15; Ex. J (Conti-Brown Decl.) at ¶ 30; Doc. 1 (Compl.) at ¶ 42. Similarly, when a RFRB audits a vendor's coin terminal, the RFRB seeks to determine whether the face value of the coin present at the coin terminal matches the RFRB's records as to the reported face value of the coin. Ex. H (FRB Aff.)

- 15 -

at ¶ 16; Affidavit of M. Kingkade, Brink's Director of Quality Assurance (Kingkade Aff.), attached as Exhibit I, at ¶ 4. Because the RFRBs value coin based on face value, they do not know and are not interested in the potential metallurgical, intrinsic, or numismatic value of RFRB-owned coin. *Id.*; *see also* Ex. B (Relator Depo.) at 57:16-58:6, 82:2-5, 84:1-3. Rather, the RFRBs recognize that coins are fungible within their respective denominations. Ex. H (FRB Aff.) at ¶ 16. The FRB of Cleveland said it best—"the [FRB of Cleveland] views a penny as a penny, without regard to metallurgical composition." Ex. H (FRB Aff.) at ¶ 18.

Valuation of coin based on face value was consistent with the expectations and past dealings between Brink's and the RFRBs as well as the terms of the parties' contractual agreements. Neither of the two parties to the CTAs – neither the RFRBs nor Brinks – interpreted or intended the CTAs in effect between 2006 and 2009 to require that RFRB coin be held, stored or returned based upon the coins' intrinsic or metallurgical value. Ex. H (FRB Aff.) at ¶ 23; Ex. I (Kingkade Aff.) at ¶ 10. This essential point is undisputed.

In fact, the CTAs executed between the RFRBs and Brink's permitted or required Brink's to maintain coin in a commingled environment (*i.e.*, RFRB coin was commingled with coin received from other Brink's customers). Ex. H (FRB Aff.) at ¶ 17; Ex. I (Kingkade Aff.) at ¶ 5; Ex. B (Relator Depo.) at 36:6-25, 56:10-14, 60:10-61:3. It would be factually incorrect to interpret the CTAs as suggesting that coin not be treated as legal tender and/or not be exchanged at face value. Ex. H (FRB Aff.) at ¶ 23; Ex. I (Kingkade Aff.) at ¶ 10. Rather, the parties to the CTAs confirm that the CTAs required that coin be treated in a fungible manner as legal tender. *Id*. This benefited the RFRBs and, more importantly, their mission of assisting with the free-flow of commerce. Ex. H (FRB Aff.) at ¶ 18; Ex. I (Kingkade Aff.) at ¶ 12. Consistent with the terms of the CTAs, the RFRBs and Brink's treated all coin as fungible legal tender. In keeping

- 16 -

with the definition of legal tender,[7] the only value of importance to the RFRBs was the face value of coin.

### ii.    The RFRBs Received Full Face Value For All Coin Held By Brink's

There is no dispute that the RFRBs received full face value for all of the pennies in the RFRBs' accounts—even Relator concedes this critical point.  Ex. B (Relator Depo.) at 71:3-16, 84:4-11.  Relator admits that after the alleged "swaps," the penny inventory and face value of the pennies in the Brink's coin room remained the same.  Ex. B (Relator Depo.) at 69:4-15, 71:9-16.  Relator further acknowledges that the RFRBs always received the correct number of pennies from Brink's based on their face value.  Ex. B (Relator Depo.) at 84:4-11.

Relator instead bases his cause of action on a claim that the RFRBs received "less than the metallurgical value" of the coin.  Doc. 1 (Compl.) at ¶ 86.  Relator's claim is meritless because the metallurgical value of coin was not known, considered by, or relevant to the RFRBs.  Ex. H (FRB Aff.) at  ¶ 16; Ex. I (Kingkade Aff.) at ¶ 4.  Metallurgic value was irrelevant to the RFRBs because the coins stored at the Brink's coin terminals were legal tender.  As a result, the metallurgic value of coin was not tracked, recorded or known.  *Id.*  Because the RFRBs received the full face value of the pennies held by Brinks—the sole value of importance to the RFRBs— Relator cannot demonstrate that the RFRBs, much less the government, received less than all of their money or property.  As a result, Relator cannot sustain his burden under Section 3729(a)(4).  Brink's is thus entitled to summary judgment on Relator's claim under 31 U.S.C. § 3729(a)(4).

---

[7] Coin, as legal tender, is exchanged based on the coins' representative value as currency (face value) rather than the tangible value (by weight) of the coins' precious metal content.  *See, e.g., Sanders v. Freeman*, 221 F.3d 846, 856 (6th Cir. 2000).

**B.**     **Even If Relator Had Not Conceded That The RFRBs Always Received Full Face Value For Their Coin, The Claim Also Fails Because Of Other Multiple Evidentiary Voids**

To establish a claim under 31 U.S.C. § 3729(a)(4), a party must satisfy each and every element of the claim.  Specifically, Relator must show that Brink's:

> (4) [had] possession, custody, or control of property or money[8] used, or to be used, by the Government[9] and, intending to defraud the Government or willfully to conceal[10] the property, *delivers*, or causes to be delivered, *less property* than the amount for which the person *receives a certificate or receipt*….

*Id.* (footnotes and emphasis added).  Relator cannot show the requisite delivery and receipt elements of the cause of action.  In fact, Relator has no evidence of any receipts or deliveries necessary to satisfy an FCA claim.  Also, Relator has no evidence that any of the alleged "swaps" involved any RFRB coin account.

**i.**     **Relator Has No Evidence Of Any "Receipt" For Purposes Of Subpart (a)(4) Of The FCA**

The metallurgic value of the pennies delivered to and received from Brink's was not only irrelevant to the RFRBs, it was also unknown.  Ex. H (FRB Aff.) at ¶ 16.  Neither the RFRBs nor Brink's kept track of the type of pennies (*i.e.*, pre-1982 copper pennies versus zinc pennies) that

---

[8] The statute refers to "property *or money*."  Here, coins as legal tender are obviously money and Relator has conceded that the face value of the money was provided to the RFRBs.  Thus, there cannot be a valid claim because all RFRB money was received and provided at face value.  Also, there is no basis to try to contort the coins, which are *money* (legal tender), into "property" under this statutory subpart.  As explained above, it is undisputed between the two contracting parties to the CTAs (the RFRBs and Brink's) that the coins were fungible, commingled legal tender; as such, the coins simply cannot be treated as if they were unique chattel or personal property.  Thus, again, Relator cannot have a valid FCA claim.

[9] As further discussed in Section III, *infra*, Relator's Complaint is also glaringly deficient because the RFRBs are not "the Government."

[10] The conspicuous absence of any evidence of intent to defraud or willfully conceal further demonstrates the inapplicability of subsection (a)(4).  *See, e.g.*, Section II B, *infra*.

were deposited into a coin terminal. In auditing a coin terminal and communicating with

Brink's, the RFRBs focused only on face value—metallurgic value is not measured, known by or

of any concern to the RFRBs. Ex. H (FRB Aff.) at ¶ 16; Ex. B (Relator Depo.) at 81:22-84:3.

Moreover, during a normal day, coins frequently move in and out of the Brink's terminals and

the RFRBs' accounts to accommodate purchases and deposits by various banks. Ex. H (FRB

Aff.) at ¶ 22; Ex. I (Kingkade Aff.) at ¶ 9; *see also* Ex. B (Relator Depo.) at 89:8-91:4. As a

result, the composition of pennies and other coin physically present in the Brink's coin room

varies significantly from hour to hour and day to day. Ex. B (Relator Depo.) at 89:8-91:4.

Because the RFRBs did not care about metallurgic value (Ex. H (FRB Aff.) at ¶ 16),

there are no records documenting the metallurgic value of coin deposited to or withdrawn from

the RFRBs' accounts and there are no records documenting the difference between these values.

Because the RFRBs did not care about metallurgic value, the RFRBs could not give a receipt that

reflected the metallurgic value of the coin delivered to or received from Brink's. Ex. I

(Kingkade Aff.) at ¶ 12; *see also* Ex. A (S.O.F.) at ¶¶ 52-53. Absent proof that the composition

of coin actually changed from receipt to delivery, which Relator lacks, Relator cannot

demonstrate that Brink's delivered "less property" back to the RFRBs (even assuming that

Relator's non-viable metallurgical value theory had merit, which it cannot in a legal tender

context). 31 U.S.C. § 3729(a)(4).

The RFRBs' lack of knowledge as to the metallurgical value of the coins delivered to

Brink's negates the statutory certificate or receipt requirement. To demonstrate a violation of 31

U.S.C. § 3729(a)(4), Relator must show that Brink's delivered "less property than the amount for

which the person receives a certificate or receipt." Thus, one of the essential elements of the

claim is receipt by Brink's of a certificate or receipt. *U.S. ex rel Aakhus v. Dyncorp, Inc.*, 136

F.3d 676, 681 (10th Cir. 1998).  Such a receipt must have some connection or relationship to

Brink's return of property and because the claim here involves the  metallurgic value of coin, the

receipt would need to reflect the metallurgic value of the coin received and returned.  *Id*.

Further, for a receipt to satisfy the statutory requirement, the receipt or certificate must be issued

by the government.  *Id*.

First, there is no evidence that Brink's received *any* receipt whatsoever from the RFRBs

(much less the government) relating to the pennies held by Brink's for the RFRBs.  In fact,

because of the constant movement of coin in and out of the Brink's facilities and the RFRBs'

accounts to accommodate the needs of the RFRBs' customers, Brink's and the RFRBs compared

their coin inventory totals (based on face value) on a daily basis.  The RFRBs did not provide

receipts to Brink's to document paper transfers of coin when a depository bank would transfer

coin from the depository bank's account to the RFRB's account.  Ex. I (Kingkade Aff.) at ¶ 12.

This lack of receipt, by itself, is enough to entitle Brink's to summary judgment.  *See U.S. ex rel*

*Aakhus,* 136 F.3d at 681  (directed verdict in favor of defendant proper where Relator failed to

present evidence of a receipt prepared by the government and documenting the property returned

to the government).

Second, even assuming receipts were provided by the RFRBs, those receipts would not

and could not have documented the metallurgic value of the coin delivered from the RFRBs to

the Brink's coin terminal because the RFRBs accounted for its coin based only on face value and

did not know, care about or measure the metallurgic value of coin.  Ex. H (FRB Aff.) at ¶¶ 15-

16.  Moreover, because the CTAs executed between Brink's and the RFRBs required or

permitted Brink's to commingle coin, the RFRBs never intended that Brink's would deliver to

them the same pennies Brink's received.  *Id*. at ¶¶ 17, 22 ("Coins move in and out of the FRBCL

- 20 -

account at Brink's coin terminal during a normal day to accommodate our depository banks'
purchases and deposits; this is why the coins are treated as fungible within their respective
denominations and must be valued, handled and accounted for at face value.").

It is undisputed that coin was treated by the RFRBs as fungible, legal tender, and the face
value of coin was the only value known, measured by and of concern to the RFRBs.  It is also
undisputed that the RFRBs could not and did not provide receipts to Brink's documenting the
metallurgic value of coin deposited to the RFRBs' accounts.  As a result, Relator cannot
demonstrate that Brink's ever provided the RFRBs with coin of lesser metallurgical value, much
less that the government provided Brink's with any receipts or certificates that documented the
metallurgical value (or alleged difference in value) of any coin provided to or received from
Brink's.

### ii.     There Is No Evidence Of Any "Delivery" To The RFRBs

Section 3729(a)(4) also requires Relator to show that there was a "delivery" of less
property or money (coin) to the Government.  There is no cognizable evidence here that Brink's
actually physically "delivered" coins to the RFRBs, much less that there was a delivery of less
than all of the Government's property.  Relator explained that day to day, the movement of coin
in and out of the RFRBs' accounts was a paper transaction, not a physical movement of coins.
Ex. B (Relator Depo.) at 43:15-45:2.  Moreover, Relator could not recall whether he in fact
physically delivered, to any RFRB, zinc coins received from Jackson Metals.  *Id*. at 148:5-
149:11.

The Complaint manifests a gross misunderstanding of how coin was handled.  Day to
day, Brink's physically receives coin from and delivers coin to the RFRBs' customers
(depository banks); however, other coin transfers were solely electronic transactions that did not
involve any physical movement of coin within the coin terminal (*e.g*., an electronic "deposit" or

- 21 -

transfer of coin from Coinstar's account to Bank of America's account).  Ex. A (S.O.F.) at ¶¶ 15-17.  Relator therefore lacks evidence of any actual, physical deliveries of coin to the RFRBs.  Absent proof of any such physical delivery of coin from Brink's to the RFRBs, Relator cannot establish this element of the claim.

> iii.   There Is No Evidence That Any RFRB-Owned Coin Was Involved In The Alleged Coin "Swaps"

Relator alleges that Brink's exchanged certain truckloads of pennies at its facilities to allow a third party, Jackson Metals, to sort out pennies with higher copper content.  Doc. 1 (Compl.) at ¶ 5.  Relator claims that as a result of this activity, Brink's failed to secure the RFRBs' property and delivered to the RFRBs coins with a lower copper content and different metallurgic composition.  *Id*. at ¶¶ 3, 86.  At its core, the Complaint rests on a faulty assumption—that the pennies received by Jackson Metals were owned by the RFRBs.

Significant quantities of pennies and other coins flow in and out of Brink's facilities throughout the day to facilitate the needs of depository banks, the RFRBs and Brink's other customers.  Ex. B (Relator Depo.) at 89:8-91:3.  Although records of the individual penny accounts for Brink's customers were documented and maintained electronically, pennies were commingled, regarded as general stock and treated as fungible legal tender within their respective denominations.  Ex. B (Relator Depo.) at 35:19-38:18.  As a practical matter, this meant that when any customer requested a physical delivery of pennies from the customer's account, Brink's could package for delivery to the customer any of the pennies in the coin room.  Ex. B (Relator Depo.) at 37:15-38:18 ("Q….[O]n any given day, Bank of America couldn't come in your facility and say, 'We want those three quarters.  I think they were ours.'  A. Correct….  Q. They may have the right to 75 cents worth of quarters under your books, and you would give them 75 cents worth of quarters, but they couldn't tell you which quarters were theirs

- 22 -

versus someone else's, correct?  A. Correct.  Yes."); Ex. C (Mulroney Depo.) at 34:1-18.   Thus,

ownership of specific, physical pennies within the commingled coin room could not be

established until those pennies were actually delivered to the customer.  Ex. B (Relator Depo.) at

38:3-18, 97:1-6; Ex. C (Mulroney Depo.) at 33:22-34:12, 139:12-22.

The evidence demonstrates that the pennies acquired by Jackson Metals were generally

purchased from Coinstar or from individual banks – they were not taken from the RFRBs'

accounts nor were they purchased from Brink's.  Ex. B (Relator Depo.) at 96:16-97:6, 107:21-

108:25; Deposition of Jackson Metals ("Jackson Metals Depo."), attached as Exhibit E,  at

24:20-25:19, 38:25-39:2, 55:2-8, 65:11-17, 155:12-157:15; Jackson Metals' Responses to

Relator's First Set of Interrogs., attached as Exhibit F, at 7-8 ("The coins were purchased from

Coinstar, and picked up at a Brink's depository" / Jackson Metals' arrangement with Brink's

"was to involve only Coinstar pennies"); Ex. D (Brink's Supp. Discovery Resp.) at Supp. Ex. A-

01 to A-17.  The pennies acquired by Jackson Metals generally were purchased and debited from

Coinstar's accounts at Brink's.   Ex. E (Jackson Metals Depo.) at 38:25-39:2; Ex. F (Jackson

Metals' Resp. to Relator's First Interrogs.) at 7-8 ("The coins were purchased from Coinstar, and

picked up at a Brink's depository.").

This is consistent with Relator's own statements and allegations.  For example, Relator

alleges in his Complaint that Brink's had accumulated certain surpluses of pennies as a result of

its Coinstar account and that the local FRB would not permit Brink's to deposit the surplus

pennies with the RFRB.  Doc. 1 (Compl.) at ¶ 63.  Relator further alleges that the shipments of

pennies to Jackson Metals were made from these surplus pennies.  *Id.* at ¶¶ 63-64.  During his

deposition, Relator also acknowledged that any coin transactions at Brink's locations with

Jackson Metals were to involve Coinstar coin.  Ex. B (Relator Depo.) at 96:16-97:6, 107:21-108:25.

Even for those transactions  loosely denominated as "swaps," there is no indication that any pennies were removed from any of the RFRBs' accounts or that there was any net change in the face value of coin held in Brink's coin rooms.  In fact, the evidence demonstrates just the opposite.  Ex. B (Relator Depo.) at 69:7-13, 71:5-16.  Moreover, despite testifying that he assisted in executing a number of penny "swaps" with Jackson Metals, Relator was unable to say whether any of the "swaps" involved any RFRB-owned coin or whether any of the  zinc pennies received from Jackson Metals were ever physically delivered to the RFRBs.  *See, e.g.*, Ex. B (Relator Depo.) at 96:22-97:6, 148:19-149:11.

Contrary to the Complaint's assertions, the transactions with Jackson Metals had nothing to do with the RFRBs.  The most significant source of copper pennies flowing into the Brink's facilities was Coinstar, not the RFRBs.  Ex. C (Mulroney Depo.) at 21:4-7, 23:20-24:3.  Absent the surplus of coin created by Coinstar's business, the transactions with Jackson Metals could not have occurred.  *Id*. at 86:17-87:6, 91:22-92:1, 96:4-97:11; Ex. E (Jackson Metals Depo.) at 28:4-17, 63:19-25.

Banks and individual Brink's customers can manage, use and transfer their own money in any way they see fit.  Ex. C (Mulroney Depo.) at 155:17-25; Ex. B (Relator Depo.) at 118:14-119:7.  That Coinstar chose to enter into transactions with Luhrman, Jackson Metals, Huntington Bank or any other third parties relating to the sale or transfer of its pennies does not implicate or impact the RFRBs' coin accounts.  Ex. C (Mulroney Depo.) at 138:25-139:22, 168:8-17.  Simply put, there is no evidence of record to support an assertion that the coins involved in Jackson

Metals' penny acquisitions involved or impacted the RFRBs' coin accounts.  As a result, the RFRBs sustained no loss and on this ground alone, judgment should be entered in Brink's favor.

## II.     Brink's Did Not Submit Any False Reports Or Statements To The RFRBs

To sustain an FCA claim under 31 U.S.C. § 3729(a)(7), Relator must show Brink's knowingly made or used "a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government."  Relator's claims are based on allegations that Brink's purportedly misreported and withheld material information from the RFRBs relating to the RFRBs' coin, allegedly in breach of Brink's obligations under the CTAs. *See* Doc. 1 (Compl.) at ¶¶ 4-6, 88-89, 96.  Relator's assertions are baseless.

First, Relator has wholly failed to identify a single false record or statement made by Brink's to the RFRBs.  Rather, Brink's accurately reported to the RFRBs all information required by the CTAs with regard to the security, location and value of the RFRBs' coin. Second, although disclosure was not required by the CTAs, the RFRBs *and the government* were well aware of the business relationship between and among Coinstar, Jackson Metals and Brink's.  Specifically, they  knew (1) that Jackson Metals had stockpiled significant quantities of pennies, (2) that many of the stockpiled pennies had been acquired from Coinstar through Brink's coin terminals, and (3) that Jackson Metals had melted substantial quantities of copper pennies prior to the ban prohibiting such melting.

As a result, Relator cannot demonstrate that Brink's knowingly made any false statement or record to the RFRBs to conceal, avoid or decrease an obligation to pay or transmit money to the RFRBs.  Relator's claim under 31 U.S.C. § 3729(a)(7) fails.

- 25 -

### A.     Brink's Accurately Reported To The RFRBs All Information Required By The CTAs

Relator has not produced any evidence demonstrating that Brink's made any false statement to the RFRBs.  Relator claims that Brink's "misreported and withheld material information relating to the security and location of the Federal Reserve's coin" because Brink's did not report the metallurgic value of the RFRBs' pennies or the transactions between Jackson Metals and Coinstar.  Doc. 1 (Compl.) at ¶¶ 87-88.  However, this is nonsense; Relator grossly misstates the rights and obligations of Brink's and the RFRBs under the CTAs.

The parties to the CTAs—Brink's and the individual RFRBs—never intended that the RFRBs' coin be held, stored or returned based on their intrinsic or metallurgic value.  Ex. H (FRB Aff.) at ¶ 23; Ex. I (Kingkade Aff.) at ¶ 10.  Rather, the RFRBs' coins were always to be treated fungibly as legal tender.  *Id*.  Although the CTAs required Brink's to submit customer inventory balance reports to the RFRBs, those reports only required Brink's to report the face value of the coins.  Ex. H (FRB Aff.) at ¶ 24; Ex. I (Kingkade Aff.) at ¶ 11.  The customer inventory balance reports were not to reflect and did not require Brink's to report on any unique, intrinsic or metallurgic value of the coin handled or stored for the RFRBs.  *Id*.  Such information was immaterial.

The only material information under the CTAs was information pertaining to the face value of the coin held by Brink's in the RFRBs' accounts.  So long as Brink's accurately reported the face value of the RFRBs' coin  in its daily reports to the RFRBs, Brink's daily inventory reports were accurate.  Ex. H (FRB Aff.) at ¶ 19; Ex. B (Relator Depo.) at 53:24-54:9, 81:22-84:3, 138:8-17.  This is true regardless of whether the intrinsic or metallurgic value of any coin in inventory exceeded the coin's face value.  Ex. H (FRB Aff.) at ¶ 19.  By reporting the face value of the RFRBs' coin in its customer inventory balance reports, Brink's fully discharged

its contractual obligation for reporting inventory values under the CTA to the RFRBs, and did so in the manner requested, required, and desired by the RFRBs. *Id.* at ¶ 24.

There is no dispute that Brink's accurately reported this information. Relator concedes that Brink's did not falsely report any information requested by the FRB of Cleveland. Ex. B (Relator Depo.) at 54:5-9, 54:18-22, 81:22-82:1, 138:8-17 ("Q...Do you still believe today that the daily coin inventory reports that you gave to the Federal Reserve Bank of Cleveland from your branch while you were the branch manager were, in fact, true and accurate reports? A. Based on the balance and face value, yes. That's how – it was face value. That's what we reported. So it was accurate. Q. That's what you reported, and that's what they asked you to report? A. Yes.").

Because Relator cannot demonstrate that Brink's made or used any false record or statement material to an obligation to transmit money or property to the RFRBs, Relator's claim under 31 U.S.C. § 3729(a)(7) fails.

### B. The Government's Knowledge of Jackson Metals' Penny Culling and Stockpiling Vitiates The Falsity Required For An FCA Claim

The underlying purpose of the FCA is to prevent the government from being defrauded. "Since the crux of an FCA violation is intentionally deceiving the government, no violation exists where the government has not been deceived." *U.S. ex rel Lamers v. City of Green Bay*, 998 F.Supp. 971, 987 (E.D. Wis. 1998), *aff'd* 168 F.3d 1013 (7th Cir. 1999). To this end, an FCA Relator must plead and prove that the defendant knowingly made or presented a false record or statement for the purpose of concealing, avoiding, or decreasing an obligation to pay or transmit money or property to the Government. *See* 31 U.S.C. § 3729(a)(7).

Although the Complaint attempts to characterize the Coinstar, Jackson Metals and Brink's business relationship as a back room deal clothed in secrecy, the simple fact is that

- 27 -

various employees of the RFRBs and the U.S. Mint,[11] including the Mint's general counsel, as well as members of Congress and their staffs were well aware of the parties' relationship, Luhrman's efforts to stockpile pennies, and Luhrman's repeated attempts to obtain governmental relief from the ban on melting pennies. Government knowledge negates the falsity or fraud aspects of an FCA claim when the government knows of the underlying facts complained of by a relator to be fraud. *See United States ex. rel Durcholz v. FKW Inc*., 189 F.3d 542, 545 (7th Cir. 1999). Here, the basis of Relator's claim was succinct:

> Q.     …Can you tell us what in your
> own mind and in your own words [why] you decided to sue
> Brink's for? Why are you bringing this lawsuit?
>
> A.     I think that they engaged in a scheme with
> Walter Luhrman and Jackson Metals to take copper content
> pennies out of circulation for the benefit of Brink's,
> Jackson Metals, Walter Luhrman, and I guess the biggest
> customer that's involved is Coinstar.
>
> Q.     Thank you. Anything else?
>
> A.     That's the simple reason why we're here.

Ex. B (Relator Depo.) at 7:23-8:7. As explained below, the *precise* facts upon which Relator relies for his lawsuit were well known to the federal government five or so years *before* Relator filed suit. On these grounds alone, Relator's FCA claim must fail.

   Walter Luhrman, Jackson Metals' president, was particularly vocal in educating governmental and the RFRBs' personnel with respect to his plan to cull, stockpile and potentially melt copper pennies. In December 2006, shortly after the Treasury Department promulgated its prohibition on the melting of pennies, Luhrman discussed his business plan with then-U.S.

---

[11] The U.S. Mint, in direct contrast to the regional FRBs, is in fact part of the federal government.

Senator George Voinovich.  Ex. G (Luhrman Decl.) at ¶ 12.  As part of that discussion, Luhrman explained to Senator Voinovich the details of his enterprise in obtaining, culling and stockpiling copper pennies, including the involvement and role of Coinstar and Brink's, as well as the potential governmental savings that could be achieved by redistributing the zinc pennies to locations in need of pennies.  *Id*. at ¶ 12.  In late 2006 or early 2007, Luhrman also spoke with a staffer for U.S. Congressman Luis Gutierrez, who was then a member of the Committee on Financial Services.  *Id*. at ¶ 13.  Luhrman explained to Congressman Guiterrez's staffer his business plan, as well as the interactions between Jackson Metals, Coinstar and Brink's in accomplishing that plan.  *Id*. at ¶ 13.

In January 2007, Luhrman contacted U.S. Congressman Zach Space and explained the details of his penny-related business endeavor.  Ex. G (Luhrman Decl.) at ¶ 14.  Congressman Space not only communicated with Luhrman by phone and in writing, but also personally visited Jackson Metals' business facility and toured its operations.  *Id*.at ¶ 14.  During his visit to the Jackson Metals facility in 2007, Congressman Space observed that Jackson Metals continued to cull and stockpile pennies.  *Id*. at ¶ 14.  As part of his conversations with Congressman Space, Luhrman explained, in detail, how Jackson Metals had and would acquire pennies, including his relationships with Coinstar and Brink's, how Jackson Metals culled the pennies for copper and was continuing to amass copper pennies, and how Jackson Metals was returning the zinc pennies to various locations across the country.  *Id*. at ¶ 14.

Luhrman also organized and facilitated other meetings with Congressional staffers and members of Congress during which Luhrman discussed Jackson Metals' penny-related business endeavors.  Ex. G (Luhrman Decl.) at ¶¶ 15-18.  During several of these meetings, the business relationship between and among Jackson Metals, Brink's and Coinstar was discussed.  *Id.* at ¶¶

15, 17-18.  In fact, a representative from Brink's (James Mulroney) attended at least one of those Congressional committee meetings.  *Id*. at ¶ 15.  In addition, Jackson Metals, Brink's and Coinstar *jointly* submitted written testimony to the U.S. House Committee on Financial Services, further discussing and disclosing the relationship between and among the parties.  *Id*. at ¶ 20, Ex. 1 ("Jackson Metals and Coinstar have formed a partnership to address the over supply of pennies in the market today.  The partnership transcends the immediate issues with respect to storage issues and includes options such as back hauls of other coins on a market to market basis.").

In addition, personnel at the Federal Reserve's Cash Product Office, the Mint and various RFRBs were aware that Jackson Metals had amassed a considerable stockpile of pennies (approximately $2.5 million worth of pennies).  Ex. G (Luhrman Decl.) at ¶¶ 21-22.  For example, Phillip Johnson of the RFRB of San Francisco noted that "the Jackson Metals topic is at the top of everyone's mind right now" and certain federal reserve bank branches used Jackson Metals as a resource in supplying and redistributing pennies.  *Id*. at ¶¶ 21-22, Ex. 7 and 8.  In 2007, certain members of Congress (after learning of Jackson Metals' copper penny culling endeavor) even went so far as to contact the Mint formally and directly on Jackson Metals' behalf.  This letter, written on Congressional letterhead, lent support to Jackson Metals' request for a license to melt pennies (after the December 2006 ban on melting pennies) and further advised the Mint that Jackson Metals was culling pre-1982 pennies for their copper content and redistributing pennies at locations where coin owned by the RFRBs was held.  *Id*. at ¶ 19, Ex. 5.

"The government's prior knowledge of an allegedly false claim can vitiate a FCA action.... In such a case, the government's knowledge effectively negates the fraud or falsity required by the FCA."  *United States ex. rel Durcholz v. FKW Inc*., 189 F.3d 542, 545 (7th Cir. 1999); *U.S. ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999) ("it is

impossible to meaningfully discuss falsity without implicating the knowledge requirement");

*U.S. ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 289 (4th Cir. 2002) ("the

government's knowledge of the facts underlying an allegedly false record or statement can

negate the scienter required for an FCA violation").

The government knowledge defense is particularly well-suited to cases in which, as here,

the government knew the underlying facts and cooperated with the parties. *U.S. ex rel. Burlbaw*

*v. Orenduff*, 548 F.3d 931, 953-57 (10th Cir. 2008).  Here, Jackson Metals informed the

government of its business plan to cull copper pennies as well as the benefit to the RFRBs in

redistributing coin.  Several RFRBs took Jackson Metals up on its offer and requested that

Jackson Metals deliver zinc pennies to certain markets to prevent penny shortages or orders of

Mint coin.  *See* Ex. G (Luhrman Decl.) at ¶¶ 20-22, Ex. 1 at JM004853 and Ex. 8 at JM005503;

*see also* Exhibit K at JM003548 (Email from J. Burke, Brink's Coin Product Manager, SE

Region, to Luhrman (4/4/2007)) ("As a result of the planned delivery of $66,000 on April 10 and

$66,000 on April 17, the Fed has cancelled its plans to deliver new Pennies to us on April 18.").

Both the government and the RFRBs knew that Jackson Metals was culling and

stockpiling copper pennies and that Jackson Metals purchased those pennies from Coinstar

through various Brink's coin terminals.  Despite this knowledge, neither the federal government

nor the RFRBs voiced any objection to allowing Brink's to act as coin terminals for the RFRBs,

nor did they raise any concern or object to the relationship between or among Jackson Metals,

Coinstar and Brink's.  Such knowledge is fatal to Relator's claims.

Moreover, Brink's did not, in fact, make any false record or statement to the RFRBs or

government as Brink's was not required, as part of its daily report to the RFRBs, to inform the

RFRBs concerning all of its other customers' penny related transactions.  *See* Ex. C (Mulroney

Depo.) at 155:17-25; Ex. B (Relator Depo.) at 118:14-119:7.  Yet even assuming that Brink's did not apprise the RFRBs of all information concerning every acquisition of pennies by Jackson Metals (just as Brink's did not inform the RFRBs of all transactions made by or between Brink's many  other customers), and assuming *arguendo* that Brink's daily inventory reports to the RFRBs could somehow be deemed a false record or statement (which is preposterous and, to be clear, they are not), Relator's claim would still fail.  Here, the government knew of the nature of the relationship between and among Coinstar, Jackson Metals and Brink's as early as the first quarter of 2007.[12]  As a result, Relator cannot demonstrate that the government was defrauded or that Brink's made any false record or statement.  Relator cannot sustain a claim under 31 U.S.C. § 3729(a)(7).

### III.    The RFRBs Are Not "The Government" For Purposes Of The FCA And Any RFRB Coins At Issue Were Not Property Of The Federal Government

The purpose of the False Claims Act, and the objective of Congress in enacting the Act, was broadly to protect the funds and property of the Government from fraudulent claims. *See Rainwater v. United States*, 356 U.S. 590, 592 (1958).  Because the Act was "designed to redress activity that attempts to cause or actually results in loss to the government[,]….claims that do not reach or ultimately threaten to reach the government fisc should not and cannot be subject to the FCA."  *U.S. ex rel Fellhoelter v. Valley Milk Prods., L.L.C.*, 617 F.Supp.2d 723, 731 (E.D. Tenn. 2008).  Relator's Complaint rests upon a fundamental misconception that is fatal to Relator's claim, namely that the RFRBs are "the Government" under the False Claims Act.

---

[12] In addition to the federal government's knowledge of all the key aspects of Jackson Metals' penny endeavors years before Relator filed suit, and contrary to the Complaint's assertion of "secrecy," the Jackson Metals penny activities were well-publicized in the media.  Ex. G (Luhrman Decl.) at ¶ 24; Ex. B (Relator Depo.) at 121:5-129:16.

To be sure, the RFRBs serve certain public purposes and interests; however, the RFRBs are, by congressional design and explicit statutory command, private corporations separate and apart from the federal government. Ex. J (Conti-Brown Decl.) at ¶¶ 5, 19-20, 25. As a result, the conduct alleged by Relator, namely that Brink's permitted certain "swaps" of pennies allegedly belonging to certain RFRBs does not and cannot implicate the government fisc because any pennies held in the RFRBs' accounts were owned by the RFRBs and were not property of the United States Government. Absent a loss or potential loss to the government fisc (and there was none here), Relator cannot sustain a claim under the FCA.

### A. Establishment Of The Federal Reserve System

Congress created the Federal Reserve System (the "System") in 1913 through passage of the Federal Reserve Act. 12 U.S.C. § 221, *et. seq.* The System is comprised of two core institutions—a Federal Reserve Board of Governors (the "Board of Governors") and twelve (12) regional FRBs. The Board of Governors serves as the central governmental agency for the System. Ex. J (Conti-Brown Decl.) at ¶ 24. The Board of Governors' members, unlike officers of the individual RFRBs, are appointed by the President of the United States and confirmed by the U.S. Senate. *Id.*; 12 U.S.C. § 241. The Board of Governors formulates national monetary policy, exercises broad responsibility for the nation's payment systems, supervises and regulates the activities of banking institutions, including the RFRBs, and administers certain consumer credit protection laws.

In contrast to the Board of Governors, the RFRBs were designed to operate as the private component of the System. Ex. J (Conti-Brown Decl.) at ¶¶ 14-16, 18-20. The individual RFRBs are corporations with the power to make contracts, sue and be sued, appoint officers and employees, adopt by-laws to prescribe the manner in which its general business is conducted and generally carry on the business of banking. 12 U.S.C. § 341; *see also* Ex. H (FRB Aff.) at ¶ 4;

Ex. J (Conti-Brown Decl.) at ¶ 14(a)-(j).  The status of the RFRBs as private sector entities is an essential and integral part of the RFRBs' history and character.  Ex. J (Conti-Brown Decl.) at ¶ 16.

### B. Operating Structure Of The RFRBs

The twelve (12) RFRBs are not structured like federal agencies.  Rather, each RFRB is a private corporation owned by private stockholders.  Ex. J (Conti-Brown Decl.) at ¶ 14(a)-(j).  A RFRB's capital stock is funded and held by (1) national banking associations, which are required to become members of and purchase stock in their regional FRB and (2) state-chartered banks which may choose to become members of and purchase stock in their local FRB.  12 U.S.C. §§ 282, 321; Ex. H (FRB Aff.) at ¶ 10; Ex. J (Conti-Brown Decl.) at ¶ 14(a).  In addition, members of the public are permitted to purchase and hold limited shares of public stock.  12 U.S.C. § 283; Ex. J (Conti-Brown Decl.) at ¶ 14(b).  The RFRBs are funded entirely from the revenues generated by the RFRBs and the capital paid in by their member banks and other stockholders.  Ex. J (Conti-Brown Decl.) at ¶¶ 21-22.  The RFRBs do not receive any federal appropriations and the United States has no proprietary interest in the RFRBs. *Id*.; Ex. H (FRB Aff.) at ¶¶ 8, 10.  While the Board of Governors is permitted to levy certain assessments against the RFRBs to fund the Board of Governors' activities, the funds obtained by the Board of Governors from the RFRBs "shall not be construed to be Government funds or appropriated monies."  12 U.S.C. § 244.  The member banks, not the United States, are liable for the contracts and debts of the RFRBs and, like other private-sector corporations, the RFRBs pay out annual dividends to their shareholders. 12 U.S.C. § 289(a)(1); 12 U.S.C. § 502.

Each RFRB is organized as a separate corporate body with the power to make contracts, own property, and sue and be sued in its own name. 12 U.S.C. § 341; Ex. H (FRB Aff.) at ¶¶ 4-5; Ex. J (Conti-Brown Decl.) at ¶ 14(f)-(g).  When involved in litigation, the individual RFRBs

represent themselves through their in-house legal staff or by outside, private counsel.  Ex. H

(FRB Aff.) at ¶ 4.  The RFRBs are not represented by the U.S. Department of Justice.  *Id*.

Moreover, when the RFRBs are entitled to payment as a result of any lawsuit, claim or

settlement, any such payment or judgment would be made payable to the individual RFRB, not

to the United States of America.  Ex. H (FRB Aff.) at ¶¶ 11-12.  Ownership of RFRB properties

is vested in the individual RFRBs rather than the Government Services Administration or the

United States.  Ex. H (FRB Aff.) at ¶ 5.

      Day-to-day operation and supervision of each RFRB is controlled by a board of directors.

The board of directors for each RFRB selects that RFRB's president and vice presidents and

selects all the RFRB's other officers.  12 U.S.C. § 341.  None of the directors or employees of

the RFRBs are appointed by the President.  12 U.S.C. §§ 222, 301-302; Ex. H (FRB Aff.) at ¶ 7.

Officers and employees of the RFRBs are largely exempt from the provisions of Title 5 of the

United States Code regarding federal employment.  *Obradovic v. Fed. Reserve Bank of N.Y.*, 569

F.Supp. 785 (S.D.N.Y. 1983).  The salaries of officers and employees of the RFRBs are not set

by the federal general schedule or other federal pay scale and are not subject to statutory caps

and RFRB employees do not participate in the Federal Employees Retirement System or any

other federal pension system.  Ex. H (FRB Aff.) at ¶¶ 6, 9; Ex. J (Conti-Brown Decl.) at ¶ 19(b).

      The RFRBs operate as full-service banking organizations and provide services to

commercial banks similar to the services that commercial banks provide to their customers (*e.g.*,

the RFRBs assist depository banks by allowing them to purchase and deposit coins, as needed).

Ex. H (FRB Aff.) at ¶ 15.  The RFRBs charge fees for their services and, in some functions,

actually compete with other banking institutions and private-sector entities.  Ex. J (Conti-Brown

Decl.) at ¶ 21.  Unlike the Board of Governors, the RFRBs are not subject to the Freedom of

Information Act and their websites use the .org domain, not the .gov domain used by governmental agencies and bodies. Ex. J (Conti-Brown Decl.) at ¶ 19(a) and (c).

### C. Judicial Recognition Of The Independent Nature Of The RFRBs

Numerous courts also have recognized the independent and private nature of the RFRBs. For example, in holding that the FRB of Kansas City was not a federal agency for purposes of calculating the time for appeal (Fed. R. App. P. 4), the Eighth Circuit noted that the "Bank is a private, independent entity independently run by its own board of directors," not the Board of Governors or any other part of the executive branch. *Scott v. Fed. Reserve Bank of Kansas City*, 406 F.3d 532, 535-36 (8th Cir. 2005). The court observed that the RFRB "is considered a separate corporation owned solely by commercial banks within its district," is not government financed, lacks the authority to promulgate regulations having the force and effect of law, is not designated, by statute, as a federal agency, plays only a limited role in carrying out government fiscal functions and can sue and be sued in its own name. *Id*. at 535-38. Similarly, the Ninth Circuit, for purposes of the Federal Tort Claims Act, has held that the RFRBs are "independent, privately owned and locally controlled corporations." *Lewis v. U.S.*, 680 F.2d 1239, 1241 (9th Cir. 1982). The Ninth Circuit noted that RFRBs are corporations owned by private banks, are empowered to conduct their activities without day-to-day direction from the federal government, do not receive federal appropriations or other federal funding, carry their own liability and workers compensation insurance, and handle their own claims. *Id*. at 1241-42; *see also Katsiavelos v. Fed. Reserve Bank of Chicago*, 859 F.Supp. 1183, 1185 (N.D. Ill. 1994) (noting that the RFRBs are not owned by the US government or controlled by the executive branch and "act with sufficient independence under private ownership and control such that they do not qualify as government corporations or independent establishments"); *Advanced Software Design Corp. v. Fed. Reserve Bank of St. Louis*, 583 F.3d 1371, 1375-76 (Fed. Cir. 2009)

(acknowledging that RFRBs, as private banks, did not themselves qualify as the Government for purposes of patent infringement claims).

To be sure, the RFRBs perform certain activities that are designed to advance public purposes and, for some purposes, the RFRBs act as or have been regarded as federal instrumentalities.  For example, in the taxation context, the RFRBs have traditionally been regarded as federal instrumentalities.  *See, e.g., Fed. Reserve Bank of St. Louis v. Metrocentre Imp. Dist. No. 1*, 657 F.2d 183, 185-86 (8th Cir. 1981); *James v. Fed. Reserve Bank of N.Y.*, 471 F.Supp.2d 226, 240 (E.D.N.Y. 2007); *Fed. Reserve Bank of Minneapolis v. Register of Deeds for Delta Cnty.*, 284 N.W. 667, 668 (Mich. 1939).[13]

Similarly, for purposes of certain other Acts, courts have found the RFRBs to be federal instrumentalities.  *See James*, 471 F.Supp.2d at 240-43 (finding that the Federal Reserve Bank of New York was a federal instrumentality for the purposes of state employment law); *Jet Courier Servs., Inc. v. Fed. Reserve Bank of Atlanta*, 713 F.2d 1221, 1228 (6th Cir. 1983) (holding that RFRB qualified as governmental agency for purposes of liability under the Sherman Act).  For example, in *Brink's v. Board of Governors of Fed. Reserve Sys.*, 466 F.Supp. 116 (D.D.C. 1979), the DC district court concluded that the FRB of Richmond was an "agency of the United States *for purposes of the Service Contract Act.*"  *Id. at* 118 (emphasis added).[14]  However, the court's decision was confined to the particular Act at issue (the Service Contract Act), which the district

---

[13] Notably, the decisions of these courts were heavily influenced by a statutory provision that specifically exempts RFRBs from federal, state and local taxation (except real estate taxes).  *See* 12 U.S.C. § 531.

[14] The FRB of Richmond maintained that it was a private banking corporation not bound by the Act.  *Brink's*, 486 F.Supp. at 117.

court concluded must be "liberally construed to effectuate the Act's humanitarian purposes." *Id*. at 120.

In other circumstances, however, courts have refused to apply the federal agency designation to the RFRBs. For example, in interpreting the Federal Tort Claims Act, the Ninth Circuit noted that "[s]uch a liberal construction of the term 'federal agency' for purposes of the Act is unwarranted" and held that the RFRBs are not federal agencies. *Lewis*, 680 F.2d at 1243. The court further observed that "[u]nlike in *Brinks*, plaintiffs are not without a forum in which to seek a remedy, for they may bring an appropriate state tort claim directly against the Bank." *Id*. Likewise, the RFRBs do not need the False Claims Act to provide an avenue for recovery. In the event of a perceived loss or breach of contract, the RFRBs can protect their own interests by initiating litigation in their own names.[15]

Regardless, the RFRBs can operate as federal instrumentalities or otherwise serve public purposes without becoming part of "the Government" for all purposes (or for purposes of the FCA). "Instrumentalities like the national banks or the federal reserve banks, in which there are private interests, are not departments of the government. They are private corporations in which the government has an interest." *United States Shipping Bd. Emergency Fleet Corp. v. W. Union Tel. Co*., 275 U.S. 415, 425-26 (1928). For example, organizations such as the Red Cross and Fannie Mae have been found to be federal instrumentalities for some purposes without becoming part of the federal government itself. *See Marcella v. Brandywine Hosp*., 47 F.3d 618, 621-24 (3d Cir. 1995) (holding that the Red Cross was not part of the federal government despite the fact

---

[15] The FRB of Cleveland explained that it can sue in its own name and that it could and would seek reimbursement from its coin vendor for any losses. Ex. H (FRB Aff.) at ¶¶ 4, 11-13. If there were any losses to the RFRBs (which there were not), the RFRBs, in their own names, would be the proper parties to pursue such a claim.

that the entity sometimes operated like an arm of the government); *U.S. ex rel. Adams v. Aurora Loan Servs., Inc.*, 813 F.3d 1259, 1260-61 (9th Cir. 2016) ("Fannie Mae's federal instrumentality status for state tax purposes doesn't answer whether Fannie Mae and Freddie Mac are also government entities for False Claims Act purposes"); *see also Arkansas v. Farm Credit Servs. of Cent. Ark.*, 520 U.S. 821, 829 (1997) ("An instrumentality of the United States can enjoy the benefits and immunities conferred by explicit statutes…without the further inference that the instrumentality has all of the rights and privileges of the National Government.").  "Whether or not an entity is a federal instrumentality" for one purpose "is a different question from whether an instrumentality is a federal agency for a specific statute." *Fasano v. Fed. Reserve Bank of New York*, 457 F.3d 274, 282 (3d Cir. 2006) (noting that the New York Fed did not claim to be *part* of the US Government, only an instrumentality thereof); *see also Nevada ex rel. Hager v. Countrywide Home Loans Servicing, LP*, 812 F.Supp.2d 1211, 1215-16 (D. Nev. 2011) (recognizing that "an entity designated as a federal instrumentality for one purpose does not mean that the entity is a federal instrumentality for other purposes").

**D.    The RFRBs are not the United States Government for Purposes of the FCA**

The distinction between a mere federal instrumentality and an entity that is part of the federal government is an important one.  This distinction is especially important in the FCA context because the FCA only prohibits false claims made or fraud against "the Government." *See, e.g., U.S. ex rel Totten v. Bombardier Corp.*, 380 F.3d 488, 490-92, 502 (D.C. Cir. 2004) (affirming dismissal of FCA claims because the alleged claims were presented only to Amtrak and Amtrak "is not the Government");  *Aurora Loan Servs.*, 813 F.3d at 1260-61 (dismissing FCA action because the Federal National Mortgage Association (Fannie Mae) and Federal Home Loan Mortgage Corporation (Freddie Mac) were not government entities for False Claims purposes); *U.S. ex rel Shupe v. Cisco Systems, Inc.*, 759 F.3d 379, 387 (5th Cir. 2014)

(recognizing that there is no FCA liability for acts "directed towards parties that are not 'the Government'").

Although the FCA does not itself define what is meant by "the Government," the United States Supreme Court has identified several factors useful in determining whether an entity is part of "the Government" for purposes of the FCA.  In considering the status of the Commodity Credit Corporation ("CCC") in *Rainwater v. United States*, 356 U.S. 590 (1958), the Supreme Court took note of (1) how the enabling statutes defined and characterized the entity (the CCC was defined in the Charter Act as an "agency and instrumentality of the United States, within the Department of Agriculture, subject to the general supervision and direction of the Secretary of Agriculture"); (2) the source of the entity's funding (the CCC's capital "was provided by congressional appropriation" and "is replaced out of the public treasury"); (3) the status of the entity's employees and officers (the CCC's officers and employees were employees of the Department of Agriculture and "compensated as such"); and (4) the measure of control exercised by the executive branch over the entity's operations (the CCC was "subject to the provisions of the Government Corporation Control Act which provides such close budgetary, auditing and fiscal controls that little more than corporate name remains to distinguish it from the ordinary government agency").  *Rainwater*, 356 U.S. at 591-92.

Each of the four *Rainwater* factors, when applied here, support a finding that the RFRBs are *not* the Government for FCA purposes.  First, in stark contrast to the CCC described in *Rainwater*, the RFRBs were statutorily designed to be independent of the government.  Ex. J (Conti-Brown Decl.) at ¶¶ 13-20.  Second, again in direct contrast to the CCC, the RFRBs receive no federal appropriations.  *Id*. at ¶¶ 21-22.  Third, CCC employees were compensated as government employees and RFRB employees are not.  *Id*. at ¶ 19(b); Ex. H (FRB Aff.) at ¶¶ 6, 9.

Fourth, the CCC was subjected to strict control under the Government Corporation Control Act and the RFRBs are subject to no such level of federal control.  Ex. J (Conti-Brown Decl.) at ¶¶ 13-15.  The *Rainwater* factors make clear both why the FCA was applicable to the CCC and why the FCA is inapplicable to the RFRBs.

Similarly, in determining whether a federal instrumentality should be considered part of the federal government, federal courts have looked to the following factors: (1) the extent to which the entity performs a governmental function; (2) the scope of governmental involvement in the organization's management; (3) whether the entity's operations are financed by the government; (4) whether persons other than the government have a proprietary interest in the alleged agency and whether the government's interest is merely custodial or incidental; (5) whether the entity is referred to as an agency in other statutes; and (6) whether the entity is treated as an arm of the government for other purposes, such as amenability to suit under the Federal Tort Claims Act.  *In re Hoag Ranches*, 846 F.2d 1225, 1227-27 (9th Cir. 1988) (finding that Production Credit Agencies were not federal agencies and should be treated as private entities).  Among these factors, the most critical is "the existence of federal government control over the 'detailed physical performance' and 'day to day operation' of that entity."  *Lewis*, 680 F.2d at 1240.  Again, when applied to the RFRBs, those factors leave but one conclusion—the FCA cannot apply because the RFRBs are not "the Government."

While the RFRBs certainly serve some public functions in handling certain government securities and issuing currency, the RFRBs also serve a number of private banking functions and in fact compete with other private-sector entities such as the Depository Trust & Clearing Corporation and Society for Worldwide Interbank Financial Telecommunication.  Ex. J (Conti-Brown Decl.) at ¶ 21.  The RFRBs also are not subject to governmental control in the day-to-day

- 41 -

operation of their business.  In transacting its business, the RFRBs are supervised and managed by their own independent boards of directors, not the Federal Reserve Board of Governors or any other part of the executive branch.  12 U.S.C. § 341; *see also Lewis,* 680 F.2d at 1241; *Scott*, 406 F.3d at 535.

Further, the Federal Reserve Act characterizes the RFRBs as corporate bodies rather than federal agencies or government corporations. 12 U.S.C. § 341; *see also Scott*, 406 F.3d at 537 (noting that "no statute designates Federal Reserve Banks as federal agencies").  The Act also explicitly exempts the RFRBs from federal, state and local taxation, an action that would be unnecessary if the RFRBs were part of the federal government. *See* 12 U.S.C. § 531.  In addition, numerous federal statutes and regulations distinguish the RFRBs from the United States Government and its agencies. *See* 29 U.S.C. § 152(2); 50 U.S.C. § 4531(b)(1); 12 U.S.C. § 1820(a); 12 U.S.C. § 1723a(d)(1); 31 CFR § 210.2(c).  Such delineation would not be necessary if the Federal Reserve Banks were in fact part of the Government.

Of the factors considered by federal courts, the source of the entity's funding is particularly significant in an FCA case, given the underlying purpose of the FCA to "protect the funds and property of the Government from fraudulent claims." *Rainwater*, 356 U.S. at 592.  The RFRBs receive no appropriations or other funding from the federal government but rather are funded through their own revenue-generating operations.  Ex. J (Conti-Brown Decl.) at ¶¶ 21-22; Ex. H (FRB Aff.) at ¶ 8.  The stock of the RFRBs is owned by private banks, not the federal government, and the coin held by Brink's for the RFRBs are assets of the RFRBs, not the federal government. *See* Ex. H (FRB Aff.) at ¶ 14; Ex. J (Conti-Brown Decl.) at ¶ 31; *Scott*, 406 F.3d at 535-36.  The fact that some monies held by the RFRBs may one day, under certain conditions, be

paid to the United States Treasury does not serve to transform the coin held and owned by the RFRBs into government funds.

In short, the RFRBs act with independence under private ownership and control such that the RFRBs cannot and should not be considered "the Government" for purposes of the FCA.[16] This is problematic for Relator as to each of his claims.

Under 31 U.S.C. § 3729(a)(4), Relator must show that Brink's had "possession, custody, or control of property or money used, or the be used, by *the Government* and, intending to defraud *the Government*…delivers, or causes to be delivered, less property than the amount for which the person receives a certificate or receipt."  (emphasis added.)  Here, Relator's allegations are based on his assertions that Brink's had possession, custody and control of RFRB coin and that Brink's delivered less than all of that coin (as judged by the coin's alleged metallurgical value) to the RFRBs.  *See* Doc. 1 (Compl.) at ¶ 86.  Because the RFRBs are not the "the Government" for FCA purposes, Relator cannot demonstrate this vital element of his FCA claim.

_____

[16] In fact, Brink's counsel could locate only one decision in which a court has hinted otherwise. In an *unpublished* memorandum opinion, the United States District Court for the Eastern District of Virginia stated that because the RFRBs "return all earnings in excess of operating and other expenses to the U.S. Treasury, fraudulent claims reduce the excess earnings, causing the Treasury to forfeit money to which it would otherwise be entitled, and triggering liability under the False Claims Act."  *U.S. ex rel Pasto v. Megabyte Business Sys., Inc*., No. 3:98CV693 (E.D. Va. Apr. 18, 2000) (Unpublished Memorandum Opinion).  However, the judge then certified for interlocutory appeal the issue of whether the FRB of Richmond is a part of the United States Government, finding that its memorandum opinion "involves controlling questions of law as to which there is substantial grounds for difference of opinion."  *Pasto*, No. 3:98CV693, 20000 WL 35911572 (E.D. Va. May 16, 2000) (Order on Defendant's Request for Interlocutory Appeal). The Fourth Circuit declined to weigh in on the issue in an interlocutory context, denying the petition for permission to appeal despite the trial judge's request for appellate input.  The issue was never finally decided as the case was dismissed in May 2001. *Pasto*, No. 3:98CV693 (E.D. Va. May 30, 2000) (granting Stipulation and Order of Dismissal [ECF 51-1]).  In any event, the unpublished opinion has no precedential value.

Similarly, to survive summary judgment under 31 U.S.C. § 3729(a)(7), Relator must

show that Brink's knowingly made or used "a false record or statement to conceal, avoid, or

decrease an obligation to pay or transmit money or property to *the Government*."  31 U.S.C. §

3729(a)(7) (emphasis added).  Under the CTAs, Brink's owed certain obligations to the RFRBs

in securely storing, handling and delivering coin owned by the RFRBs.  *See* Doc. 1 (Compl.) at

¶¶ 81-82.  Brink's obligations under the CTAs were to the RFRBs, not the federal government,

and Brink's fulfilled each of those obligations.  As a result, Relator cannot succeed on his claim.

Likewise, the Relator's conspiracy claim under 31 U.S.C. § 3729(a)(3) fails for the same

reasons.

> **E.**    **Even Assuming Arguendo That Certain Discrete Functions Or Activities Of The RFRBs Could Implicate Federal Instrumentality Status, The Activities At Issue In This Case Are Not Governmental And Thus The FCA Should Not Apply**

As explained above, there is ample support to allow this Court to declare broadly that the

FCA simply does not apply to the RFRBs.  Alternatively, however, this Court may choose to

adopt a more narrow approach by looking to whether the function and role played by the RFRBs

here is governmental in nature such that the FCA should apply.  Applying this narrower

approach, it is clear that the RFRBs, in facilitating the purchase, deposit and transfer of coin, are

not playing a uniquely governmental function.  Rather, in providing these services, the RFRBs

play a role similar to that of any other banking institution.  As such, there is no reason to treat the

RFRBs as "the Government" for purposes of the FCA in this context.

It is undisputed that the coins owned by the RFRB are not owned by the Government.

Ex. H (FRB Aff.) at ¶ 14; Ex. J (Conti-Brown Decl.) at ¶¶ 31-32.  Such coin is clearly owned by

and an asset of the individual RFRBs.  *Id*.  These RFRBs use coin to service the needs of their

customers—depository banks.  Ex. H (FRB Aff.) at ¶ 15.  In providing such coin-related

services, the RFRBs are performing a private banking function (making change), not a public, governmental one. *See Ball v. Bd. of Governors of Fed. Reserve Sys.*, 87 F.Supp. 3d 33, 38, 56 (D.D.C. 2015) (noting that RFRBs engage in private functions similar to that of other banks or financial institutions).

The activity at issue here (the storage of coin for the RFRBs and their customers and the transfer of coin between and among those accounts) is a private banking function. Similarly, the coin at issue is owned by the RFRBs, not the federal government. As such, for purposes of the FCA, the RFRBs need not and should not be deemed to be part of "the Government." Because the RFRBs are not "the Government," Relator's claims against Brink's fail and summary judgment should be granted.

## IV. Relator's FCA Conspiracy Claim Fails Because Relator Has Failed To Produce Evidence Of Any Post-FERA Conduct And For Lack Of An Underlying FCA Violation

Under the pre-FERA version of the FCA, to prove a claim for conspiracy, a relator must demonstrate that a defendant has "conspire[d] to defraud the Government by getting a false or fraudulent claim allowed or paid." 31 U.S.C. § 3729(a)(3). This Court previously found that because Relator failed to allege that Brink's made or presented false claims for payment or performed one or more acts to effect payment of false claims, Relator could not state a claim under 31 U.S.C. § 3729(a)(3).[17] Doc. 74 (Opinion & Order) at 39. As a result, this Court dismissed Relator's claims under 31 U.S.C. § 3729(a)(3) for any alleged conduct prior to May 20, 2009. *Id.* at 41. Because Relator lacks any evidence demonstrating that Brink's engaged in

---

[17] Here, there was no claim presented to either the RFRBs or the Government because Brink's provided its services to the RFRBs under the CTA without charge. Ex. C (Mulroney Depo.) at 26:24-27:2.

any wrongful conduct *after* May 20, 2009, Brink's is entitled to summary judgment on Relator's remaining FCA conspiracy claims.

Even under the post-FERA version of the FCA, which does not apply here because Relator has not shown any post-FERA conduct, Relator's conspiracy claim still fails. To prove a conspiracy, Relator ultimately must be able to show (1) the existence of an unlawful agreement to violate the FCA and (2) at least one act performed in furtherance of that agreement. *See U.S. ex rel. Farmer v. City of Houston*, 523 F.3d 333, 343 (5th Cir. 2008). General civil conspiracy principles also apply to FCA-based conspiracy claims. *Pencheng Si v. Laogai Research Found.*, 71 F.Supp.3d 73, 89 (D.D.C. 2014). Conspiracy does not exist without an underlying tortious act. Thus, in the FCA context, "there can be no liability for conspiracy where there is no underlying violation of the FCA." *Id*. Because Relator cannot sustain an action on his other FCA claims, Relator also cannot succeed on his conspiracy claim. Brink's is thus entitled to summary judgment on Relator's FCA claim for conspiracy.

## CONCLUSION

For the reasons set forth herein, Defendant Brink's, Incorporated respectfully requests that this Court enter summary judgment in favor of Brink's as to the entirety of Relator's Complaint, and for such other and further relief as this Court deems just and proper under the circumstances.

Respectfully submitted,


/s/ Edward A. Cohen

Nelson E. Genshaft, Esq. (0011023)
Strip, Hoppers, Leithart, McGrath
& Terlecky Co., LPA
575 South Third Street
Columbus, OH 43215-5759
Telephone: (614) 228-6345
Facsimile: (614) 228-6369
E Mail: neg@columbuslawyer.net
*Trial Counsel*

Edward A. Cohen, Esq. (*Admitted Pro Hac Vice*)
J. David Duffy, Esq. *(Admitted Pro Hac Vice)*
Thompson Coburn LLP
55 East Monroe Street
37th Floor
Chicago, IL 60603
Telephone: (312) 580-2225
Facsimile: (312) 782-1825
E Mail: ecohen@thompsoncoburn.com
E Mail: dduffy@thompsoncoburn.com

*Attorneys for Defendant Brink's, Incorporated*


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 6th day of October, 2017 the foregoing pleading was served upon all counsel of record by operation of the court's electronic filing system.

/s/ Edward A. Cohen

- 47 -