# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION AT COLUMBUS

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. BRIAN D. HOLBROOK, | JUDGE ALGENON L. MARBLEY |
| Relator, | MAGISTRATE JUDGE ELIZABETH PRESTON DEAVERS |
| v. | |
| THE BRINK'S COMPANY, et al., | Civil Action No. 2:13-cv-873 |
| Defendants. | |

## DEFENDANT BRINK'S, INCORPORATED'S REPLY
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

SUMMARY OF ARGUMENT ................................................................................ 1

ARGUMENT ......................................................................................................... 3

I.     Relator Cannot Survive Summary Judgment Because Relator Has Failed To And Cannot Establish The Existence Of Every Element Essential To Relator's Claims ............................................................................................ 3

     A.     This Court's Order On Brink's Motion To Dismiss Did Not Establish The Law Of The Case, Nor Did It Decide The Case In Relator's Favor ........................................................................... 3

     B.     Relator Ignores And Fails To Controvert Key Facts And Evidentiary Materials Submitted By Brink's ................................. 5

          1.     The Affidavits Of Kenneth Green And Peter Conti-Brown Offered In Support Of Brink's Motion For Summary Judgment Constitute Competent Evidence And Should Be Considered By The Court ................................. 6

II.    Relator Has Failed To Properly Support His Assertion That Brink's Returned Less Than All Money Or Property To The Government (31 U.S.C. § 3729(a)(4)) ..................................................................................... 9

     A.     Relator Cannot Show That Any Of The Pennies Received By Jackson Metals Belonged To The Government ......................... 10

          1.     The RFRBs Are Not The Government For Purposes Of The FCA ...................................................................... 10

               a.     This Court Has Not Previously Decided Whether The RFRBs Are The Government For Purposes Of The FCA     11

               b.     None Of The Cases Cited By Relator Demonstrate That The RFRBs Are The Government For Purposes Of The FCA     12

          2.     Jackson Metals Did Not Purchase Or Acquire RFRB Coin From Brink's ................................................................ 14

     B.     Relator Has Failed To Controvert Facts Demonstrating That The RFRBs Received The Full Value Of All Their Pennies ......................... 19

     C.     Relator Has Failed To Present Evidence Demonstrating That The Government Issued Any Certificate Or Receipt To Brink's .................... 22

- i -

        D.      Relator Has Failed To Present Evidence Demonstrating That Brink's Delivered Less Than All Coin To The Government....................24

III.     Relator Has Failed To Properly Support His Assertion That Brink's Knowingly Made Or Used a False Record Or Statement To Avoid An Obligation To Pay Or Transmit Money Or Property To The Government (31 U.S.C. § 3729(a)(7)) ...........................................................................25

        A.      There Was No Secret Scheme To Defraud The Government— The Government Knew Of The Relationship Between Brink's And Jackson Metals ....................................................................25

        B.      None Of The Statements Or Records Submitted By Brink's To The FRBs Were False ...................................................................28

        C.      Brink's Did Not Knowingly Submit Any False Records Or Statements To The RFRBs.......................................................30

        D.      Brink's Did Not Have A Present Obligation To Pay Or Transmit Money Or Property To The Government At The Time Brink's Submitted Inventory Reports To The RFRBs.............................32

IV.     Brink's Is Entitled To Summary Judgment With Respect To Relator's FCA Conspiracy Claim.............................................................................34

CONCLUSION.............................................................................................. 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Textile Mfrs. Inst., Inc. v. The Limited, Inc.*, 190 F.3d 729 (6th Cir. 1999) .....................25, 32

*Brink's, Inc. v. Bd. of Governors of Fed. Reserve Bank,* 466 F.Supp. 116 (D.D.C.
1979) ...............................................................................................................................14

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................................1, 18

*Dawson v. Norwood*, No. 1:06-cv-914, 2011 WL 2667962 (W.D. Mich. July 5,
2011) ...............................................................................................................................12

*Devlin v. Kalm*, 630 Fed. App'x 534 (6th Cir. 2015) ....................................................................4

*Farmer v. Rountree*, 252 F.2d 490 (6th Cir. 1958)........................................................................4

*Fasano v. Fed. Reserve Bank of N.Y.*, 457 F.3d 274 (3d Cir. 2006)............................................13

*Golden v. City of Columbus*, 404 F.3d 950 (6th Cir. 2005)........................................................12

*In re Hoag Ranches*, 846 F.2d 1225 (9th Cir. 1988) ..................................................................11

*Lewis v. U.S.*, 680 F.2 1239, 1240 (9th Cir. 1982) .....................................................................11

*McKenzie v. BellSouth Telecommunications*, 219 F.3d 508 (6th Cir. 2000) ...........................4, 20

*Pickens v. Kanawha River Towing*, 916 F. Supp. 702 (S.D. Ohio 1996) .....................................30

*Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383 (6th Cir. 2007) .....................13

*Thompson v. TransAm Trucking, Inc.*, No. 2:08-cv-927, 2011 WL 2293281 (S.D.
Ohio June 8, 2011)............................................................................................................4

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552
F.3d 430 (6th Cir. 2008) .................................................................................................12

*U.S. ex rel. Aakhus v. Dyncorp, Inc.*, 136 F.3d 676 (10th Cir. 1998).........................................23

*U.S. ex rel. Berge v. Bd. of Trustees of the Univ. of Ala.*, 104 F.3d 1453 (4th Cir.
1997) .........................................................................................................................30, 32

*U.S. ex rel. Dennis v. Health Mgmt. Assocs., Inc.*, No. 3:09-CV-00484, 2013 WL
146048 (M.D. Tenn. Jan. 14, 2013)................................................................................25

*U.S. ex rel Fellhoelter v. Valley Milk Prods., L.L.C.*, 617 F. Supp. 2d 723 (E.D. Tenn. 2008) ................................................................................................10

*U.S. ex rel Harper v. Muskingum Watershed Conservancy Dist.*, 842 F.3d 430 (6th Cir. 2016) ............................................................................................1, 31

*U.S. ex rel Lamers v. City of Green Bay*, 998 F.Supp. 971 (E.D. Wis. 1998) ............................27

*U.S. ex rel Pasto v. Megabyte Business System, Inc.*, No. 3:98CV693 (E.D. Va. Apr. 18, 2000) (Unpublished Memorandum Opinion) .....................................13, 14

*U.S. v. Q Intern. Courier, Inc.*, 131 F.3d 770 (8th Cir. 1997) ................................25, 32

*Wilkins v. Jakeway*, 44 Fed. App'x 724 (6th Cir. 2002) ..........................................4, 5

*Wilson v. Buckeye Steel Castings Co.*, No. 2:99-CV-1300, 2001 WL 1681130 (S.D. Ohio Sept. 25, 2001) .....................................................................4, 5

## Statutes and Constitutional Provisions

31 U.S.C. § 3729 ..................................................................................... *passim*

Service Contract Act ........................................................................................13

## Rules

Fed. R. Civ. P. 26 ............................................................................................7, 8

Fed. R. Civ. P. 56 ........................................................................................8, 9, 18

## Other Authorities

82 Fed. Reg. 43730-32 (September 19, 2017) ..........................................................21

## SUMMARY OF ARGUMENT

In his Opposition (Doc. 128), Relator expends considerable energy arguing, without admissible evidence, that Brink's violated the Coin Terminal Agreement that existed between Brink's and the FRB of Cleveland.  Relator's entire FCA case is thus nothing more than an attempt to transform an alleged breach of contract into a case of fraud; however, the FCA was never intended to be used as a vehicle to police a party's performance under a contract or for correcting perceived breaches of contract.  *See U.S. ex rel Harper v. Muskingum Watershed Conservancy Dist.*, 842 F.3d 430, 434 (6th Cir. 2016) ("it is well settled that a mere breach of contract does not give rise to liability under the FCA").

Despite the FCA's inapplicability to his claims, Relator distorts, misrepresents and mischaracterizes the record evidence to muddy the issues while noticeably ignoring other competent record evidence fatal to his claims.[1]  And Relator's naked assertions merely distract the Court from the real issue—Relator's inability to establish the existence of every element essential to Relator's FCA claims and his glaring lack of evidence needed to defeat summary judgment.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  By contrast, to obtain summary judgment, Brink's has either proffered evidence negating the elements of Relator's causes of action or has shown that Relator has no evidentiary support to prove each element of

---

[1] For example, throughout his Opposition, Relator asserts that Brink's *sold* coin to Jackson Metals.  *See, e.g.*, Relator's Opp. at 2, 6-7, 22 (Doc. 128 at 7, 11-12, 27).  This statement is wholly untrue and is belied by the undisputed record evidence.  Brink's never sold coin to Jackson Metals.  Rather, Jackson Metals purchased coin from Coinstar or a bank.  Brink's MSJ, Ex. E (Jackson Metals Depo. at 27:14-30:5) (Doc. 122-5 at 4-5).  Moreover, the income received by Brink's from Jackson Metals was not related to the metallurgical composition of the pennies but was generated from fees for handling, processing and verifying the coin received by and from Jackson Metals.  Brink's MSJ, Ex. C (Mulroney Depo. at 87:7-20) (Doc. 122-3 at 17).  This is but one of the many instances in which Relator ignores, mischaracterizes and misconstrues the facts so as to tell the narrative Relator has concocted.

his FCA claims.  The time for unsupported allegations has passed—faced with a motion for summary judgment Relator is now put to his burden, which he does not meet.

Lacking affirmative evidence, Relator asks the Court simply to ignore the record evidence that has been presented and award him an astronomical judgment.  He does so by claiming that this Court's prior ruling on Brink's motion to dismiss did all of the work for him.  Relator's over-reliance on the Court's motion to dismiss ruling is simply misguided.  To survive Brink's motion for summary judgment, Relator must come forward with *evidence* to controvert Brink's material facts, which he does not do.

In failing to specifically respond to Brink's detailed Statement of Undisputed Material Facts ("Brink's S.O.F."), Relator unfairly obfuscates the record.  Brink's has tried to redress Relator's failure by matching each paragraph in Brink's S.O.F. with the responsive evidence, if any, proffered by Relator.  This matching of factual point and counterpoint reveals that Relator has conceded virtually every fact of record relevant to Brink's Motion for Summary Judgment.  *See* Exhibit L attached hereto.  Relator's  Counterstatement of "material fact" does not respond to Brink's Statement of Uncontroverted Material Facts.  It is simply a collection of irrelevant and immaterial argument and assertions (albeit presented by Relator as "facts") that have no bearing on Brink's pending motion.  Nevertheless, to aid the Court and advance the *factual* record, Brink's has responded to Relator's "facts."  *See* Exhibit M.  Once Brink's S.O.F and Relator's Counterstatement are examined, virtually every statement in Brink's S.O.F. stands unopposed by competent and admissible evidence, and is thus conceded by Relator.

Relator further attempts to confuse the issues by suggesting that evidence presented by Kenneth Green of the Federal Reserve Bank of Cleveland and the Wharton School's Peter Conti-Brown should not be given its due.  As explained below, Relator's grounds for this suggestion

are ill-conceived and spurious.  But even without the incredibly helpful evidence from these two witnesses, the remaining pertinent record evidence is still overwhelming and undisputed.  One need only read the affidavits of Michael Kingkade and Walter Luhrman to see that Relator's claims are meritless.  These two key affidavits are neither factually disputed, nor challenged in any way by Relator.  They stand undisputed and are dispositive of Brink's pending motion.

Relator further contends that the RFRBs' contracts (the CTAs) were breached and the RFRBs were deprived of the metallurgical value of pennies.  Given these contentions at the core of Relator's claim, the question then must be:  Why did Relator, who carries the burden, not proffer *any* evidence from *any* of the twelve regional FRBs?  The answer and inference to be drawn are clear—the RFRBs do not support Relator's assertions, and his FCA claims fail.

## ARGUMENT

I. **Relator Cannot Survive Summary Judgment Because Relator Has Failed To And Cannot Establish The Existence Of Every Element Essential To Relator's Claims**

A. **This Court's Order On Brink's Motion To Dismiss Did Not Establish The Law Of The Case, Nor Did It Decide The Case In Relator's Favor[2]**

Of critical importance to Relator's Opposition is his flawed argument that this Court's prior ruling on a motion to dismiss constitutes the law of the case and eliminates Relator's burden to introduce competent admissible evidence to prove his case.  On several essential elements, Relator relies exclusively on the Court's Order for support. *See* Relator's Opp. at 18-22, 27-29, 32-35 (Doc. 128 at 23-27, 32-34, 37-40).  Relator's law of the case arguments are misplaced, unsupported and flat wrong.  Contrary to Relator's assertions, the well-accepted law of the Sixth Circuit and Southern District of Ohio is that orders pertaining to motions to dismiss

---

[2] For additional authority demonstrating the inapplicability of the law of the case doctrine, see Brink's Memorandum in Opposition to Relator's Motion for Partial Summary Judgment (Doc. 129 at 5-9).

do *not* constitute the law of the case, nor do they release or excuse a party from his obligation to present evidence sufficient to support every element of his claim.

In *McKenzie v. BellSouth Telecommunications*, 219 F.3d 508 (6th Cir. 2000), the Sixth Circuit expressly rejected arguments by an FCA relator who argued that summary judgment could not be entered in favor of defendant because the court's prior opinion, relating to a motion to dismiss, "determined that [plaintiff] had stated a valid claim for retaliation under the facts as alleged in her complaint." *Id*. at 512-13. The Sixth Circuit specifically held that a ruling on a motion to dismiss "does not establish the law of the case for purposes of summary judgment, when the complaint has been supplemented by discovery." *Id*. at 513. Numerous courts in both the Sixth Circuit and the Southern District of Ohio have held likewise. *See Devlin v. Kalm*, 630 Fed. App'x 534, 539 (6th Cir. 2015) (district court erred in its belief that the law of the case doctrine required it to adhere to conclusions reached at the motion to dismiss stage because "a decision 'on a motion to dismiss does not establish the law of the case for purposes of summary judgment'"); *Wilkins v. Jakeway*, 44 Fed. App'x 724 (6th Cir. 2002) (rejecting plaintiff's argument that district court failed to follow law of the case in granting summary judgment for defendants because the question of whether plaintiff's complaint stated a cause of action is separate from whether the evidence supported plaintiff's claims on summary judgment); *Farmer v. Rountree*, 252 F.2d 490, 491 (6th Cir. 1958) (holding that "the prior order overruling motions to dismiss, did not constitute the law of the case"); *Thompson v. TransAm Trucking, Inc*., No. 2:08-cv-927, 2011 WL 2293281, at *6 (S.D. Ohio June 8, 2011) ("A decision on a motion to dismiss, however, does not establish the law of the case for purposes of summary judgment."); *Wilson v. Buckeye Steel Castings Co*., No. 2:99-CV-1300, 2001 WL 1681130, at *4 (S.D. Ohio Sept. 25, 2001) (order on motion to dismiss did not constitute law of the case).

The law of the case doctrine is inapplicable because the purposes of and standards applicable to motions to dismiss and motions for summary judgment are substantially different. Denial of a motion to dismiss is not an adjudication on the merits of the underlying claim, and here, substantially different facts have been discovered since this Court's motion to dismiss ruling. *See Wilkins*, 44 Fed. App'x at 727; *Wilson*, 2001 WL 1681130, at *4. Stripped of his misguided reliance on the Court's 2015 Order on Brink's Motion to Dismiss, Relator has no evidence to support his claims.

**B.      Relator Ignores And Fails To Controvert Key Facts And Evidentiary Materials Submitted By Brink's**

Throughout his Opposition, Relator repeats the same unsupported conclusions and allegations; however, Relator fails to rebut several key pieces of evidence that doom his claims. Most significantly, Relator's own testimony contradicts his claims that Brink's made false statements to the RFRBs, knowingly omitted required information from its customer inventory reports, or returned less than all of the RFRBs' pennies:

- Relator, who personally orchestrated several of the alleged "swaps" with Jackson Metals, admits that Brink's *accurately reported* to the FRB of Cleveland, on a daily basis, the face value of the coins Brink's held for the FRB of Cleveland. Brink's MSJ, Ex. B (Relator Depo at 54:5-9, 138:8-17) (Doc. 122-2 at 8, 23).

- Relator admits that during his time as branch manager (between 2004 and 2007), he *never submitted any false statements* to the FRB of Cleveland. *Id*. at 58:7-21 (Doc. 122-2 at 9).

- Relator admits that Brink's *always provided the RFRBs the full value of the pennies* held by Brink's for the RFRBs as determined and measured by the pennies' face value. *Id*. at 81:10-82:22, 84:4-11 (Doc. 122-2 at 13).

- Relator admits that communications with the RFRBs were based on face value and that *face value was the only relevant value to communicate*. *Id*. at 54:18-22, 58:13-59:8, 82:2-22 (Doc. 122-2 at 8-9, 13).

- Relator admits that *face value was the only value requested by and to be reported to the RFRBs* in submitting daily coin inventory reports. *Id*. at 138:8-17 (Doc. 122-2 at 23).

The unrebutted testimony of Michael Kingkade, Kenneth Green and Peter Conti-Brown also demonstrate that the CTAs executed between Brink's and the RFRBs permitted or required Brink's to maintain coin in a commingled environment (Brink's MSJ, Ex. A at ¶ 20 (Doc. 122-1 at 4-5), the RFRBs account for and value coin based only on face value (*id*. at ¶¶ 23-25 (Doc. 122-1 at 5)), the RFRBs do not know and are not interested in the metallurgical value of RFRB-owned coin (*id*. at ¶ 28 (Doc. 122-1 at 5)), to the RFRBs a penny is a penny regardless of its metallurgical composition (*id*. at ¶ 30 (Doc. 122-1 at 6)), the CTAs did not require Brink's to report on or return coins of the same metallurgical value (*id*. at ¶¶ 36-40 (Doc. 122-1 at 6-7) and the coin held by Brink's for the RFRBs are assets of the RFRBs, not the federal government (*id*. at ¶ 65 (Doc. 122-1 at 10)). These facts contradict Relator's assertions and demonstrate why Relator cannot prove his claim.[3]

1.     **The Affidavits Of Kenneth Green And Peter Conti-Brown Offered In Support Of Brink's Motion For Summary Judgment Constitute Competent Evidence And Should Be Considered By The Court**

Relator argues that the affidavits of Kenneth Green, Vice President of the FRB of Cleveland, and Peter Conti-Brown, a financial historian with specific expertise in the U.S. Federal Reserve System should not be considered because neither witness nor their affidavits were previously disclosed to Relator as part of an initial disclosure. While the default rule on

___

[3] As previously stated, Relator failed to respond to or otherwise specifically controvert the material facts set forth in Brink's S.O.F.; thus, for the purposes of this motion, those facts must be deemed admitted. *See* Ex. L. Also, Relator has obfuscated the factual record by offering his own Counterstatement of "material fact" without first responding to Brink's S.O.F. Nevertheless, to aid the Court and advance the record, Brink's has attempted to respond to Relator's "facts." *See* Exhibit M. The counterstatement mainly sets forth assertions, not evidence, and almost every paragraph states information irrelevant to Brink's pending Motion.

initial disclosures specifies that initial disclosures are to be made within 14 days of the Rule 26(f) conference, Rule 26(a)(1)(C) also specifically provides that the requirement and timeline for initial disclosures can be altered by stipulation or court order. That was exactly what happened here.

On October 18, 2013, this Court entered a scheduling order which included a date for the parties to make their Rule 26(a)(1) initial disclosures; however, all discovery in the case was stayed as a result of settlement discussions. Doc. 62. This Court, by request and stipulation of the parties, later vacated the deadlines specified in the scheduling order (including the deadline for initial disclosures). Doc. 72. Although a discovery deadline of August 12, 2016 was later established (Doc. 95), this deadline was vacated and narrowed to apply only to discovery relating to former defendant Jackson Metals' motion for summary judgment. Doc. 96.

Thereafter, the parties filed a joint status report in which they requested a scheduling order giving the parties 120 days to complete certain "focused discovery." Doc. 114. With the Court having vacated the Rule 26 initial disclosure and other deadlines, *neither* party provided any Rule 26(a)(1) disclosures, nor did the parties address initial disclosures in their joint report. *See* Doc. 114; *see also* Declaration of Edward A. Cohen ("Cohen Decl."), Exhibit N attached hereto.

The Court adopted a scheduling order and both Relator and Brink's continued with discovery. Relator served multiple sets of discovery requests on Brink's and Brink's served discovery requests on Relator. Ex. N (Cohen Decl.) at ¶¶ 9-10. Because of the vacation of the prior scheduling order, Brink's, in its discovery requests, specifically asked Relator to list witnesses and persons with knowledge of the matters alleged in Relator's Complaint. *Id*. at ¶¶ 10-11. Brink's also requested information relating to the computation of Relator's damages. *Id*.

Relator asserted a number of objections to Brink's requests, including an objection that the requests, including those relating to expert witnesses, were "premature."[4] *Id.* at Ex. 1, pp. 5-8. Notably, Relator never disclosed its damages calculations (or the total amount sought) prior to the filing of its motion for partial summary judgment, nor did it previously disclose that Relator's counsel would be offering an affidavit containing factual matter. Clearly, Relator's counsel *and* defense counsel believed that no Rule 26 disclosures were to be made, and this view is supported by the procedural history and previous orders entered in this case.

Here, the Court, with Relator's input, set a deadline for filing summary judgment motions, which deadline was later extended (*at* Relator's request). Doc. 115. In filing motions for summary judgment, a party is clearly permitted to offer affidavits and declarations in support of or in opposition to a motion for summary judgment. *See* Rule 56(c). Brink's is entitled to present evidence, including affidavits and declarations, to support its motion for summary judgment and it properly did so here. Moreover, all of the evidence to which Relator objects falls within the scope of discovery Brink's represented to Relator that Brink's would conduct (i.e, "federal reserve bank issues and positions that bear directly on the viability (or lack thereof) of plaintiff's claims"). Doc. 114 at 3. This should not be a surprise to Relator.[5]

---

[4] Ironically, after having objected to Brink's discovery requests seeking the disclosure of Relator's expert witnesses and Relator's complete failure to propound any reciprocal request, Relator now objects to Brink's disclosure and use of the affidavit of Peter Conti-Brown. *See* Cohen Decl., Ex. 1 at 8. Relator's criticism is without basis, especially given Relator's belief that expert disclosures were not yet due. Also, of course, expert witnesses, such as Dr. Conti-Brown, are not disclosed as part of Rule 26(a)(1) initial disclosures.

[5] By contrast, it is Relator who ambushed Brink's by failing to make timely damages disclosures. Notably, Brink's, in interrogatories, requests for production and during deposition, specifically requested that Relator disclose the amount of any damages claimed and explain the methodology used in calculating those damages. *See* Cohen Decl. at ¶¶ 13-14. Despite Brink's multiple requests and Relator's express representation that he would supplement his responses, no supplementation was made. *Id.* at ¶ 15. Instead, Relator unveiled his astonishing $120 million damages calculation and "methodology" for the first time in his Motion for Partial Summary Judgment.

Relator remained free to propound additional interrogatories and requests for documents upon Brink's to request information concerning Brink's potential witnesses or other evidence but Relator elected not to do so. Having had ample opportunity to conduct discovery, Relator cannot now complain that he did not request enough information, especially when Relator was operating under the same belief that initial disclosures were not required in advance of the dispositive motion deadline. Also, if Relator believed that he was unable to present facts essential to justify his opposition to Brink's motion for summary judgment, Relator was permitted to seek relief from the Court; however, Relator did not request any such relief. *See* Rule 56(d).[6]

The affidavits of both Kenneth Green and Peter Conti-Brown provide competent, relevant and admissible evidence that demonstrate the deficiencies in Relator's claims. Relator's arguments seeking the exclusion of such evidence are insincere[7] and should be rejected.

## II. Relator Has Failed To Properly Support His Assertion That Brink's Returned Less Than All Money Or Property To The Government (31 U.S.C. § 3729(a)(4))

Relator's claim under 31 U.S.C. § 3729(a)(4) cannot survive summary judgment because Relator has failed to present evidence that (1) any of the pennies at issue were money or property used or to be used by "the Government"; (2) either the RFRBs or the Government received from Brink's "less property than the amount for which [Brink's] receive[d] a certificate or receipt"; or (3) Brink's "delivered" less than all property to the RFRBs or Government. *See* 31 U.S.C. § 3729(a)(4).

---

[6] Relator's silence as to Rule 56(d) is telling. Relator presumably knows of no evidence contrary to the substance of the Green FRB Affidavit. Relator articulates no prejudice from the Green FRB affidavit.

[7] It is curious but noteworthy that, according to Relator's contention, Brink's should have disclosed Kenneth Green *earlier* (despite no date set for any such disclosure and despite Relator not asking for such persons with knowledge) and Conti-Brown should have been disclosed *later* in this process.

### A. Relator Cannot Show That Any Of The Pennies Received By Jackson Metals Belonged To The Government

Brink's is entitled to summary judgment because Relator cannot, and does not, demonstrate that any of the pennies received by Jackson Metals belonged to *the Government* both because (1) the RFRBs are not the Government for purposes of the FCA and (2) Jackson Metals did not purchase or receive any RFRB coin from Brink's.

### 1. The RFRBs Are Not The Government For Purposes Of The FCA

As fully discussed in Section III of its Memorandum in Support of Summary Judgment (Doc. 122 at 38-51), the RFRBs are not "the Government" for purposes of the FCA. This fact is supported by the independent and private nature of the RFRBs, their structure, function, operation and design, as well as the underlying purpose of the FCA. Doc. 122 at 38-49. To be sure, the RFRBs serve certain public purposes and interests; however, the function served by the RFRBs and *at issue* here (to make change for member banks) is a private banking function rather than a public, governmental one. Moreover, the RFRBs act with such independence and autonomy from the federal government, including the ability to sue in their own names using their own legal counsel and to fund and manage their own operations, such that resort to or use of the FCA is unnecessary. *Id.* The individual RFRBs are able to protect their own interests and because coin is an asset of the RFRBs, not the federal government (FRB Aff. at ¶¶ 4, 12, 14 (Doc. 122-9 at 2-3)), the underlying purpose of the FCA—to redress activity that results in a loss to the government fisc—is not served here. *U.S. ex rel Fellhoelter v. Valley Milk Prods., L.L.C.*, 617 F. Supp. 2d 723, 731 (E.D. Tenn. 2008) ("claims that do not reach or ultimately threaten to reach the government fisc should not and cannot be subject to the FCA").

To prove a cause of action under 31 U.S.C. § 3729(a)(4), Relator must show that the underlying money or property at issue belonged to or was to be used by the Government;

however, Relator cannot make that showing here both because the RFRBs are not the

Government[8] and it is undisputed that the coin owned by the RFRBs is an asset of the individual

RFRB, not the Government. *See* Brink's MSJ, Ex. A (SOF at ¶¶ 27, 34) (Doc. 122-1 at 5-6).

This undisputed fact, standing alone, defeats Relator's claims.

### a. This Court Has Not Previously Decided Whether The RFRBs Are The Government For Purposes Of The FCA

Without any proper citation, Relator boldly asserts that this Court has "already decided

the issue, consistent with all available relevant precedent, and that decision remains law of the

case." Relator's Opp. at 19 (Doc. 128 at 24). As support for his claim, Relator cites a single

page of the Court's previous Order on Defendants' Motion to Dismiss; however, neither that

page, nor any other portion of the Court's 2015 Order contains any finding of the type Relator

claims—i.e, "that the FRB is the Government for purposes of the FCA." Relator's Opp. at 20

(Doc. 128 at 15).

In fact, the question was not even before the Court on Brink's Motion to Dismiss.

Although Brink's noted, in its Motion to Dismiss, that Relator's assumption that the RFRBs were

federal agencies for FCA purposes was incorrect, Brink's specifically stated that it was *not*

challenging Relator's assertion *in its Motion to Dismiss*. *See* Brink's MTD at 12 (Doc. 26-1 at

20, n. 9). Relator's brazen claim that the issue was presented to *and decided by* the Court is

simply untrue.

---

[8] The question of whether the RFRBs are the Government involves the application of fact to law. In determining whether a specified entity should be deemed to be part of the Government, courts analyze the factual record presented by the parties. *See, e.g., In re Hoag Ranches*, 846 F.2d 1225, 1227-28 (9th Cir. 1988); *Lewis v. U.S.*, 680 F.2d 1239, 1240-42 (9th Cir. 1982). Here, however, Relator has offered no facts to support his position that the RFRBs are the Government. This is significant because FCA liability only attaches where there is some fraud or claim made against the Government. As a result, a showing that the RFRBs are the Government is a necessary element of Relator's claim and one that Relator has failed to make.

Equally faulty, Relator also appears to argue that when this Court denied Brink's motion to dismiss, this Court "held that Relator sufficiently established all elements of his causes of action as a matter of law, including that the Government was defrauded by Brink's actions." Relator's Opp. at 20 (Doc. 128 at 25). Relator thus concludes, incorrectly, that this Court factually determined that the RFRBs are the Government for purposes of the FCA, and therefore, Relator need not prove this element. While perhaps consistent with Relator's fanciful conception of the law of the case doctrine, his arguments are groundless – especially because the issue was not even before the Court. In fact, Relator's argument evinces a complete misunderstanding of the effect of a denial of a motion to dismiss.[9]

Contrary to Relator's arguments, this Court has not previously decided whether the RFRBs are the Government for purposes of the FCA and Brink's is not barred from raising Relator's failure of proof on this element as a ground for entry of summary judgment against Relator.

> **b.  None Of The Cases Cited By Relator Demonstrate That The RFRBs Are The Government For Purposes Of The FCA**

Relator admits that the cases he cites support treating the RFRBs as the Government "when the FRB is acting in furtherance of their *quasi-governmental functions*." Relator's Opp. at 20, fn. 10 (Doc. 128 at 25) (emphasis added). Yet, here, the RFRBs are not serving a

---

[9] A motion to dismiss "is a test of the plaintiff's cause of action as stated in the complaint, not a challenge to the plaintiff's factual allegations." *Golden v. City of Columbus*, 404 F.3d 950, 958-59 (6th Cir. 2005). On a motion to dismiss, a court must presume that all factual allegations stated in the Complaint are true and make all reasonable inferences in favor of Relator. *See Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008); *see also* Opinion and Order at 9-10 (Doc. 74). A denial of a motion to dismiss does not release or excuse Relator from his ultimate burden to prove all elements of his claim at trial. *See, e.g., Dawson v. Norwood*, No. 1:06-cv-914, 2011 WL 2667962, at 1-2 (W.D. Mich. July 5, 2011) (rejecting plaintiff's argument that the court's denial of a motion to dismiss constituted a finding that plaintiff had established each of the elements of his claim). The ultimate burden to *prove* that the facts alleged are true remains with Relator. *See also* Section I.A, *supra*.

governmental or quasi-governmental function.  Rather, in providing coin-related services to member banks, the RFRBs are performing a private banking function (basically, making change), not a public, governmental one.

Further, that a single district court outside of this Circuit and in an unpublished memorandum opinion issued more than seventeen (17) years ago found that the plaintiff in that case had sufficiently alleged, for purposes of a motion to dismiss, that there was "a call upon the government fisc" says nothing about whether the RFRBs are the Government here.  *U.S. ex rel Pasto v. Megabyte Business System, Inc.*, No. 3:98CV693 (E.D. Va. Apr. 18, 2000) (Unpublished Memorandum Opinion).  The *Pasto* decision is not binding on this Court, nor is it particularly persuasive.  In fact, the court in that case was so uncertain about its finding that it certified the issue for interlocutory appeal.  *Pasto*, 2000 WL 35911572 (E.D. Va. May 16, 2000) (noting that its opinion involved controlling questions of law "as to which there is substantial grounds for difference of opinion").  The decision has no precedential value here and is entitled to no weight.

Relator's claim that a previous legal argument advanced by Brink's almost forty years ago with respect to a different Act (the Service Contract Act) constitutes a "judicial admission" is also meritless.  Relator's Opp. at 21 (Doc. 128 at 26).  To constitute a judicial admission, the statement must concern one of *fact*.  *Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 394–95 (6th Cir. 2007).  A party's statements regarding its interpretation of the law or the application of fact to law do not qualify as judicial admissions.  *Id*.  Moreover, the question of whether the RFRBs are part of the government for purposes of the FCA is a wholly separate question from whether the RFRBs may be deemed to be part of the government for the purpose of a different statute.  *See Fasano v. Fed. Reserve Bank of N.Y.*, 457 F.3d 274, 282 (3d Cir. 2006)

- 13 -

(noting that whether an entity is a federal instrumentality for one purpose "is a different question

from whether an instrumentality is a federal agency for a specific statute"). Thus, even if Brink's

prior legal arguments could constitute judicial admissions (and they cannot), such purported

admissions are not binding on or relevant to the question here—whether the RFRBs are "the

Government" for purposes of the FCA.[10]

### 2. Jackson Metals Did Not Purchase Or Acquire RFRB Coin From Brink's

Relator's claims rest upon a faulty premise—that the pennies provided to Jackson Metals

belonged to the RFRBs. In fact, that was never the case. There is *no* evidence that any of the

pennies received by Jackson Metals were taken from the RFRBs' accounts. Rather, the evidence

indicates that the pennies acquired by Jackson Metals were generally purchased from Coinstar or

individual banks. *See* Brink's MSJ at Ex. A (S.O.F.), ¶¶ 7-8, 10 (Doc. 122-1 at 2-3).

Relator admits that due to its Coinstar account, Brink's had accumulated certain surpluses

of pennies and the local FRB would *not* allow those surplus pennies to be deposited to the local

FRB. Doc. 1 (Compl. at ¶¶ 63-64). Relator further concedes that shipments of pennies to

Jackson Metals were made from those surplus pennies. *Id*. Relator also acknowledged that the

coin transactions with Jackson Metals were to involve Coinstar coin. Brink's MSJ at Ex. B

(Relator Depo.) at 96:16-97:6, 107:21-108:25 (Doc. 122-2 at 15-16, 17). Relator does not

dispute these admissions but rather argues that because coin in general inventory was

---

[10] It appears that in both the *Pasto* and *Brink's, Inc. v. Bd. of Governors of Fed. Reserve Bank,* 466 F.Supp. 116 (D.D.C. 1979) actions, the Court was provided a factual record about the FRB from which the Court could apply fact to law. Tellingly, Relator offers no such factual predicate to this Court.

commingled[11] and treated as fungible, the transactions with Jackson Metals must have involved coin owned by the RFRBs because the RFRBs owned between 10% and 42% of the total penny inventory held at Brink's coin terminals.  Relator's logic is fundamentally flawed.

First, Relator assumes that Brink's practice of commingling coin was not permitted by the CTAs and that, conversely, Brink's was required to physically segregate the RFRBs' coin. Relator misunderstands and mischaracterizes the CTAs and blatantly ignores the parties' well established practice and their understanding and interpretations of the agreements.  *See* Brink's MSJ, Ex. H (FRB Aff. at ¶¶ 17, 20, 21, 23 (Doc. 122-9 at 4-5); Ex. I (Kingkade Aff. at ¶¶ 5-6, 8, 10) (Doc. 122-10 at 2-4).   Contrary to Relator's assertions, the CTAs' language regarding the storage, handling and title to coin did not impose upon Brink's any obligation to segregate coin, otherwise restrict Brink's from handling or moving commingled coin in general inventory, or require Brink's to return to the RFRBs the same coins received by Brink's.[12]

In fact, the CTAs executed between the RFRBs and Brink's permitted or required Brink's to maintain the RFRBs' coin in a commingled coin environment and this practice was well known to and accepted by the RFRBs. Brink's MSJ, Ex. A (S.O.F. at ¶ 21) (Doc. 122-1 at 4); Ex.

---

[11] While all coin in general inventory was commingled, Brink's personnel would typically set aside pennies from Coinstar that were intended for Jackson Metals without depositing them into Coinstar's bank account or adding them to general inventory.  *See* Brink's MSJ, Ex. A at ¶ 12 (Doc. 122-1 at 3). Relator ignores this undisputed but important fact, which is simply that the great majority of pennies Jackson Metals acquired from Brink's facilities were Coinstar coins that were set aside and never reached general inventory.

[12] In fact, return of the same coins was impossible because the CTAs themselves required Brink's to accept coin from and ship coin out to various banks.  These shipments and deposits, which resulted in an ever changing inventory of pennies, constituted the primary purpose of the CTAs. Brink's MSJ, Ex. H at Ex 2, p. 1 (Doc. 122-9 at 10) (noting purpose of agreement was "to provide coin services to depository financial institutions ("DFIs") which order coin from and deposit coin with the Bank").  Relator ignores the fact that Brink's coin operations functioned like a bank for the RFRBs and other bank customers.

- 15 -

B (Relator Depo at 60:10-61:3) (Doc. 122-2 at 9-10). The RFRBs typically audited Brink's facilities twice per year; however, there is no evidence that *any* of the RFRBs' auditors objected to Brink's practice of commingling the RFRBs' coin with other general inventory coin during the subject timeframe. *Id*. at Ex. B (Relator Depo. at 59:9-61:3) (Doc. 122-2 at 9-10); Ex. I (Kingkade Aff. at ¶¶ 4, 8) (Doc. 122-10 at 2-3); Ex. H (FRB Aff. at ¶ 21) (Doc. 122-9 at 5). Segregation was neither necessary nor desired because, as both parties to the CTAs recognized, coin is fungible, legal tender—a penny is a penny regardless of its metallurgical composition. *Id*. Ex. A (S.O.F. at ¶¶ 29-30, 33) (Doc. 122-1 at 5-6).

That, pursuant to the CTAs, title to the RFRBs' coin was to remain with the RFRBs does not change the analysis or otherwise prohibit Brink's from commingling coin. *See* Brink's MSJ, Ex. H (FRB Aff.) at Ex. 2, ¶ 1 (Doc. 122-9 at 10) ("title to Bank-owned coin shall at all times remain with the Bank and Brink's shall have no right, title or interest therein"). Rather, as explained during discovery, the purpose of that provision of the CTA was to alter the typical relationship between Brink's and its customers which permitted Brink's to seize the customer's funds in the event of non-payment for services rendered by Brink's. *See* Mulroney Depo. (attached as Ex. O) at 164:5-165:6. This provision merely prevented Brink's from seizing, confiscating or taking title to the RFRBs' coin or otherwise debiting the RFRBs' coin accounts due to non-payment—it did not prevent Brink's from commingling or otherwise handling and managing the RFRBs' coin. *Id.*

Next, Relator incorrectly assumes that by physically commingling coin, Brink's created a tenancy in common type relationship whereby each account owner holds "a separate fractional share in undivided property." Relator's Opp. at 23 (Doc. 128 at 28). While coins in general inventory were physically commingled, Brink's maintained detailed, individualized coin account

records for each of its customers, including the RFRBs. Brink's MSJ, Ex. A (S.O.F. at ¶¶ 17-18) (Doc. 122-1 at 4). In managing the accounts and physical coin inventories at its facilities, Brink's operates like a bank. Brink's receives coin from its customers for deposit into that customer's account or the account of another customer, such as a bank or the RFRB. Like a bank, Brink's physically receives and verifies the coin then electronically credits the customer's account using the face value of the coin. *Id*. at ¶¶ 15, 17 (Doc. 122-1 at 4). The bank's physical coins are placed in general inventory and treated as fungible, legal tender. *Id*. at ¶ 18 (Doc. 122-1 at 4). Although the customer has the right to demand payment and take possession of coin in the amounts reflected in the customer's electronic account, the customer does not have a right to receive the same physical coin it deposited. *See id*. at Ex. B (Relator Depo. at 38:3-13) (Doc. 122-2 at 5).

The same is true in any typical banking transaction. If a bank customer deposits physical coin or currency to his account, his account is electronically credited and the physical coin or currency is commingled with other cash and coin held at the bank. If the customer later returns to withdraw the funds deposited, he will not receive back the same physical coin or currency, nor would he expect to because money is fungible. Similarly, a bank customer does not obtain a fractional interest in all the money held by a bank simply because the physical coin or currency he deposited was commingled.

Relator's conclusion that the RFRBs owned a fractional share in all pennies and that therefore between 10% and 42% of all pennies received by Jackson Metals were RFRB coin would defeat the entire system of legal tender, destroy the banking system and prevent the free-flow of commerce. If, as Relator contends, the RFRBs and all other Brink's customers have a fractional interest in every penny held by Brink's, Brink's would be unable to transfer, ship or

deliver any coin absent authorization from each and every customer.  Moreover, under Relator's logic, any shipment, transfer or delivery of coin to *any* customer would constitute an FCA violation because (using Relator's logic) *every* coin is partially owned by the RFRBs.  This is clearly not the law, nor was it contemplated or intended by the parties.  *See* Brink's MSJ at Ex. H (FRB Aff.) (Doc. 122-9) and Ex. I (Kingkade Aff.) (Doc. 122-10). The RFRBs do not have an interest in every penny-related transaction or own a proportional share of every penny held at a Brink's facility merely because coin, as permitted by the CTAs, is held in a commingled environment.

Moreover, it is undisputed that banks and individual Brink's customers can manage, use and transfer their money in any way they see fit.  Brink's MSJ, Ex. B (Relator Depo at 118:14-119:7) (Doc. 122-2 at 19); Ex. C (Mulroney Depo. at 155:19-25) (Doc. 122-3 at 23).  That Coinstar chose to enter into transactions with Luhrman, Jackson Metals, Bank of America or any other third party relating to the sale or transfer of pennies by Coinstar does not implicate RFRB property.  *Id*. at Ex. C (Mulroney Depo at 138:25-139:22, 168:8-17) (Doc. 122-3 at 21).

As the plaintiff, Relator must demonstrate that the pennies received by Jackson Metals belonged to the Government; however, Relator lacks any such evidence and he has failed to controvert Brink's evidence.[13]  Relator therefore cannot demonstrate this essential element of his claim and, consequently, cannot survive summary judgment.

---

[13] Relator improperly attempts to shift the burden of proof to Brink's on this issue, arguing that "Brink's cannot establish that the coins it sold to Jackson Metals were not Fed-coin."  Relator's Opp. at 23 (Doc. 128 at 28). Apart from being factually inaccurate—Brink's did not, in fact, sell any coin to Jackson Metals (*see* Brink's MSJ, Ex. E (Jackson Metals Depo. at 28:4-30:5) (Doc. 122-5 at 4-5))—Brink's lacks any obligation to disprove Relator's unsupported assertions.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) ("we find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim").

**B.** **Relator Has Failed To Controvert Facts Demonstrating That The RFRBs Received The Full Value Of All Their Pennies**

In his Opposition, Relator makes no attempt to controvert any of the key evidence

presented by Brink's including any of the following:

- The RFRBs received full face value for all the pennies in the RFRBs' accounts. Brink's MSJ at 17 (Doc. 122 at 23), Ex. B (Relator Depo) at 71:3-16, 84:4-11 (Doc. 122-2 at 12-13).

- Even after the alleged swaps, the penny inventory and face value of the pennies in Brink's coin room remained the same. *Id.* at Ex. B (Relator Depo) at 69:4-15, 71:9-16 (Doc. 122-2 at 12).

- The RFRBs always received the correct number of pennies from Brink's based on face value. *Id.* at Ex. B (Relator Depo) at 84:4-11 (Doc. 122-2 at 13).

- The metallurgical value of coin was not known, considered by, or relevant to the RFRBs. *Id.* at Ex. H (FRB Aff. at ¶ 16) (Doc 122-9 at 3), Ex. I (Kingkade Aff. at ¶ 4) (Doc. 122-10 at 2).

These uncontroverted facts demonstrate that the RFRBs received the full face value of the

pennies held by Brink's—the sole value of importance to the RFRBs. As a result, Relator cannot

demonstrate that the RFRBs, much less the Government, received less than all of their money or

property.

To distract from his failure to produce evidence, Relator rehashes his defective law of the

case arguments, deceptively cites and mischaracterizes certain record evidence and points to

irrelevant statements made by the U.S. Mint. Further, Relator improperly attempts to flip the

burden of proof, disavowing any responsibility to prove his own case with any record evidence.

Once again, Relator mistakes the effect of a ruling on a motion to dismiss. This Court's prior

ruling does not constitute the law of the case and, in any event, the law of the case doctrine does

not apply in this situation where discovery supplements and contradicts the allegations set forth in the complaint.[14] *See McKenzie*, 219 F.3d at 512-13.

Relator, in citing material from the record, also unfairly edits and heavily mischaracterizes Brink's evidence. For example, Relator quotes a narrow excerpt from Brink's congressional testimony and jumps to the conclusion that the pennies acquired by Jackson Metals belonged to the RFRBs (which was not the case) and that Brink's had a contractual obligation to consult with the RFRBs concerning the disposition of excess coin. Relator's Opp. at 28 (Doc. 128 at 33). Relator conflates the excess coin discussed in the congressional testimony with the excess coin referenced the CTAs. The provision in the CTA on excess coin applies only to instances where quantities of RFRB coin exceeded the maximum quantities of coin Brink's agreed to hold for the RFRBs without charge. Relator's Opp., Ex. C at 1-2 (Doc. 128-2 at 63-64). In contrast, the excess coin discussed in Brink's congressional testimony concerned quantities of coin in commerce in the U.S. system as a whole. *Id*. at Ex. N (Doc. 128-2 at 188-89). As previously explained, the pennies acquired by Jackson Metals were not taken from the RFRBs' accounts and were not excess pennies owned by the RFRBs. *See* Section II.A, *supra*. As a result, contrary to Relator's assertion, Brink's had no reason to consult with the RFRBs regarding the disposition of the coin.

---

[14] Contrary to Relator's assertions, this Court's observation in its ruling on the motion to dismiss that the terms of the CTA presuppose that the same coins received by Brink's would be returned to the RFRBs is not "fully supported by the record." Relator's Opp. at 27-28 (Doc. 128 at 32-33). In fact, Brink's has presented multiple affidavits demonstrating that coin is fungible and the RFRBs did not care about metallurgical value. Brink's MSJ at Ex. H (FRB Aff. at ¶¶ 15-16, 22-23) (Doc. 122-9 at 3, 5), Ex. I (Kingkade Aff. at ¶¶ 4, 10) (Doc. 122-10 at 2, 4). As support for his claim, Relator points to a portion of a CTA that describes how misstruck coin is to be handled. Relator's Opp. at 28, fn. 14 (Doc. 128 at 33). Notably, misstruck coins were to be returned to the U.S. Treasury because such coins "are not legal tender." *Id*. at Ex. K at ¶ 27 (Doc. 128-2 at 177) ("Operator recognizes that misstruck coins are not legal tender and remain the property of the United States Treasury Department."). Only by significantly altering the actual language of the agreement can Relator use this provision as alleged "support" for his argument.

Relator also misuses certain statements made by the Mint. To counter the sworn statement of Kenneth Green, Vice President of the FRB of Cleveland, that the only value of importance to the FRB of Cleveland is face value and that the FRB of Cleveland does not know or care about the metallurgic composition of coin, Relator points to statements made by the U.S. Mint in issuing its rule prohibiting the exportation and melting of pennies. Relator's Opp. at 29 (Doc. 128 at 34). Specifically, the U.S. Mint stated that such a ban was necessary to avoid a shortage of pennies in circulation and that if such a shortage occurred, the Mint would bear the cost of replacing the needed coin. *Id.* Notably, the rule does not prohibit persons from hoarding, collecting or removing pennies from circulation so long as those persons do not export, melt or destroy the pennies. Brink's MSJ, Ex. G (Luhrman Dec.) at Ex. 3 (Doc. 122-7 at 38-42).

That a party's actions may *potentially* injure the Government does not establish that the FCA has been violated (*i.e*, there is a difference between liability and damages—proof of damage does not demonstrate liability). Similarly, although the Mint acknowledged that certain speculators may attempt to recycle pennies for their value as scrap metal, this does not demonstrate that *the Government* views copper pennies as more valuable than zinc pennies[15] or that Brink's was required to return to the RFRBs coins with a specific metallurgical content.

---

[15] In fact, the U.S. Mint recently expressed its opinion on the relative value of copper and zinc coins in a recent notice of proposed rulemaking relating to a change in redemption rates for uncurrent or mutilated pennies. Under the U.S. Mint's proposed rule, the redemption rate for zinc pennies would be $1.8100 per pound versus a redemption rate of $1.4585 for copper coins or mixtures of copper and zinc coins. 82 Fed. Reg. 43730-32 (September 19, 2017) (attached as Exhibit P). The rationale behind the rule is that copper coins weigh slightly more than zinc coins and as a result, a pound of zinc coins contains a larger number of pennies than a pound of copper coins. *Id*. at 43730. The change in redemption rate more closely aligns the *number* of pennies being redeemed with their actual *face value* by taking into account the weight of individual coins (*i.e*, the U.S. Mint will redeem zinc pennies at a rate of $1.81 per pound because zinc pennies weigh approximately 0.0882 ounces each, which amounts to approximately 181 pennies per pound). This clear and undisputed evidence of the Government's intent to value and redeem both copper and zinc pennies at face value – a penny is a penny – undercuts the entire premise of the Relator's claims. *See also* Doc. 126-1.

Here, the uncontroverted facts demonstrate that the RFRBs received the full face value of their pennies.  As a result, Relator cannot establish that the RFRBs, much less the Government, received less than all of their money or property.

### C.    Relator Has Failed To Present Evidence Demonstrating That The Government Issued Any Certificate Or Receipt To Brink's

Relator's Opposition clearly demonstrates why his claim fails.  Relator lacks any evidence demonstrating that Brink's received any type of certificate or receipt from the Government that indicates how much property Brink's allegedly returned to the Government.  In fact, Relator in essence *admits* that he has no such evidence.  Relator's Opp. at 31 (Doc. 128 at 36).

Sensing the serious deficiencies in his case, Relator attempts to place the blame on Brink's, arguing (*without support*) that Brink's was contractually required to provide the RFRBs with receipts for every transaction involving the RFRBs' coin.[16]  As purported support for his assertion, Relator points to language in a CTA executed with the FRB of Chicago relating to daily inventory reporting.  Relator's Opp. at 30 (Doc. 128 at 35).  Contrary to Relator's claim, however, the cited document does not require Brink's to provide either the RFRB or the Government "with receipts for every transaction involving Bank coin."  *Id.*  Rather, the cited page is a form provided by the Chicago FRB for use in reporting Brink's close of day inventory.  Relator's Opp. at Ex. K at 12, 14-15 (Doc. 128-2 at 165, 167-68).  The form's reference to the

---

[16] Relator's unsupported assertions are also contradicted by the record evidence.  It is undisputed that during the 2006-2009 timeframe, the RFRBs would not issue receipts to Brink's when a depository bank deposited coin into a RFRB's account at a Brink's coin terminal.  Brink's MSJ, Ex. I (Kingkade Aff. at ¶ 12) (Doc. 122-10 at 4-5)).  Rather, when a depository bank wanted to deposit coin to an RFRB's account, the depository bank would prepare or instruct Brink's to prepare a deposit ticket and Brink's would then transfer the specified sum into the RFRB's account.  Brink's would then provide the deposit ticket to the RFRB but the salient and undisputed fact is that the RFRB did not issue any receipt to Brink's.  *Id.*

"complete statement of transactions" also does not require a list of transactions or the creation of receipts.  Only collective totals are required because the form was used for reconciliation purposes.  *See* Ex. K at 15 (Doc 128-2 at 168) ("One employee completes the transaction section of the report by listing the closing balance of the last report; total deposits are added and shipments are subtracted; and a bookkeeping balance is calculated at the end of the business day.").

Relator's claim that Brink's has receipts from the RFRBs but has not produced them to Relator is nothing more than speculation.[17]  Similarly, Relator's assertion that its counsel obtained examples of "similar receipts" during a Brink's site visit is meritless.  None of the documents referenced in counsel's declaration are of a type required by the FCA—*i.e.*, a certificate or receipt *created by the Government* which indicates how much property Brink's allegedly *returned* to the Government.  *See U.S. ex rel. Aakhus v. Dyncorp, Inc.*, 136 F.3d 676, 681 (10th Cir. 1998) ("In our view, the language of (a)(4) clearly suggests the certificate or receipts at issue must be created by the government….[and] makes clear the certificate or receipt at issue must have some connection or relationship to the defendant's return of property.  In other words, the certificate or receipt must indicate how much property defendant allegedly returned to the government.").  Moreover, none of these documents provide any support for Relator's claim that metallurgical value was of any importance to the parties or that Brink's returned less than all coin to the RFRBs or Government.  Because Relator has failed to prove this essential element of his FCA claim, his claim fails.

---

[17] If Relator was convinced that such receipts in fact existed, Relator was free to seek such documents from the RFRBs; however, Relator apparently elected not to do so.

### D. Relator Has Failed To Present Evidence Demonstrating That Brink's Delivered Less Than All Coin To The Government

Relator has not only failed to show that the RFRBs *received* less than all of their property—Relator has also failed to prove that Brink's *delivered* less property or money to the Government. *See* 31 U.S.C. § 3729(a)(4). In an apparent bid to save his claim, Relator changes his theory and now argues that deliveries of coin occurred "every time Brink's transferred coin to and from FRB accounts"—that is, every time Brink's credited, on paper, coin to the RFRBs' accounts. Relator's Opp. at 30 (Doc. 128 at 35). If this is, in fact, now Relator's argument for "delivery," Relator has absolutely no evidence that Brink's delivered less than all coin or property to the RFRBs. Also, electronic transfers are not a "delivery" to the RFRB for purposes of the FCA.

Relator points to no evidence, and in fact does not even allege, that the RFRBs' electronic accounts were shortchanged. Rather, the uncontroverted evidence demonstrates that (1) the value of coin held by Brink's for the RFRBs was based solely on the face value of coin (Brink's MSJ, Ex. A at ¶ 25 (Doc. 122-1 at 5)); (2) the RFRBs did not require Brink's to report the intrinsic value of coins owned by the RFRBs (Brink's MSJ, Ex. A at ¶ 36 (Doc. 122-1 at 6)); (3) face value was the only value of importance to and the only value required to be reported to the RFRBs (Brink's MSJ, Ex. A at ¶ 41 (Doc. 122-1 at 7), Ex. H at ¶¶ 15, 18 (Doc. 122-9 at 3-4)); (4) Brink's accurately reported to the RFRBs the face value of the coin in the RFRBs' accounts (Brink's MSJ, Ex. A at ¶¶ 41, 48 (Doc. 122-1 at 7-8)); and (5) Brink's always provided the RFRBs the full value of the pennies held by Brink's as measured by their face value (Brink's MSJ, Ex. A at ¶ 47 (Doc. 122-1 at 8)).

Because Relator lacks any proof of any physical or paper delivery to the Government of less property than the amount for which Brink's received a certificate or receipt from the

Government, Relator cannot prove this element of his claim, thus entitling Brink's to summary judgment.

### III. Relator Has Failed To Properly Support His Assertion That Brink's Knowingly Made Or Used a False Record Or Statement To Avoid An Obligation To Pay Or Transmit Money Or Property To The Government (31 U.S.C. § 3729(a)(7))

To prove a violation of Section 3729(a)(7), Relator must present evidence demonstrating each of the following elements: (1) a false record or statement made by Brink's, (2) Brink's knowledge of the falsity, (3) the false statement was made or used for the purpose of concealing, avoiding or decreasing an obligation to pay money or property to the Government, and (4) the misrepresentation was material.  *See U.S. ex rel. Dennis v. Health Mgmt. Assocs., Inc.*, No. 3:09-CV-00484, 2013 WL 146048, at *18 (M.D. Tenn. Jan. 14, 2013); *U.S. v. Q Intern. Courier, Inc.*, 131 F.3d 770, 772 (8th Cir. 1997) (noting that intention of reverse false claims provision is to give the United States a means to recover from someone who makes a "material misrepresentation" to avoid paying an obligation owed to the Government).  In addition, Relator must prove that the false statement or record was made "at a time that the defendant owed to the Government an obligation sufficiently certain to give rise to an action of debt at common law." *Am. Textile Mfrs. Inst., Inc. v. The Limited, Inc.*, 190 F.3d 729, 736 (6th Cir. 1999); *see also Q Intern. Courier, Inc.*, 131 F.3d at 773 ("defendant must have had a present duty to pay money or property" to the Government).  Relator cannot meet his burden on *any* of these elements.

### A. There Was No Secret Scheme To Defraud The Government—The Government Knew Of The Relationship Between Brink's And Jackson Metals

Throughout its pleadings, Relator mischaracterizes the relationship between Brink's and Jackson Metals as a secret scheme that Brink's sought to hide from the RFRBs and the Government.  Relator continues to cling to this unsupported mantra in his Opposition, refusing to

acknowledge the substantial evidence demonstrating otherwise, including the unrefuted affidavit of Walter Luhrman (Brink's MSJ, Ex. G (Doc. 122-7)).

Relator points to the Confidentiality and Non-Competition Agreement executed between Brink's and Jackson Metals; however, this document does not aid Relator because the uncontroverted evidence demonstrates that, despite the Agreement, the details of Jackson Metals' penny operation, including his plan to cull, stockpile and potentially melt copper pennies and the general nature of his relationship with Brink's and Coinstar were *actually disclosed* to various employees of the RFRBs, the U.S. Mint and members of Congress and their staffs. *See* Brink's MSJ, Ex. G (Lurhman Dec.) (Doc. 122-7).

In his affidavit, Walter Luhrman describes his multiple meetings and communications with various members of Congress, their staffs, congressional committees, and employees of the U.S. Mint and various RFRBs. *Id*. at ¶¶ 10-22 (Doc 122-7 at 2-7). Notably, in early 2007, a U.S. Congressman even visited the Jackson Metals facility, saw Jackson Metals' sizable penny stockpile and culling operations and received a full overview of Jackson Metals' operations. *Id*. at ¶ 14 (Doc. 122-7 at 4). Specifically, Luhrman provided "a detailed explanation of how Jackson Metals had and would acquire pennies *by working with Coinstar and Brink's*, how Jackson Metals culled the pennies for copper, how Jackson Metals was continuing to amass the Copper Pennies, and how Jackson Metals was returning the Zinc Pennies to various locations." *Id* (emphasis added). Relator's arguments that the Confidentiality and Non-Competition Agreement foreclosed any government knowledge or otherwise provides proof of fraud and secrecy thus fall flat.[18]

---

[18] Similarly, that Mr. Mulroney did not discuss Brink's relationship with Jackson Metals with the RFRBs' auditors does not detract from the fact that information concerning Jackson Metals' penny operation and its relationship with Brink's was in fact disclosed to other RFRB employees and the Government.

Likewise, Relator's claims that Brink's "manipulat[ed] the system" to prevent the RFRBs from learning of its relationship with Jackson Metals are frivolous. In managing coin inventories in various markets, the RFRBs carefully track their inventories of coin and use information concerning market demand and coin availability to determine whether additional coin is needed. Brink's MSJ, Ex. C (Mulroney Depo. at 150:22-155:25) (Doc. 122-3 at 22-23). In deciding whether additional coin is needed, however, the RFRBs only consider the coin on their books— *i.e.*, the coin they own and have access to. *Id.* While the RFRBs may *perceive* that there is a penny shortage and decide that new coin should be ordered (based on their account balances and knowledge of how much coin is needed in the market), such shortages are often artificial because of the coin inventories held by other banks. *Id.* This can cause a storage problem for Brink's because Brink's holds coin not only for the RFRBs, but for other customers as well and those customers often hold significant quantities of coin. *Id.* In such circumstances, Brink's has an interest in preventing the Government from ordering additional coin because of its limited storage space. *Id.* at 154:4-18. Mr. Mulroney's statement that Brink's employees needed to be careful about building up inventories was directed toward this storage concern—i.e., if Brink's continued to save coin for Jackson Metals and Jackson Metals did not retrieve the coin, Brink's would run out of storage space. *Id.* at 154:22-155:25. Relator's assertions that Brink's was "manipulating the system" are just plain wrong.

Here, the relationship between Jackson Metals and Brink's was by no means secret. Neither the RFRBs, nor the Government were deceived—they were well aware of the parties' relationship. *U.S. ex rel Lamers v. City of Green Bay*, 998 F.Supp. 971, 987 (E.D. Wis. 1998) (acknowledging that "no [FCA] violation exists where the government has not been deceived").

**B.     None Of The Statements Or Records Submitted By Brink's To The FRBs Were False**

Relator cannot point to a single false statement or report that was transmitted to the RFRBs[19] (and there are none), nor does Relator have any proof that Brink's omitted any information required by the CTAs to be submitted to the RFRBs.  The language and materials cited by Relator in claimed support of his action are taken wholly out of context, do not support the cited proposition or do not in fact appear in the document cited.

First, Relator claims that Brink's had an obligation to "notify[] the FRB of the 'dollar value and denomination of coin ordered for shipping to Mutual Customers." Relator's Opp. at 8 (Doc. 128 at 13).  Notably, this quoted provision imposes an obligation on the *FRB of Cleveland*, not Brinks: "The *Bank* shall notify Brink's, by electronic or facsimile transmission, of the dollar value and denomination of coin ordered for shipping to Mutual Customers."  Relator's Opp., Ex. 1 at Ex. C ¶ 10 (Doc. 128-2 at 67) (emphasis added).

Second, Relator claims that Brink's alleged "[f]ailure to retain proper documentation exposes Brink's to substantial liability under the CTA"; however, the language quoted by Relator has nothing to do with Brink's daily reporting obligations.  Relator's Opp. at 8 (Doc. 128 at 13) (citing Exhibit C at ¶ 13).  Moreover, Relator has not, in fact presented any evidence that would demonstrate that Brink's failed to retain the documentation requested by the RFRBs as described

---

[19] In its Opposition, Relator cites three documents which his counsel claims (without any factual support) were submitted to the RFRBs—a Coin Inventory Report, Coin Detail Report and Customer Inventory Totals.  Relator's Opp. at 33-34 (Doc. 128 at 38-39). Relator lacks *any* proof that *any* of these documents were, in fact, submitted to the RFRBs, much less that any of the information contained therein was false. This is unsurprising given that these documents are internal Brink's documents maintained by Brink's primarily for the purpose of documenting and tracking customer account balances.  In addition, Relator himself acknowledged that the information Brink's provided to the RFRBs was not false.  *See* Brink's MSJ at Ex. B (Relator Depo) at 53:24-54:9, 58:7-59:8, 81:22-82:22 (testifying that he never submitted any false statements to the Cleveland FRB and that face value was the only value of relevance to communicate to the RFRBs).

in the CTAs.  While Relator asserts that Brink's was required to "include an explanation of all transactions involving Bank coin" as part of its daily reports to the RFRBs, his assertions are not supported by the evidence.  Relator's Opp. at 8 (Doc. 128 at 13).

Rather, the CTA executed with the FRB of Cleveland only requires reporting of the RFRB's "close-of-day inventory." Brink's MSJ, Ex. H at Ex. 2 ¶ 10 (Doc. 122-9 at 14).  The CTA executed with the FRB of Chicago similarly requires that Brink's report on the RFRB's "close-of-day inventory." Relator's Opp., Ex. K at 12 ¶ 10 (Doc. 128-2 at 165).  Unlike the Cleveland CTA, the Chicago CTA includes a model inventory reporting form; however, this form, and it accompanying instructions, destroys Relator's argument that explanations or descriptions of individual transactions were required.  Appendix 3 to the Chicago CTA provides specific instructions as to how the transaction section of the inventory report was to be completed: "One employee completes the transaction section of the report by listing the closing balance of the last report; total deposits are added and shipments are subtracted; and a bookkeeping balance is calculated at the end of the business day."  *See* Ex. K at 15 (Doc 128-2 at 168).  Contrary to Relator's assertions, explanations or descriptions of individual transactions were *not* required, nor were they to be provided.  Rather, because the reports were used for reconciliation or balancing purposes, only collective totals were required.

Moreover, Relator's underlying assumption that the transactions with Jackson Metals involved coins owned by the RFRBs is groundless.  In actuality, none of the pennies acquired by Jackson Metals were taken from the RFRBs' accounts.  *See* Brink's MSJ, Ex. A at ¶¶ 8-12 (Doc. 122-1 at 2-3).  Thus, Brink's also had no *reason* to report information concerning its relationship with Jackson Metals (or its relationship with any other customers) to the RFRBs as part of the daily inventory reports, nor was Brink's required to do so under the CTAs.  Most damaging of all

- 29 -

to Relator, however, is his own uncontroverted testimony that the information Brink's provided to the RFRBs was not false.  *See* Brink's MSJ at Ex. B (Relator Depo at 53:24-54:9, 58:7-59:8, 81:22-82:22 (Doc. 122-2 at 8-9, 13) (testifying that he never submitted any false statements to the Cleveland FRB and that face value was the only value of relevance to communicate to the RFRBs).

Here, Relator claims that the daily customer inventory reports submitted by Brink's to the RFRBs were false because the reports omitted transactions with Jackson Metals; however, the CTAs did not require Brink's to report such information.[20]  Rather, the CTAs, by their terms, only requested an accounting of the RFRBs' end of day inventory balance.  There is no requirement to individually list or describe every transaction involving RFRB coin, nor was there any obligation to describe the metallurgical values of the coin.  "There can only be liability under the False Claims Act where the defendant has an obligation to disclose omitted information."  *U.S. ex rel. Berge v. Bd. of Trustees of the Univ. of Ala.*, 104 F.3d 1453, 1461 (4th Cir. 1997).  There was no such obligation here.

### C.    Brink's Did Not Knowingly Submit Any False Records Or Statements To The RFRBs

As set forth above, Relator has failed, at the outset, to prove that Brink's made or used any false record or statement, but even if Relator did have such proof (and he does not, as Brink's made no false statements), Relator lacks any evidence that Brink's *knowingly* submitted

---

[20] This is not a situation where Brink's omitted information it would normally have included in a regular log to avoid an obligation to the RFRBs.  Unlike the defendant in *Pickens v. Kanawha River Towing*, 916 F. Supp. 702 (S.D. Ohio 1996), there is no evidence here that Brink's normally included a list or detailed description of transactions as part of its daily reporting to the RFRBs but later decided to omit certain information from its daily reporting so as to defraud the RFRBs.

false records or statements to the RFRBs.  Under the FCA, it is not enough merely to show a false statement or record—Section 3719(a)(7) requires proof of a *knowing* violation.

The knowledge requirement set forth in the FCA is strictly enforced to ensure that "ordinary breaches of contract are not converted into FCA liability."  *U.S. ex rel Harper v. Muskingum Watershed Conservancy Dist.*, 842 F.3d 430, 437 (6th Cir. 2016) (*quoting U.S. v. Sci. Application Int'l Corp.*, 626 F.3d 1257, 1271 (D.C. Cir. 2010)).  To establish the necessary element of knowledge, Relator must "'prove that the defendant knows…that he violated an…obligation,' not simply that he mistakenly interpreted a legal obligation."  *Id.*

Here, Relator claims that Brink's omitted certain information from reports provided to the RFRBs; however, as detailed above, the CTAs did not require Brink's to individually list or describe every transaction involving RFRB coin, nor was there any obligation to describe the metallurgical values of the coin.  As both parties to the Cleveland CTA acknowledge, "[s]o long as Brink's accurately reports the face value of FRBCL coins in its inventory in any daily report to the FRBCL that sets forth the amount of inventory on hand, then the vendor's daily inventory report is accurate.  This is true even if the metallic value of any coin in inventory exceeds the coin's face value."  *See* Brink's MSJ, Ex. H (FRB Aff.) at ¶ 19 (Doc. 122-9 at 4).  Relator himself admits that Brink's always accurately reported to the RFRBs the face value of the coin.  *See* Brink's MSJ at Ex. B (Relator Depo) at 58:13-21.

Given the nature and purpose of the inventory reports to the RFRBs and the fact that the transactions with Jackson Metals did not involve RFRB coin or the RFRBs' coin accounts, Brink's had no reason to believe that it should have reported specific information about

transactions or its relationship with Jackson Metals as part of its daily reporting to the RFRBs.[21] As such, Relator cannot demonstrate that Brink's acted with the requisite knowledge required under the Act.

### D. Brink's Did Not Have A Present Obligation To Pay Or Transmit Money Or Property To The Government At The Time Brink's Submitted Inventory Reports To The RFRBs

The purpose of 31 U.S.C. § 3729(a)(7) is to provide a means to recover from a party "who makes a material misrepresentation to avoid paying some obligation owed to the government." *U.S. v. Q Intern. Courier, Inc.*, 131 F.3d 770, 772 (8th Cir. 1997). To prove a violation, Relator must show that the Government was owed "a specific, legal obligation at the time that the alleged false record or statement was made, used, or caused to be made or used." *Am. Textile Mfrs. Instit., Inc.*, 190 F.3d at 735 (quoting *Q Intern. Courier, Inc.*, 131 F.3d at 773). Further, at the time of the alleged statement, the defendant "must have had a present duty to pay money or property" to the Government. *Id*. Potential or future liability is not sufficient. *Id*.

Relator fails on two grounds. First, as previously explained, Relator has not and cannot show that Brink's owed any legal obligation to pay or transmit money or property to *the Government* because the RFRBs are not the Government for purposes of FCA enforcement. Second, Relator cannot show that Brink's had any present duty to "*pay* or *transmit* money or property" to either the Government or the RFRBs at the time Brink's submitted its daily reports to the RFRBs. 31 U.S.C. § 3729(a)(7) (emphasis added). To be sure, Brink's facilities that hold coin for the RFRBs are required, upon request, to pay or return to an RFRB the full value of coin

---

[21] Relator's allegations also fail from a materiality standpoint. Omitted information that a defendant had no obligation to disclose cannot be deemed material because "[t]here can only be liability under the False Claims Act where the defendant has an obligation to disclose omitted information." *U.S. ex rel. Berge v. Bd. of Trustees of the Univ. of Ala.*, 104 F.3d 1453, 1461 (4th Cir. 1997).

in that RFRB's account; however, that obligation does not arise until the RFRB actually requests or demands a return or delivery of coin.

Here, Relator lacks any evidence showing that during the 2006-2008 timeframe, any RFRB demanded or requested the return of any coin or that any coin was physically delivered or returned to any RFRB, much less that Brink's returned coin of lesser value or that a false statement was made in connection with such a delivery. Relator clearly *assumes* that such deliveries occurred, but he does not proffer any evidence supporting this assumption. Undeterred, Relator now attempts to argue that Brink's "owed a contractual duty to pay or transmit money or property to the Government or a Bank-authorized consignee[22] whenever such an authorized transaction occurred." Relator's Opp. at 36 (Doc. 128 at 41). Relator's Opposition painfully contorts the record evidence in an attempt to shoehorn its claim within the FCA.

Importantly, the FCA prohibits the use of a false record or statement in connection with an obligation to *pay* or *transmit* money or property to the Government, it does not create liability in connection with *handling* or *storing* Government property. The purpose of the end of day inventory reports was to report on the balance of coin remaining in the RFRBs' accounts and *stored* by Brink's, these reports were *not* created or presented in connection with any *payment* or *transmission* of money or property to the Government. As a result, Brink's had no "present duty to pay money or property" to either the RFRBs or the Government at the time Brink's submitted

---

[22] Relator's allegations relating to "Bank-authorized consignees" are wholly unsupported by either the record evidence or the language of the Act. Section 3729(a)(7) does not reference consignees, nor does Relator provide any evidence sufficient to prove that Brink's made any deliveries to "Bank-authorized consignees," such as a coin terminal operated by another vendor. Depository banks are not "Bank-authorized consignees" because they *purchase* coin from the RFRBs.

its daily reports to the RFRBs.  Relator therefore cannot meet his burden on this essential element.

## IV.	Brink's Is Entitled To Summary Judgment With Respect To Relator's FCA Conspiracy Claim

Relator offers no evidence or argument in response to Brink's request for summary judgment on Relator's FCA conspiracy claim.  Because there is no genuine issue of material fact on this claim (and due to Relator's lack of response), this Court should enter summary judgment in favor of Brink's with respect to Count III of Relator's Complaint (FCA Conspiracy (31 U.S.C. § 3729(a)(3)).

## CONCLUSION

For the reasons set forth herein and in its Motion and Memorandum in Support of Summary Judgment, Defendant Brink's, Incorporated respectfully requests that this Court enter summary judgment in favor of Brink's on all causes of action set forth in Relator's Complaint and for such other and further relief as this Court deems just and proper under the circumstances.

Respectfully submitted,

/s/ Edward A. Cohen

Nelson E. Genshaft, Esq. (0011023)
Strip, Hoppers, Leithart, McGrath
& Terlecky Co., LPA
575 South Third Street
Columbus, OH 43215-5759
Telephone: (614) 228-6345
Facsimile: (614) 228-6369
E Mail: neg@columbuslawyer.net

*Trial Counsel*

Edward A. Cohen, Esq. (*Admitted Pro Hac Vice*)
J. David Duffy, Esq. *(Admitted Pro Hac Vice)*
Thompson Coburn LLP
55 East Monroe Street
37th Floor
Chicago, IL 60603
Telephone: (312) 580-2225
Facsimile: (312) 782-1825
E Mail: ecohen@thompsoncoburn.com
E Mail: dduffy@thompsoncoburn.com

*Attorneys for Defendant  Brink's, Incorporated*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 10th day of November, 2017 the foregoing pleading was served upon all counsel of record by operation of the court's electronic filing system.

/s/ Edward A. Cohen

- 35 -