# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |  |
| --- | --- | --- |
| **UNITED STATES OF AMERICA,** | : | |
| *ex rel.* **BRIAN D. HOLBROOK,** | : | |
| | : | **Case No. 2:13-CV-873** |
| **Plaintiff,** | : | |
| | : | **JUDGE MARBLEY** |
| **v.** | : | |
| | : | **Magistrate Judge Deavers** |
| **THE BRINK'S COMPANY,** *et al.*, | : | |
| | : | |
| **Defendants.** | : | |

## OPINION & ORDER

This matter is before the Court on the Motion for Summary Judgment of Defendant Brink's Incorporated ("Brink's") (ECF No. 121) and the Motion for Partial Summary Judgment of Plaintiff/Relator Brian D. Holbrook (ECF No. 123). For the reasons that follow, the Court **GRANTS** Brink's Motion and **DENIES** Mr. Holbrook'. This case is hereby **DISMISSED**.

## I.        BACKGROUND

### A.        Factual Background

Mr. Holbrook filed this *qui tam* action, alleging violations of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729, against his former employer, Defendant Brink's Incorporated. (ECF No. 1). Brink's is an armored carrier company which provides a host of coin-related services to its clients—which include both private banks and Regional Federal Reserve Banks ("RFRBs")—including storing, transporting, sorting, and wrapping coins. (ECF No. 122-1 at 1).

### 1.        The Coin Terminal Agreement

Brink's, like many armored carriers, entered into agreements with certain RFRBs called "Coin Terminal Agreements" ("CTAs") in which Brink's agreed to transport and store a certain quantity of coin from the RFRB without charge. (*Id.* at 4-5). This was a mutually-beneficial

arrangement: Brink's and other armored carriers provide these services gratis to the RFRBs "in exchange for access at the armored carrier terminals to Reserve Bank coin inventories, which significantly reduced the transportation expenses incurred by the armored carriers in obtaining the coin from Reserve Bank locations."[1]

Brink's had a CTA with the Federal Reserve Bank of Cleveland (hereafter, "RFRB"), which acknowledged the mutual desire of both parties for "Brink's to maintain an inventory of Bank-owned coin in a vault or similarly secure storage compartment or area at its facility. . . ." (ECF No. 26-4).

Brink's agreed to "handle bank-owned coin only for the purpose of, and in accordance with the requirements set forth in this agreement," and acknowledged that "title to Bank-owned coin shall at all times remain with the Bank and Brink's shall have no right, title or interest therein." (*Id.* at ¶ 1). The agreement also strictly limited the movement of Bank-owned coin in Brink's care. The CTA acknowledges that there may be situations in which it would be convenient for Brink's to deliver coin to or receive coin from a competing armored carrier or to a non-customer bank, but it is permitted only with the mutual consent of the Bank, and if Brink's reports such transfers the same day to the Bank. (*Id.* at ¶ 2(c)). Further, the only time in which the CTA permits Brink's to "remove bags of coin from the Bank's designated storage area" is for the purpose of "opening the bags and wrapping the coin for pending delivery to a Mutual Customer…" (*Id.* at ¶ 9).

---

[1] Testimony before the Subcommittee on Domestic Monetary Policy and Technology, Committee on Financial Services, U.S. House of Representatives, Washington, D.C., https://www.federalreserve.gov/newsevents/testimony/roseman20100720a.htm.

Brink's receives coin from the RFRB in penny, nickel, dime, quarter, half-dollar and dollar denominations, but the CTA only requires Brink's to weigh incoming bags of Bank-owned coin in the dime, quarter, half-dollar and dollar denominations and report to the Bank if the bags of coin are not within "Weight Tolerances set forth on Appendix E." (*Id.* at ¶ 3). According to the July 20, 2010, testimony of the Director, Division of Reserve Bank Operations and Payment Systems, "[t]he Reserve Banks stopped routinely weighing penny and nickel deposits in 2003 after determining that the costs exceeded the benefits of doing so. Instead the Reserve Banks give depository institutions credit on deposits of coin on a 'said to contain' basis." Upon receipt, the Bank-owned coin accepted for the "Bank's inventory shall be stored at the Facility in a vault or similarly secure compartment or area." (ECF No. 26-4 at ¶ 6).

The CTA outlines procedures for ensuring the RFRB is apprised of the location and amount of bank-owned coin stored at Brink's facilities at all times. For example, Brink's is tasked with retaining "documentation to show in reasonable detail at any given point in time accountability for Bank-owned coin," notifying the RFRB of the "dollar value and denomination of coin ordered for shipping to Mutual Customers," and sending the RFRB daily "Customer Inventory Reports…of its close-of-the-day inventory." (*Id.* at ¶¶ 6, 10, 13). Further, the RFRB can conduct periodic, unannounced inspections "for the purpose of inspecting the Bank's inventory and verifying that Brink's is receiving, counting, weighing, storing, handling, disbursing, shipping and/or transferring Bank-owned coin in accordance with the requirements of [the] Agreement." (*Id.* at ¶ 14). The CTA further provides for the exchange of receipts as Bank-owned coin is transferred between both entities:

> Brink's liability and responsibility hereunder shall attach and commence when a shipment of Bank-owned coin is received into its possession upon Brink's giving a receipt therefore and shall continue until the property has been delivered to and receipted by the Bank or any other authorized consignee.

*Id.* at ¶ 13.

Neither party disputes that although Brink's maintained electronic records as to the coins in its inventory, the physical coins were commingled and not segregated by customer. (ECF Nos. 122 at 3; 128 at 7-8). Brink's indicated that coin stored at its terminals was "commingled, [and] regarded as general stock. . . . [P]hysical coins held by Brink's were not segregated by customer" and Brink's had no knowledge of the origin of the coins once they were deposited in the terminal. (ECF No. 122-1 at 4). Furthermore, neither party disputes that the RFRBs were aware of and consented to the commingling of coin. Indeed, the Vice President of the RFRB gave deposition testimony indicating that the RFRB "did not interpret or intend that the CTA (Exhibit 2) in effect between 2006-2009 be interpreted as requiring the [RFRB]'s coin to be held, stored or returned (1) based upon any intrinsic value that some coins may have had or (2) based upon any concern with metallurgical value. It would be factually incorrect to interpret the CTA as suggesting that coins are not to be treated as legal tender and/or not to be exchanged at face value; rather, coins under the CTA are to be treated in a fungible manner as legal tender." (ECF No. 122-9).

## 2. The Penny-Swapping Allegations

Brink's also provides coin services to customers such as Coinstar, an entity that operates kiosks at which individuals can exchange loose change for cash. (ECF No. 122-1 at 2). Coinstar's business model involves monetizing a large quantity of pennies, which in turn, created storage problems for Brink's at its coin terminals. (*Id.*). In 2006, another corporation—Jackson Metals— approached Brink's with a business proposition: it offered to purchase Coinstar's pennies through Brink's as an intermediary, sort though the pennies, cull out pennies that were minted prior to 1982 (which are of high metallurgical value due to their high copper content) and replace them with

pennies minted after 1982 (which are mostly made of lower-value zinc). (*Id.*). Jackson Metals and Coinstar ultimately contracted with each other and typically operated in the following manner: "(1) Jackson Metals would identify a Brink's coin terminal with large amounts of Coinstar pennies in inventory; (2) Jackson Metals would contact Coinstar to arrange a purchase of the coins; (3) Jackson Metals would wire payment to Coinstar for a shipment of pennies (usually a tractor-trailer load or $66,000 worth of pennies); (4) Brink's personnel typically would set aside pennies from Coinstar shipments without depositing them into Coinstar's bank account; (5) Jackson Metals would pick up these pennies from the Brink's terminal identified by Coinstar and take them back to the Jackson Metals facility; (6) Jackson Metals would run the pennies through its sorting machines to cull out the older copper pennies from the newer pennies made primarily of zinc; and finally, (7) Jackson Metals would deliver the zinc pennies it had amassed (but did not want or need) to a Brink's coin terminal for deposit into Jackson Metals' bank account at Huntington Bank." (ECF No. 122-1 at ¶ 12.). Some subset of Jackson Metals penny acquisitions did not follow this procedure. That subset involved even exchanges of zinc pennies for circulated pennies from the vaults. (ECF No. 122 at 5-6). It is undisputed that the RFRB coin accounted for between 10 and 42 percent of the total penny inventory held by Brink's at its terminals. (ECF No. 123-2 at 103). It is therefore possible that the swaps sometimes involved coin originally deposited by the RFRB. There is no definitive evidence in the record, however, to prove that the swaps involved or impacted any RFRB accounts.

### 3. Alleged Harm to the Government

On December 14, 2006, the United States Mint announced the enactment of new regulations prohibiting the melting and limiting the exportations of pennies and nickels with the goal of preventing a shortage of small change in circulation. *See* 31 C.F.R. §§ 82, et seq. The

rules became final on October 29, 2007 and extend through 2014.  The Secretary of the Treasury

propounded this regulation after determining that

> to protect the coinage of the United States, it is necessary to generally prohibit the
> exportation, melting, or treatment of 5-cent and one-cent coins minted and issued
> by the United States. The Secretary has made this determination because the values
> of the metal contents of 5-cent and one-cent coins are in excess of their respective
> face values, raising the likelihood that these coins will be the subject of recycling
> and speculation. The prohibitions contained in this final rule apply only to 5-cent
> and one-cent coins. It is anticipated that this regulation will be a temporary measure
> that will be rescinded once actions are taken, or conditions change, to abate
> concerns that sufficient quantities of 5-cent and one-cent coins will remain in
> circulation to meet the needs of the United States.

Prohibition on the Exportation, Melting, or Treatment of 5-Cent and One-Cent Coins, 72 FR
18880-02.

Holbrook alleges that Defendants' alleged penny-swapping scheme not only costs

taxpayers down the line as the U.S. mint must replace these coins, but also deprives the

Government of the copper in the pennies if it should choose to recycle the copper pennies in the

future.

### B.        Procedural Background

On August 16, 2011, Mr. Holbrook filed this *qui tam* action in the United States District

Court for the District of New Jersey against Defendants Brink's Company, Brink's Incorporated,

Jackson Metals, LLC, and Walter Luhrman.  (ECF No. 1). On September 6, 2012, the United States

declined to intervene in this action. (ECF No. 7).   In 2013, the District of New Jersey granted

Defendants' motion for change of venue, and the case was transferred to this Court.  (ECF No.

43).

Defendants sought to dismiss the claims on the grounds that Plaintiff failed to state a claim

for relief under the FCA, and failed to meet the particularity pleading requirements under Federal

Rules of Civil Procedure 8(a) and 9(b).  In January 2015, this Court issued an Order granting in

part and denying in part the motion. (ECF No. 74). First, the Court noted that on May 20, 2007, Congress passed the Fraud Enforcement and Recovery Act ("FERA"), which made amendments to the FCA. (*Id.* at 12). It determined that the Court "will apply the pre-FERA version of the FCA to conduct alleged in the complaint prior to May 20, 2009, and the post-FERA version of the FCA to conduct alleged after May, 2009. Although Plaintiff's Complaint alleges violations of the post-FERA version of the FCA for all alleged conduct from 2006 through the present, this Court will construe the causes of action under pre-FERA numbering and text when necessary." (*Id.* at 15-16).

The Court then denied the motion to dismiss as to Brink's, permitting all claims to proceed against the company except for the claim under the pre-FERA version of the FCA at 31 U.S.C. §3729(a)(3) for any alleged Defendant conduct prior to May 20, 2009 (*Id.* at 43). It granted the motion to dismiss as to the claims against Brink's Incorporated. (*Id.*). Later the parties agreed jointly to dismiss Defendants Jackson Metals and Walter Luhrman. (ECF No. 111).

The following claims remain against Defendant Brink's: Count I, which alleges a violation of pre-FERA 31 U.S.C. § 3729(a)(4) and post-FERA 31. § 3729(a)(1)(D) (providing that a person violates the FCA when he "has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property"), Count II, which alleges a violation of pre-FERA 31 U.S.C. § 3729(a)(7) and post-FERA 31 U.S.C. § (a)(1)(G) (providing that a person violates the FCA when he "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government") and Count III, which alleges only a violation of post-FERA 31 U.S.C. § (a)(1)(C)

(providing that a person violates the FCA when he conspires to violate the aforementioned provisions of the FCA) for post-May 20, 2009 alleged conduct.[2]

## II.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." In evaluating such a motion, the evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in the non-moving party's favor. *United States Sec. & Exch. Comm'n v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013) (citing *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006) ). This Court then asks "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 251-52 (1986) ). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

## III.     ANALYSIS

Brink's Motion for Summary Judgment seeks dismissal of all three Counts.  (ECF No. 122).  It contends that Brink's could not have violated the CTA because the RFRB "unequivocally stated that it only cares about the face value of its coins" as opposed to the metallurgical value of the coins.  (*Id.* 1-2).  It also argues that it could not have violated the False Claims Act because

---

[2]      At oral argument, Brink's conveyed—and Mr. Holbrook did not refute—that the only remaining claims concerned post-FERA conduct.  Nevertheless, the Court addresses the pre-FERA claims in this Order for the sake of completeness.

none of the statements Brink's made to the RFRB was false, and because, in any event, the RFRB is not a governmental entity. (*Id.*).

Mr. Holbrook's Motion for Partial Summary Judgment, by contrast, begins with the proposition that the Court, in its January 15, 2015, Order Denying Brink's Motion to Dismiss, articulated the "law of the case" and made the following findings: first, that Brink's returned to the Cleveland Regional Federal Reserve Bank pennies with less metallurgical value than those entrusted to it, second, that the penny swapping scheme violated the False Claims Act, and third, that Brink's failure to disclose the transfer of the pennies to Jackson Metals meant that Customer Inventory Reports and other documents were false records within the meaning of 18 U.S.C. § 3729(a)(7). (ECF No. 123 at 15). Thus, in Mr. Holbrook's view, liability has been established—the only remaining question is as to the amount of penalty assessed.[3] (*Id.* at 4).

### A.    Mr. Holbrook's Motion for Summary Judgment

The Court begins with Mr. Holbrook's Motion for Summary Judgment, which asks a fundamental question: did this Court, in its January 15, 2015, Order Denying Brink's Motion to Dismiss, make factual findings that bind the Court at the summary judgment stage? Mr. Holbrook argues that it did, suggesting that "[t]his Court already held that Defendant enacted this scheme in violation of the CTAs and deprived the Government of valuable resources. Defendant cannot dispute the law of the case, wherein this Court found that 'Brink's returned to the [R]FRB pennies with less intrinsic value than entrusted to it. Further, Brink's profited from trading pennies with higher intrinsic value, to which [R]FRB had title and exclusive right, as the CTA makes clear.'" (ECF No. 123 at 15).

---

[3]    Mr. Holbrook acknowledges that there remains a genuine issue of material fact as to compensatory damages. (ECF No. 123 at 4 fn. 3).

There are several fatal flaws to this contention, chief of which is that Mr. Holbrook misrepresents the Court's January 15, 2015, Order on the Motion to Dismiss. That Order makes clear that a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure is "a test of the plaintiff's cause of action as stated in the complaint, not a challenge to the plaintiff's factual allegations." (ECF No. 74 at 9 (quoting *Golden v. City of Columbus*, 404 F.3d 950, 958-59 (6th Cir. 2005)). In making its conclusions, the Court noted repeatedly that it tested Mr. Holbrook's claims not for veracity, but for compliance with the pleading requirements in the Federal Rules of Civil Procedure. (*Id.* at 31, 38-39, 40-41). Thus, to rely, as Mr. Holbrook does, on the recitation of the facts in the January 15, 2015 Order *as pled in the Complaint* is to abdicate his burden at this stage to cite to facts *as adduced through discovery*. The citations to the record contained in Mr. Holbrook's Motion for Partial Summary Judgment are scant and, where they exist, immaterial or cursory. (*See generally* ECF No. 123). Because "a party moving for summary judgment *always* bears the burden of demonstrating the absence of a genuine issue as to a material fact," Mr. Holbrook's Motion is defective as a matter of law. *Hanson v. Madison Cty. Det. Ctr.*, No. 17-5209, 2018 WL 2324252, at *11 (6th Cir. May 22, 2018) (emphasis in original) (quoting *Carver v. Bunch*, 946 F.2d 451, 454 (6th Cir. 1991).

Mr. Holbrook urges that the Court is bound by the "law-of-the-case doctrine," which "precludes reconsideration of issues decided at an earlier stage of the case." *McKenzie v. BellSouth Telecommunications, Inc.*, 219 F.3d 508, 512–13 (6th Cir. 2000). It bears note, as a preliminary matter, that this Court is not reconsidering the same issue—that is, whether the Complaint stated a claim upon which relief could be granted (Fed. R. Civ. P. 12(b)(6))—but instead now considers whether, after discovery, there exists a genuine issue of material fact (Fed. R. Civ. P. 56(a)). Even if this were not so, however, the law-of-the-case doctrine is inapposite:

Sixth Circuit precedent establishes that the law-of-the-case doctrine is confined to circumstances in which the district court is evaluating issues already decided by an *appellate* court, and does not bind district courts in reevaluating its own determinations. *McKenzie*, 219 F. 3d at 513 (citing *Jones v. Lewis*, 957 F.2d 260, 262 (6th Cir.1992)); *cf. William G. Wilcox, D.O., P.C. Emps. Defined Ben. Pension Tr. v. United States*, 888 F.2d 1111, 1114 (6th Cir. 1989) ("Because of the lesser burden of proof required to support a motion for preliminary injunction as contrasted with a motion for summary judgment, a trial court's disposition of the substantive issues joined on a motion for extraordinary relief is not dispositive of those substantive issues on the merits.").

The Court therefore **DENIES** Mr. Holbrook's Motion for Partial Summary Judgment.

### B.       The Brink's Motion for Summary Judgment

The Court turns next to Brink's Motion for Summary Judgment. (ECF No. 122).   Brink's argues that:  (1) there was no fraud because Brink's provided the full face value of all pennies held for the RFRBs; (2) it did not submit any false reports to the Government; and (3) in any event, the conspiracy claim must fail because there is no evidence of post-FERA conduct.  It also makes a broader, statutory argument: the FCA does not apply because RFRBs are not "the Government."

### 1.       Application of the FCA to RFRBs

The role of the FCA is to combat "fraud against the *Government*." *Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662, 669 (2008) (emphasis in original) (quoting *Rainwater v. United States,* 356 U.S. 590, 592 (1958)).  It does not reach private actors: "[r]ecognizing a cause of action under the FCA for fraud directed at private entities would threaten to transform the FCA into an all-purpose antifraud statute." *Id.* at 672.

Consequently, an essential element of FCA liability is that the fraud be directed at a governmental entity.  To survive a motion for summary judgment, a Relator seeking damages for

a violation of the False Claims Act under 31 U.S.C. § 3729(a)(4) must present evidence that the defendant "has possession, custody, or control of property or money used, or to be used, by the Government and, intending to defraud *the Government*…delivers, or causes to be delivered, less property than the amount for which the person receives a certificate or receipt." 31 U.S.C. § 3729(a)(4) (emphasis added). Similarly, to survive entry of summary judgment on a claim under 31 U.S.C. § 3729(a)(7), a Relator must demonstrate that the defendant knowingly made or used "a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to *the Government*." 31 U.S.C. § 3729(a)(7) (emphasis added). With respect to FCA conspiracy, the Relator must show that the defendant "conspire[d] to defraud *the Government* by getting a false or fraudulent claim allowed or paid." 31 U.S.C. § 3729(a)(3) (emphasis added). Brink's argues that for the purposes of the FCA, RFRBs are not "the Government" and that Mr. Holbrook's claims must therefore be dismissed.

The Court begins its analysis with a word on the structure of the Federal Reserve: under the Federal Reserve Act, the Board of Governors of the Federal Reserve is comprised of seven members, who are appointed by the President with the advice and consent of the Senate. 12 U.S.C. § 241. By contrast, the RFRBs are "private corporations whose stock is owned by the member commercial banks within their districts." *Comm. for Monetary Reform v. Bd. of Governors of Fed. Reserve Sys.*, 766 F.2d 538, 540 (D.C. Cir. 1985) (citing 12 U.S.C. § 321); *see also Scott v. Fed. Reserve Bank of Kansas City*, 406 F.3d 532, 535-36 (8th Cir. 2005) ("[E]ach Federal Reserve Bank is owned by the commercial banks within its district. Accordingly, although the government may have a substantial interest in the operation of the Federal Reserve Banks, it does not have a proprietary interest in them."); *Lewis v. United States*, 680 F.2d 1239, 1241 (9th Cir. 1982) ("[t]he [Regional] Federal Reserve Banks, though heavily regulated, are locally controlled by their

member banks. Unlike typical federal agencies, each bank is empowered to hire and fire employees at will. Bank employees do not participate in the Civil Service Retirement System. They are covered by worker's compensation insurance, purchased by the Bank, rather than the Federal Employees Compensation Act. Employees traveling on Bank business are not subject to federal travel regulations and do not receive government employee discounts on lodging and services.").

It appears that only two courts have grappled with the specific question whether RFRBs are "the Government" for the purposes of the False Claims Act. First, in *United States ex rel. Kraus v. Wells Fargo & Company*,[4] the United States District Court for the Eastern District of New York reasoned that in creating the dual structure with the Board of Governors of the Federal Reserve System overseeing the RFRBs, Congress intended the RFRBs to remain private, non-governmental entities:

> "Congress divided the powers of the Federal Reserve System between the Board, which is a federal agency, and the [Federal Reserve Banks], which were established as regional banks.... The Federal Reserve [System] is structured to empower local institutions to lend, while permitting federal oversight." *Fox News Network, LLC v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F.3d 158, 161 (2d Cir. 2010) (internal citation and quotation omitted); *see Lewis v. United States*, 680 F.2d 1239, 1241 (9th Cir. 1982) ("It is evident from the legislative history of the Federal Reserve Act that Congress did not intend to give the federal government direction over the daily operation of the Reserve Banks.").

---

[4]     An appeal of this decision is pending in the Second Circuit, *United States v. Wells Fargo & Company*, 18-1746.   Additionally, in dicta, the United States District Court for the Southern District of New York disagreed with the court's conclusion in *Kraus*, noting that "[a]lthough, as a legal matter the Federal Reserve Banks are federal instrumentalities, not federal agencies, they are properly conceived of as part of the federal Government under the FCA. Although their funding is not appropriated by Congress, they are themselves the federal Government's money-issuing authority, and accordingly are funded by the sovereign public as much as any other federal agency." *United States ex rel. Grubea v. Rosicki, Rosicki & Assocs., P.C.*, No. 12-CV-7199 (JSR), 2018 WL 3091255, at *17 fn. 20 (S.D.N.Y. June 23, 2018).

*United States ex rel. Kraus v. Wells Fargo & Co.*, No. 11 CIV. 5457 (BMC), 2018 WL 2172662, at *3 (E.D.N.Y. May 10, 2018).  The court supported this conclusion with legislative history: "In introducing the bill that became the FRA, Congressman Glass—one of its drafters—stated: 'The fundamental idea of the bill ... is the creation of a new class of banks to be known as Federal reserve banks ... to be owned and operated by the stockholding banks of the [Federal Reserve] district[s].... While subject to limited control by the Federal reserve board, the regional bank is given an independent status....'" *Id.* at *4 (quoting 50 Cong. Rec. H.4643 (Sept. 13, 1913)); *see also id.* (quoting H.R. Rep. No. 69, 63 Cong. 1st Sess. 18-19 (1913) ("It is proposed that the Government shall retain sufficient power over the reserve banks to enable it to exercise a direct authority when necessary to do so, but that it shall in no way attempt to carry on through its own mechanism the routine operations and banking which require detailed knowledge of local and individual credit and which determine the actual use of the funds of the community in any given instance. In other words, the reserve-bank plan retains to the Government power over the exercise of the broader banking functions, while it leaves to individuals and privately owned institutions the actual direction of routine.")).

The *Kraus* court also noted that two Supreme Court cases – *Rainwater v. United States*, 356 U.S. 590 (1958) and *United States v. McNich*, 356 U.S. 595 (1958) – "suggest a non-exclusive list of factors to consider in deciding if an entity counts as the Government under the FCA." *Id.* at *3  Those factors include: (1) whether the statutory language places the entity within the Government; (2) whether the source of the entity's original capital is governmental and whether the Government has a continuing financial involvement with the entity; (3) the manner in which the entity's leadership is chosen; and (4) the Government's interest and involvement in the purpose and function of the entity.  *Id.* The Court then conducted a thorough analysis of each of the four

factors, and made the following conclusions: (1) the enabling statute makes clear that RFRBs are privately owned bodies; (2) RFRBs are private corporations made up of private stockholders and do not receive government appropriations to operate; (3) although the Board of Governors appoints three of the nine-member board of directors of each RFRB, the controlling majority is elected by member banks, and in any event RFRB employees are not Government employees; and (4) RFRBs have no lawmaking authority and operate largely independently of the Board of Directors. *Id.* at *3-*7. It concluded, therefore, that RFRBs "are not the Government or its agents for purposes of the FCA" and that the Relator's case must be dismissed. *Id.* at *9.

*United States ex rel. Pasto v. Megagbyte Business Systems*, an unpublished memorandum opinion out of the United States District Court for the Eastern District of Virginia, is the only other case to have addressed this question, and it comes out the other way. For the *Pasto* court, the dispositive factor was that "the Federal Reserve Bank's activities are subject to the general supervision of the Federal Reserve Board and its excess capital is turned over to the Treasury." 2009 U.S. Dist. LEXIS 23099 (citing Title 12 U.S.C. §§ 248(a), 290; 33 Fed. Res. Bull. 518 (1947)). It concluded that "[s]ince the Federal Reserve Banks return all earnings in excess of operating and other expenses to the U.S. Treasury, fraudulent claims reduce the excess earnings, causing the Treasury to forfeit money to which it would otherwise be entitled, and triggering liability under the False Claims Act." (*Id.*).

This Court adopts the approach of the *Kraus* court and holds that the Cleveland RFRB is not the Government for the purpose of FCA liability. The *Kraus* approach is consonant with the guidance of the Supreme Court in *Rainwater* and *McNich*, which directs courts to examine the enabling statute, and cautions against placing undue weight on any one factor. At oral argument, Relator conceded that the enabling statute makes clear that RFRBs are privately-owned entities,

15

that they are comprised of private stockholders and do not receive government appropriations to operate, that RFRB employees are not government employees, and that the RFRBs have no law-making authority. (ECF No. 145 at 18-20). On the other hand, as both Relator and the *Pasto* court noted, there exists a financial relationship between RFRBs and the Government. (*Id.*). This countervailing factor is insufficient, and if the Court were to find it dispositive, it would threaten to expand the FCA into an all-purpose fraud statute: virtually all fraud results in negative economic consequences that could have an impact on the Treasury's coffers.

Finally, to the extent that reasonable minds could differ on the question whether RFRBs are subject to the FCA, "the tie must go to the defendant" because "[t]he rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *United States v. Santos*, 553 U.S. 507, 513–14 (2008) (citing *United States v. Gradwell*, 243 U.S. 476, 485 (1917); *McBoyle v. United States*, 283 U.S. 25, 27 (1931); *United States v. Bass*, 404 U.S. 336, 347–349 (1971)). This exegetical approach "not only vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed. It also places the weight of inertia upon the party that can best induce Congress to speak more clearly and keeps courts from making criminal law in Congress's stead." *Id.* at 514. To adopt a modest view as to the ambit of the statutory phrase "the Government" would always favor Defendants, and therefore is favored by this Court.

On this basis alone, the Court would grant the Brink's Motion for Summary Judgment. But even if the RFRB were considered "the Government" for the purpose of FCA Liability, as the Court explains below, Mr. Holbrook's claim still must fail.

**2.    Count I: Pre-FERA 31 U.S.C. §3729(a)(4) and post-FERA 31 U.S.C. §3729(a)(1)(D)**

a. Does the fact that Brink's provided the face value of all currency held vitiate liability?

Brink's next argument focuses on 31 U.S.C. § 3729(a)(4) which, stated again, imposes liability on an individual who "has possession, custody, or control of property or money used, or to be used, by the Government and, intending to defraud the Government…delivers, or causes to be delivered, *less property* than the amount for which the person receives a certificate or receipt." The post-FERA statute similarly imposes liability "has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, *less than all of that money or property*." 31 U.S.C. §3729(a)(1)(D). Put differently, the essential elements of a cause of action under either version of the statute include: (1) possession, custody, or control of property or money used, or to be used, by the government; (2) delivery of less property than the amount for which the person receives a certificate or receipt; and (3) with intent to defraud or willfully to conceal the property. *See United States v. Dyncorp*, 136 F.3d 676, 681 (10th Cir. 1998).

Brink's argues that the Government could not have received "less property," as a matter of law, because it is undisputed that the RFRBs received full face value on any pennies deposited with the Brink's. Mr. Holbrook rejoins that Brink's uses the wrong metric: because the Brink's returned pennies of less *metallurgical* value, the RFRB received "less property."

Mr. Holbrook believes this issue was decided in the Court's Order on the Motion to Dismiss. (ECF No. 22). Not so. In that Order, this Court held that "[w]hen read as a whole, the terms of the CTA presuppose that the same coins entrusted to the RFRB would be returned to it or a consignee. Such a presupposition obviated any need for the CTA to have distinguished between pennies with a lesser or higher copper content, as under no circumstances should RFRB's pennies

17

have been sorted based metallurgical content and reconstituted in their metallurgical content in any way." (ECF No. 74 at 19).

Undisputed evidence now in the record, however, demonstrates that the CTA may not have made such a presupposition because it would not have been relevant to the RFRB, which "expected that Brink's would hold coin in a commingled environment and would report, on a daily basis, the face value of the coin held by Brink's for the bank." (ECF No. 122 at 7). The Affidavit of the Vice President of the RFRB notes that the RFRB "did not interpret or intend that the CTA (Exhibit 2) in effect between 2006-2009 be interpreted as requiring the [RFRB]'s coin to be held, stored or returned (1) based upon any intrinsic value that some coins may have had or (2) based upon any concern with metallurgical value. It would be factually incorrect to interpret the CTA as suggesting that coins are not to be treated as legal tender and/or not to be exchanged at face value; rather, coins under the CTA are to be treated in a fungible manner as legal tender." (ECF No. 122, Exh. H). Additionally, the United States Mint recently promulgated a proposed rulemaking setting the redemption rate for zinc pennies at $1.8100 per pound versus a redemption rate of $1.4585 per pound of copper coins. 82 Fed. Reg. at 43730. That rate aligns with the number of pennies per pound rather than the metallurgical value of pennies per pound. (ECF No. 126). Copper weighs a bit more than zinc, so a pound of zinc coins is slightly less valuable than a pound of copper coins. (*See id.*). (If the United States Mint cared about the metallurgical value of the coins, we would expect the delta between the redemption rates to be higher.) In other words: the RFRB deposited a certain *number* of pennies, and expected to receive that number back from Brink's when needed. Those expectations were fulfilled. That, upon learning of the penny swaps, the RFRB did not feel aggrieved, informs this Court's analysis as to what the CTA requires.

The FCA claims also suffer from a more fundamental evidentiary lacuna: there is no evidence that the pennies received from Jackson Metals were from the RFRB accounts. In some cases, the pennies came directly from non-commingled Coinstar accounts or from other depositor banks. Ex. B (Relator Depo.) at 96:16-97:6, 107:21- 108:25; Deposition of Jackson Metals ("Jackson Metals Depo."), attached as Exhibit E, at 24:20-25:19, 38:25-39:2, 55:2-8, 65:11-17, 155:12-157:15. In other cases, the pennies may have come from fungible, commingled currency. Ex. B (Relator Depo.) at 37:15-38:18 ("Q….[O]n any given day, Bank of America couldn't come in your facility and say, 'We want those three quarters. I think they were ours.' A. Correct…. Q. They may have the right to 75 cents worth of quarters under your books, and you would give them 75 cents worth of quarters, but they couldn't tell you which quarters were theirs versus someone else's, correct? A. Correct. Yes."). Without more, nothing connects the penny swap scheme to the RFRB deposits.

The Court therefore **GRANTS** Brink's Motion for Summary Judgment as to Count I.

**3.    Count II: Pre-FERA 31 U.S.C. §3729(a)(7) and post-FERA 31 U.S.C. §3729(a)(1)(G)**

Prior to FERA, 31 U.S.C. §3729(a)(7) stated that a person violates the FCA who "knowingly makes, uses, or causes to be made or used, a *false record or statement* to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." (emphasis added). The post-May 20, 2009 version of 31 U.S.C. §3729(a)(7), renumbered to 31 U.S.C. §3729(a)(1)(G), similarly states that a person violates the FCA who "knowingly makes, uses, or causes to be made or used, *a false record or statement* material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." (emphasis added).

Brink's argues that Count II should be dismissed because it did not submit any false records or statements to the RFRBs. (ECF No. 122 at 25-27). In particular, Brink's argues that: (1) Brink's accurately reported all information required by the CTAs to the RFRBs; and (2) in any event, the Government was not deceived, so the records cannot be false.

Beginning with Brink's first argument: that the reports contained all information required by the CTAs is dispositive because, here, the RFRB did not rely on the reports to contain any information as to the metallurgical value of the coins held. In its Order on the Motion to Dismiss, the Court found compelling *Pickens v. Kanawha River Towing*, 916 F.Supp. 702, 705 (S.D.Ohio 1996), a case in which the court held that "failure to document certain information in a regularly kept log, even one that the defendant is under no obligation to maintain, constitutes a false record or statement." (ECF No. 74 at 33-34 (citing *Pickens*, 916 F.Supp. at 708). But in *Pickens*, the court so held because the Government relied on the relevant logs as part of its regulatory role. Here, although Brink's was required to submit "documentation to show in reasonable detail at any given point in time accountability for Bank-owned coin," notify the RFRB of the "dollar value and denomination of coin ordered for shipping to Mutual Customers," and send the RFRB daily "Customer Inventory Reports…of its close-of-the-day inventory." (CTA, Doc. 26-4 at ¶¶ 6, 10, 13), nothing in the record suggests the government expected disclosure of the metallurgical value of its coins contained in Brink's vaults. And there is no dispute that Brink's accurately reported the face value of the coins that it held for the RFRB: Mr. Holbrook himself testified that he and other Brink's employees accurately reported the face value of the coins to the RFRB. (ECF No. 122-2 at 138 ("Q: . . . Do you still believe today that the daily coin inventory reports that you gave to the Federal Reserve Bank of Cleveland form your branch while you were the branch manager were, in fact, true and accurate reports? A: Based on the balance and face value, yes. That's how

– it was face value. That's what we reported. So it was accurate. Q: That's what you reported, and that's what they asked you to report? A: Yes.).

Brink's argues additionally that the reports cannot be false because the Government was never deceived. In support of this contention, Brink's identifies a number of uncontroverted facts: employees of the RFRBs as well as the United States Mint knew about the Jackson Metals contract (ECF No. 122 at 28), as did the General Counsel of the United States Mint (*id*), as did Members of Congress and their staffs, to whom Brink's actively reached out to explain the partnership (*id.*). Mr. Holbrook does not dispute these facts. Instead, he relies – once again – on the Court's January 15, 2015 Order and erroneously claims that the Court made "findings" as to liability. This is not sufficient to defeat summary judgment.

The Court therefore **GRANTS** Brink's Motion for Summary Judgment as to Count II.

### 4. Count III: Pre-FERA 31 U.S.C. § (a)(1)(C)[5]

Finally, Brink's seeks summary judgment as to Count III, the conspiracy charge. Under the FCA, "there can be no liability for conspiracy where there is no underlying violation of the FCA." *Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 89 (D.D.C. 2014) (citing *United States ex rel. Amin v. George Washington Univ.,* 26 F.Supp.2d 162, 165 (D.D.C.1998) (dismissing a conspiracy action because, among other things, the alleged fraudulent actions of defendants were "entirely lawful" and did not violate the FCA)). Because there is no underlying violation in this case, summary judgment must be granted. But if that were not enough, Mr. Holbrook offers no evidence or argument to rebut Brink's Motion on the conspiracy claim. By failing to address the

---

[5]    The Court dismissed the post-FERA allegations under Count III at the Motion to Dismiss stage. (ECF No. 74 at 39).

merits of the conspiracy claim, Mr. Holbrook has abandoned it entirely. *See Dage v. Time Warner Cable*, 395 F. Supp. 2d 668, 679 (S.D. Ohio 2005) (holding that plaintiff abandons a claim when it fails to address it in responsive briefing to a dispositive motion) (citing *Bradley v. Mary Rutan Hosp. Assoc.,* 322 F.Supp.2d 926, 931 n. 7 (S.D.Ohio 2004); *Kattar v. Three Rivers Area Hosp. Auth.,* 52 F.Supp.2d 789, 798 n. 7 (W.D.Mich.1999); *Jones v. Allercare,* 203 F.R.D. 290, 307 (N.D.Ohio 2001)).

The Court therefore **GRANTS** Brink's Motion for Summary Judgment as to Count III.

## IV.    CONCLUSION

Mr. Holbrook's Motion for Summary Judgment is **DENIED**.  Brink's Motion for Summary Judgment is **GRANTED**.  This case is hereby **DISMISSED**.

**IT IS SO ORDERED.**


    __s/ Algenon L. Marbley_____
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED:  August 20, 2018**